GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A. Shah
Adam T. Berkowitz
*Proposed Counsel for Debtors*
*And Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:

LONG BEACH MEDICAL CENTER, et al.[1]

Chapter 11
Case No. 14-_____ (___)

Debtors.

(Joint Administration Pending)

-----------------------------------------------------------x

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED, SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)

The Motion of Long Beach Medical Center ("**LBMC**") and Long Beach Memorial

Nursing Home, Inc. d/b/a The Komanoff Center for Geriatric and Rehabilitative Medicine

("**Komanoff**," each a "**Debtor**", and collectively sometimes referred to as the "**Debtors**" or the

"**Medical Center**"), for the entry of an interim order (the "**Interim Order**") and a final order

(the "**Final Order,**" and together with the Interim Order, the "**Financing Orders**") and other

related relief, (the "**Motion**"). In support of this Motion, the Debtors respectfully represent as

follows:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: Long Beach Medical Center (5084) and Long Beach Memorial Nursing Home, Inc. d/b/a The Komanoff Center for Geriatric and Rehabilitative Medicine (3422).

## I.    RELIEF REQUESTED

1.    By this Motion, the Debtors seek entry of the Financing Orders, pursuant to Sections 105(a), 361, 362, 363, 364(c) and 364(d) of Title 11, United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-5 of the Local Rules for the United States Bankruptcy Court for the Eastern District of New York (the "**Local Rules**"), granting:

      (a)    authorization under sections 364(c) and 364(d) of the Bankruptcy Code and Rule 4001(c) of the Bankruptcy Rules for the Debtors to obtain secured, superpriority postpetition financing consisting of a multiple-draw term loan in the aggregate amount not to exceed $4.5 million (the "**DIP Financing**"), of which the Debtors are seeking authority to borrow up to $1.8 on an interim basis, all in accordance with that Debtor in Possession Loan and Security Agreement (the "**DIP Loan Agreement**") by and among the Debtors and South Nassau Communities Hospital ("**SNCH**" or "**Lender**"), a copy of which is annexed hereto as Exhibit A;

      (b)    authorization under section 363 of the Bankruptcy Code and Rules 4001(b) and 6004 of the Bankruptcy Rules for the Debtors to use any cash collateral (as defined in section 363(a) of the Bankruptcy Code, "**Cash Collateral**"), and the proceeds from the DIP Financing for general working capital purposes and general corporate purposes relating to the postpetition operations and the costs and expenses associated with these Chapter 11 cases (the "**Chapter 11 Cases**"), including fees of professionals, all in accordance with the terms of the Debtors' proposed budget (the "**Budget**"), a copy of which is annexed hereto as Exhibit B;

      (c)    authorization for the Debtors to grant security interests, liens, and superpriority administrative claims, including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2), and 364(c)(3), and priming liens, solely with respect to the real and personal property assets of the Komanoff (the "**Komanoff Collateral**"), pursuant to section 364(d) of the Bankruptcy Code, and related protections to SNCH to secure all DIP Obligations (as defined below), in accordance with the provisions of the Financing Orders and as set forth in DIP Loan Agreement;

      (d)    authorization for the Debtors to execute and deliver the DIP Loan Agreement, the Promissory Note, and any and all other documents related to or otherwise necessary to evidence or secure (including any and all mortgages and UCC-1 financing statements) the Loan, including, without limitation, the Financing Orders, (collectively, the "**DIP Loan Documents**") and to perform

such other acts as may be necessary or desirable in connection with the DIP Loan Documents and pursuant to the provisions of the Financing Orders;

(e)    the approval of certain stipulations by the Debtors with respect to the Prepetition Term Loan, and Prepetition Debt (each as defined herein), and the liens and security interests arising with respect thereto;

(f)    subject only to and effective upon entry of a Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

(g)    authorization for the Debtors to provide adequate protection to the Pension Benefit Guaranty Corporation ("**PBGC**"), SNCH and all other secured creditors holding a valid prepetition security interest in the Komanoff Collateral (collectively, the "**Komanoff Prepetition Secured Creditors**") pursuant to the terms of the Financing Orders for any diminution in the value of their respective interests in the Prepetition Collateral (as defined below) resulting from, as the case may be, the subordination to the DIP Liens (and the Carve Out, as defined below), the Debtors' use, sale or lease of such Komanoff Collateral and Cash Collateral, and the imposition of the automatic stay (collectively, and solely to the extent of any such diminution in value the "**Diminution in Value**");

(h)    to vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Loan Documents and the Financing Orders; and

(i)    to waive any applicable stay as provided in the Bankruptcy Rules and provide for the immediate effectiveness of the Financing Orders.

2.    As discussed more fully below, prior to superstorm Sandy the Debtors operated the only acute care hospital on the island of Long Beach, a skilled nursing facility and various clinics. In the immediate wake of the storm, the Debtors temporarily ceased all normal operations, providing only emergency care with the assistance of other providers. In the months following the storm, through the extraordinary efforts of the Debtors' key personnel, the skilled nursing facility together with certain clinics reopened. However, the acute care hospital remained closed leaving Long Beach and its surrounding communities without immediate access to certain health care services such as a 911 receiving emergency department. In evaluating its options, the Debtors management determined that the only viable course of action which takes

into account both the Debtors' not-for-profit mission along with its obligations to creditors, many of whom stood by the Debtors in the aftermath of the storm, was a sale of substantially all of its assets to SNCH, who has agreed, subject to receiving the requisite assistance from the Federal Emergency Management Agency ("**FEMA**"), to restore certain health care services to Long Beach and its surrounding communities. In connection with the sale, SNCH agreed to provide the Debtors with the DIP Financing.

3.    Access to the DIP Financing and the use of Cash Collateral is critical to the Debtors ability to fund their postpetition operating requirements in a manner that will permit the continued provision of competent medical care at their skilled nursing facility while preserving and maintaining the value of their assets pending the sale to SNCH. Having adequate financing in place also will provide the Debtors' vendors and suppliers with the comfort of knowing that the Debtors will have the financial ability to fund the ongoing purchase of goods and services and otherwise pay their postpetition obligations as they become due. Of no less import is the fact that absent adequate funding, the Debtors would not have the ability to satisfy the conditions of their sale agreement with SNCH, effectuate an orderly sale of their assets and preserve value for the benefit of their creditors.

4.    In support of the Motion, the Debtors rely upon and fully incorporate by reference the Affidavit of Douglas Melzer, the President and Chief Executive Officer of the Debtors Pursuant to Local Rule 1007-4 and in Support of the First Day Motions (the "**Melzer Affidavit**"), which the Debtors filed concurrently with this herewith.

## II.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This mater is a core proceeding under 28 U.S.C. §157(b). Venue is

4

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for relief

requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules

2002, 4001 and 9014 of the Bankruptcy Rules.

### III.    BACKGROUND

6.      On February 19, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors remain in possession

of their assets and continue to manage their businesses as debtors-in-possession pursuant to

Bankruptcy Code sections 1107 and 1108. No trustee, examiner or committee of creditors has

yet been appointed in these cases and to the best of my knowledge, information and belief there

have been no informal committees formed prior to the filing of these Chapter 11 cases.

7.      On February 18, 2014, an asset purchase agreement (the "**APA**") was executed

between SNCH and the Debtors, providing for the sale of all of the Debtors' real property and

substantially all operating assets and the assumption of certain liabilities by SNCH (the "**Sale

Transaction**"). Among the overriding concerns of the parties when entering into the APA was

to ensure that the Medical Center's not-for-profit mission would continue to be met by SNCH

and that an appropriate level of healthcare under a viable delivery model be restored to the storm

ravaged communities of Long Beach in a manner that is supported by the New York State

Department of Health ("**DOH**"), the community and all affected parties. Simultaneously

herewith, the Debtors have filed a Motion to, *inter alia*, establish bid procedures and approve the

Sale Transaction to SNCH or any other party or entity making a higher and better bid therefore

(the "**Sale Motion**").

8.      During these Chapter 11 Cases, the Debtors intend to: (i) consummate the Sale

Transaction pursuant to section 363 of the Bankruptcy Code; (ii) implement an orderly transition

2722843v.6

of their properties and operations to SNCH or any other successful bidder; and (iii) ultimately confirm a liquidating plan that addresses the claims of creditors.

9.    **LBMC**:  Prior to Sandy, a significant portion of the Debtors' core business focused around LBMC.  LBMC is a not-for-profit 162-bed, community-based hospital which, prior to the storm offered primary, acute, emergency and long-term health care to the residents of Long Beach.  LBMC is located at 455 East Bay Drive, Long Beach, New York 11561.  Founded in 1922, LBMC was a teaching facility for the New York College of Osteopathic Medicine, with residency programs in Physical Medicine and Rehabilitation and Family Medicine.  It also hosted several centers of excellence including Arthritis and Osteoporosis; Diabetes; Wound Care & Hyperbaric; Behavioral Health and Addiction Treatment.

10.    **Long Beach Memorial Nursing Home d/b/a The Komanoff Center for Geriatric and Rehabilitative Medicine**:  Established in 1974, Komanoff is a 200-bed, skilled nursing facility, which was considered hospital based for Medicare purposes due to its affiliation with Long Beach Medical Center.  It provides services for residents requiring long term nursing home care and short term post-acute (sub-acute) care.  Although most of the residents are over 65 years of age, it also serves younger residents.  Residents largely come from communities within the southern portion of Nassau County.  Currently there are 127 residents of Komanoff, of which 118 are long term nursing residents and 9 require only short term care.

11.    **Charitable Mission**:  In furtherance of their charitable mission, the Debtors provided critical healthcare services to large uninsured and indigent populations.  While unable to return to pre-storm levels, the Debtors attempted to continue providing such care post-Sandy to the greatest extent possible.

12.    The Debtors provided free care on a sliding scale basis to patients unable to pay for medical services.  The Debtors do not pursue amounts due for charity care through collection.  Accordingly, any such amounts due to the Debtors are not reported as revenue.  However, the Debtors are entitled to distributions from the New York State Charity Care pools for the provision of such charitable care.  In 2011 and 2012, the Debtors provided over $1.7 million in charitable care.

13.    **Events Leading to Filings**:  As is true with many community hospitals, the Medical Center has been beset by the financial pressures caused by cuts in Medicare and Medicaid funding, declining indigent pool payments, and changing demographics in the communities served by the Debtors.  For a number of years the Debtors experienced a progressive decline in patient volume and discharges and reduction in acuity of the case mix.  Operating revenues have steadily decreased, leading to significant losses in the years preceding these filings.  Cash book balances were frequently negative, and past due vendor payables increased.

14.    Given the Medical Center's historical losses, DOH urged the Debtors to partner or otherwise affiliate with a more financially viable healthcare system.  In the years preceding the filings, the Debtors had, at various times, engaged in active discussions with several regional healthcare providers, including Mount Sinai Hospital, Winthrop Hospital, South Nassau Communities Hospital and North Shore-Long Island Jewish Hospital.  None of those bore fruit as an affiliation was not consistent with the geographical footprint or strategic plan of any of those systems.

15.    On a parallel track, as previously noted, the Debtors undertook a number of initiatives in an attempt to address the Debtors' operating and liquidity concerns.  While some of

7

these initiatives were beginning to show positive results, the Debtors efforts were brought to an abrupt halt in October of 2012 when superstorm Sandy decimated the Medical Center. The storm further exacerbated an already precarious financial situation and left the Debtors in a situation from which they have not been able to recover.

16.    In the months following the storm, the Debtors undertook tremendous efforts to reopen both LBMC and Komanoff. On January 28, 2013, those efforts led to the reopening of Komanoff, allowing 120 nursing home residents to return home and reinstituting more than 200 employees to their jobs. While rebuilding and repair efforts persist, the acute care portion of the hospital remains closed with extensive damage to its boilers, mechanical and electrical distribution systems, fire alarm systems, communications, food services and laundry services. As a result, CMS cancelled LBMC's Medicare provider agreement (the agreement that allowed LBMC to get reimbursed for medical services from the Medicare program), as of February 1, 2014. Accordingly, Komanoff, while still part of the Medicare program pursuant to its own Medicare provider agreement, ceased to be considered a *hospital based* skilled nursing facility. The practical ramification is that Komanoff's reimbursement rates will decline, and Komanoff will receive approximately $15,000 to $16,000 less each month from Medicare.

17.    During the year ended December 31, 2012, the Medical Center had a negative working capital of approximately $7.6 million and experienced an operating loss of approximately $4.8 million with a net asset deficiency of approximately $18.2 million.

18.    **Proposed Repurposing and Marketing Process**: Senior Management took the initial days and weeks after superstorm Sandy to focus on essential emergency measures. FEMA established a command center in Long Beach and the hospital's CEO was charged with

coordinating health services.  Once the initial fallout from Sandy was addressed, the Debtors turned their attention to the long term recovery and viability of the Medical Center.

19.    In December, 2012 with the approval of DOH, the Medical Center engaged a consulting firm to analyze the hospital's pre-storm services and existing community needs in order to make recommendations to restructure services in a more financially feasible model.  In March 2013 the consultant's plan was presented to DOH but the plan was rejected.  An amended proposal was rejected the following month.

20.    In February, 2013 LBMC separately engaged FEMA and construction consultants to facilitate completion of the temporary repairs necessary to reopen two of LBMC's five wings housing vital services including the emergency department.  LBMC also enlisted many of its elected representatives over the course of ensuing months to assist the hospital in obtaining financial support including designation as a Vital Access Provider, Community Development Block Grants or Social Services Block Grants but none of these requests materialized.  LBMC also urged officials to advocate for the reopening of services at LBMC.  DOH concluded that the facility could not be reopened in any capacity without the joinder of a strong provider.

21.    Simultaneously, the Debtors renewed efforts to find a financially viable healthcare system to partner with.  In March, 2013, while rebuilding efforts continued, the Debtors issued a request for proposal ("**RFP**") to five hospital providers that might have sights on the South Shore Long Island market as part of their strategic plans.  Thus RFP's for an affiliation were sent to NYU Medical Center ("**NYU**"), North Shore Long Island Jewish Hospital ("**NS-LIJ**"), New York Presbyterian Healthcare System ("**NYPH**"), the Catholic Health System of Long Island ("**CHS**") and South Nassau Communities Hospital ("**SNCH**").  The RFP's issued in conjunction with management's ongoing discussions with DOH regarding alternative

9

healthcare models at the LBMC site, the potential use of grant dollars to restructure the Medical Center's balance sheet and the use of FEMA and Community Development Block grants to repair and upgrade the physical plant.

22.    No responses were received from NYU, NYPH or NS-LIJ.  CHS expressed initial interest in an affiliation arrangement and several meetings among executive management followed, but CHS ultimately determined not to proceed for geographical reasons.

23.    The only serious interest came from SNCH which neighbors the Long Beach facility.  SNCH also brought financial strength to the equation and was best positioned to assure the continuity of healthcare in the Long Beach area.  In August, 2013, the parties entered into a memorandum of understanding (the "**MOU**") to explore proposed transactions which contemplated the sale of substantially all of the Medical Center's real property and operating assets to SNCH, changes to the healthcare delivery model at the Long Beach site, the restructuring or satisfaction and discharge of LBMC and Komanoff indebtedness, and the provision of financing to fund continued operations and maintenance of the assets until any transaction could be completed.  The MOU was submitted to DOH for its review and ultimately received the Department's strong support.

24.    Recognizing that the damage sustained to the Medical Center's facilities and the changes to the demographics of the Long Beach area did not permit the continuation of a full service, 162 bed acute care hospital, the parties embarked on an analysis of how services could be restructured in a financially sound manner consistent with community needs.  As an initial matter, SNCH sought, and subsequently obtained, certificate of need approval to establish an urgent care center at the LBMC campus and applied for, and subsequently received, a

community block grant to fund its development and operation.  The project is currently in the developmental stage.

25.     On a larger scale, the parties entered into negotiations for SNCH to acquire substantially all of the real property and operating assets of both the LBMC campus and Komanoff.  Those negotiations resulted in the execution of the APA which provides, as is set forth more fully in the Sale Motion, that SNCH will pay appraised value for the real property and operating assets.  It is anticipated that SNCH will continue to operate the Komanoff nursing home.  The parties will continue to pursue FEMA funding to repair and restore the LBMC campus facilities.  What proposed uses the LBMC campus will be put to by SNCH still remains in the developmental stages and depends in some measure on the ability to obtain, and the amount of any FEMA funding, to restore and rebuild the physical plant.

## IV.     PREPETITION SECURED DEBT

### A.     New York State Housing Financing Agency

26.     During 1973, Komanoff entered into an agreement with the State of New York and the New York State Housing Finance Agency in order to finance the construction of a new facility. A total of $6,155,000 was borrowed via the issuance of $5,105,000 of 1974 Series A Bonds and $1,050,000 of 1977 Series A Bonds. Principal and interest payments are made monthly. The average interest rate was 5.9% per annum on the 1974 Series and 7.0% on the 1977 Series. The bonds were scheduled to be redeemed forty years from the date of issuance.

27.     During 1998, Komanoff entered into an agreement with the New York State Housing Finance Agency to refinance its 1974 Series A and 1977 Series A Bonds. The mortgage agreement, with a remaining balance of approximately $3,762,527, was refinanced with an average interest rate of 4.9% per annum. The 1998 Series A Project Revenue Bonds are

scheduled to be redeemed 16 years from the date of refinancing. The mortgage loan payable is collateralized by substantially all assets and future revenues of Komanoff.

28.    Under the terms of the mortgage and the subsequent refinancing, Komanoff is required to make monthly deposits equal to 1/12 of its current annual principal amortization and interest expense into the mortgage repayment escrow fund, which is restricted for the payment of bond interest and principal.

29.    Monthly deposits are also required, under this agreement, into the operating escrow fund. This fund consists of a reserve for equipment replacement and structural repairs and a reserve for contingencies. Komanoff may draw monies out of these reserves with the approval of DOH.

30.    As of the Petition Date, the balance due on the 1998 Series A Project Revenue Bonds is $172,527, and the balance of the mortgage repayment and operating escrow sum is $41,118 and $345,307, respectively.

**B.    Dormitory Authority of the State of New York ("DASNY").**

31.    Pursuant to a Reimbursement Agreement dated as of November 1, 2007, DASNY made a non-interest-bearing loan to LBMC in the initial principal amount of $2,000,000 (the "**DASNY Loan**") for the purpose of funding the restructuring of its operations to improve operating performance, consistent with the recommendations of the Commission of Health Care Facilities in the 21st Century. As security for the DASNY Loan, DASNY was given a mortgage in certain of the Medical Center's real property constituting the parking lots adjacent to the facilities. Commencing January 2010, the Medical Center was to begin repaying the balance in sixty monthly installments of $33,333. In 2011, the Medical Center only made nine payments. In April 2012, the repayment terms were revised and the Medical Center began to make monthly payments of $10,000, with interest being charged at 1%, scheduled through December 31, 2013.

12

Those payments were schedule to increase to $31,500 in January of 2014, and were to remain at that amount until the balance is repaid. The last payment made in respect of the DASNY Loan was in September of 2012, approximately one month prior to Sandy. As of the Petition Date, the outstanding balance of the DASNY Loan is approximately $1.252 million.

**C.      First Central Savings Bank ("First Central").**

32.      LBMC holds several properties which it used as off-site storage, employee housing and physician office space. LBMC purchased these properties over a number of years as part of a strategic expansion plan. The properties include: 757 Lincoln Blvd., 758 Lincoln Blvd., 759 Lincoln Blvd., 760 Lincoln Blvd., 762 Lincoln Blvd., 711 Lincoln Blvd., 415 State St., 425 State St., 479 State St., 765 Franklyn Blvd., and 761 Franklyn Blvd (the "**Offsite Premises**").

33.      In order to refinance and consolidate the various loan obligations with respect to the aforementioned properties, LBMC borrowed from First Central $1.8 million, evidenced by a permanent loan note (the "**Mortgage Loan**") and obtained a line of credit in the amount of $1 million (the "**First Central Line**"), evidenced by a commercial line of credit note (the "**Line Note**") and security agreement ("**Line Security Agreement**"), each dated as of March 7, 2008. In connection therewith, LBMC executed and delivered to First Central a blanket mortgage on the Offsite Premises (the "**First Central Mortgage**"). Subsequently, LBMC requested a complete draw of the First Central Line. As a condition to authorizing the full draw, First Central required LBMC to consolidate the Mortgage Loan and the First Central Line into a consolidated note (the "**First Central Consolidated Note**"). On or about August 1, 2008, LBMC drew down on the First Central Line. The principal balance upon consolidation, after taking into account payments previously made, was $2,704,606.26. As of the Petition Date, obligations under the First Central Consolidated Note are approximately $2,641,000.00.

**D.**     **Pension Plan/Pension Benefit Guaranty Corporation ("PBGC").**

34.     The Medical Center sponsored two noncontributory defined benefit pension plans (the "**Pension Plans**") covering substantially all employees. The Pension Plans provided benefits based primarily on years of service and career average pay.

35.     The Medical Center applied to PBGC for distress terminations of the Pension Plans effective July 31, 2009. By letters dated September 14, 2010 and July 29, 2011, PBGC approved the distress application for the LBMC and Komanoff, respectively. As a result of the termination of the Pension Plans, through the executed trusteeship agreement with the PBGC, benefit accruals under the Pension Plans ceased as of July 31, 2009, the PBGC became the Pension Plans' trustee, and the PBGC has become responsible for paying the Pension Plans' benefits, up to insured limits. The termination of the Pension Plans and previously unpaid pension contributions and premiums resulted in liabilities for the Medical Center arising under the provisions of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), and the Internal Revenue Code ("**IRC**"), for pension termination underfunding, past contributions due to the Pension Plans, unpaid special termination and pension insurance premiums due to PBGC with respect to the Pension Plans, and unpaid excise taxes plus interest and penalties.

36.     As of the Petition Date, LBMC and Komanoff collectively owe PBGC in excess of $40 million for termination underfunding, unpaid premiums, and excise taxes. LBMC and Komanoff are jointly and severally liable for the Pension Plan liabilities. Of the aforementioned liabilities, PBGC has federal liens against the properties of the Medical Center in the aggregate amount of approximately $9 million, of which approximately $7.2 million relates to LBMC and $1.8 million relates to Komanoff.

2722843v.6

E.    **Mechanics Liens.**

37.    As noted above, in the wake of superstorm Sandy the Medical Center undertook substantial efforts to restore the physical plant to a condition suitable for the reinstatement of health care services.  Accordingly, the Medical Center contracted with various entities to make necessary, and in many instances emergency, repairs to their facilities with the understanding that the majority of the funding for such work would be coming from FEMA.  The FEMA reimbursement process is not an expedient one, and without any significant operating revenue, the Medical Center quickly amassed sizeable payables associated with this work.  Many of the contractors performing repair work at the Medical Center filed mechanic's liens against the property of LBMC and/or Komanoff as applicable.

38.    The FEMA process involves an in-depth review of all invoices submitted for reimbursement.  Once approved by FEMA, funds are obligated for reimbursement based on specific projects and vendors.  FEMA will only reimburse up to 90% of the actual costs associated with any given project.  By agreement between FEMA and the New York State Office of Emergency Management ("**OEM**"), FEMA authorizes OEM to remit funds to the Medical Center.  Upon receipt, these funds become restricted assets only available to specific payees, and are subsequently paid to the vendors for which the funds were obligated.

39.    To date the Medical Center has received approximately $17.6 million from FEMA, which has been used to satisfy a substantial portion of the mechanics' liens.  As of the Petition Date, there remains approximately $3.7 million in mechanics' liens against he property of LBMC and approximately $500,000 in mechanics' liens against the property of Komanoff, each after taking into account duplicative filings by general and subcontractors.  Based on FEMA's reimbursement scheme, the Debtors anticipate that approximately 90% of the remaining mechanics' liens will be satisfied by FEMA reimbursements.  The Debtors anticipate that the

15

remaining 10% of outstanding mechanics liens, or approximately $2,000,000, may be satisfied by Community Block Grants.

**F.      New York State Department of Labor.**

40.      The Debtors are each not-for-profit corporations under Section 501(c)(3) of the federal Internal Revenue Code, and, as such, are able to elect one of two payment methods for discharging its obligations to the New York State Department of Labor (the "**DOL**"), referred to as either the "reimbursement" or "tax contribution" options. Those employers that elect the tax contribution basis remit funds to the DOL periodically as a tax. This tax is based on the employer's applicable tax rate and the annual compensation paid to its employees. Employers that elect the reimbursement option do not make periodic payments and instead are only obligated to repay the DOL for unemployment benefits actually paid out to former employees. The Debtors elected to satisfy its unemployment obligations on a reimbursement basis. Accordingly, after superstorm Sandy the Debtors' obligation to DOL rose precipitously at the same time their revenue stream collapsed, giving rise to a claim for non-payment.

41.      Accordingly, the DOL asserts that it is owed $3,012,334.14 and $358,763.50 on account of unemployment benefits DOL paid to LBMC and Komanoff's respective terminated employees. In order to secure LBMC's obligation to pay such amounts, DOL filed state tax liens against it. A warrant was issued for the amounts due DOL by Komanoff, although it is not clear if it has become a tax lien. The aggregate amount due DOL as of the Petition Date is approximately $3.37 million

**G.      South Nassau Communities Hospital Prepetition Credit Agreement.**

42.      As the Medical Center's liquidity continued to deteriorate in the weeks before the Chapter 11 filing, there became an increased need for immediate additional funding. As the Debtors were unable to secure such financing from traditional sources, they turned to SNCH to

16

provide the necessary liquidity and working capital to maintain operations pending completion of the Sale Transaction, as well as to fund expenses in connection with the preparation and filing of these Chapter 11 cases. After extensive arms length negotiations, SNCH agreed to provide such funding and, pursuant to that certain Loan and Security Agreement, dated as of December 30, 2013 (as amended, modified or otherwise supplemented from time to time, (the "**Pre-Petition Credit Agreement**"), among SNCH and the Debtors signatory thereto, SNCH made available to the Debtors up to $1.5 million in financing secured by liens in substantially all of the Debtors' assets subject to previously existing liens.

43.     Under the Pre-Petition Credit Agreement, SNCH is owed, as of the Petition Date, approximately $1,500,000 in principal obligations, plus interest, fees, costs and expenses and all the "Obligations" under and as defined in the Pre-Petition Credit Agreement (the "**Pre-Petition Obligations**"). The Pre-Petition Obligations are secured by liens on and security interests in substantially all of the Debtors' real and personal property assets, subject to all previously existing liens and security interests in any such property.

## IV.     PROPOSED DIP LOAN FACILITY AND USE OF CASH COLLATERAL

### A.     The Need for Postpetition DIP Financing.

44.     As noted above, in order to maximize the value of their existing asset base the Debtors intend to sell substantially all of their assets to SNCH, which will continue the Debtors' efforts to restore an appropriate level of health care to Long Beach and its surrounding communities. Absent the DIP Financing the Debtors will not have sufficient sources of working capital to continue operations or otherwise fund the administrative expenses of these Chapter 11 cases, putting both the sale process and the future of health care in Long Beach and its surrounding communities in jeopardy.

45.     The DIP Financing will be used to permit the Debtors to pay their medical and nursing staffs and other employees in order to provide critical patient care, maintain already strained business relationships with vendors and suppliers, purchase new inventory, and otherwise finance their operations.  Without the DIP Financing, serious and irreparable harm could result, not only to the Debtors' remaining operations and their continued eligibility for FEMA funds, but to the community and the more than 100 patient residents of Komanoff, all of whom are relying on the process for the restoration of medical services.

46.     Given the Debtors' financial condition, current financing arrangements, and capital structure, the Debtors do not have any unencumbered funds and are otherwise unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  As detailed more fully below, financing on a postpetition unsecured or solely on a superpriority basis is not available.  SNCH is willing to provide the DIP Financing pursuant to section 364(c)(1) of the Bankruptcy Code, provided that the Lender has priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code other than as described below, and such indebtedness and obligations are secured by the interests in and the liens  (including, with respect to the assets of Komanoff, priming liens) upon the property described below pursuant to sections 364(c) and 364 (d) of the Bankruptcy Code.   The Debtors are unable to obtain from another lender the necessary postpetition financing that they need on terms more favorable in the aggregate than those provided in the DIP Loan Agreement.

**B.     The Economic Terms of the Postpetition Financing;
DIP Liens and Superpriority Claim**

47.     Under the proposed DIP Loan Agreement, the Lender will make cash advances and other extensions of credit in a maximum principal amount not to exceed $4.5 million on a

multiple draw term loan basis under and subject to the terms and conditions of DIP Loan Documents.

48.    The proceeds of the DIP Financing under the DIP Loan Documents will be used by the Debtors for: (i) general working capital purposes and general corporate purposes relating to postpetition operations; and (ii) the costs and expenses associated with these Chapter 11 Cases, including the fees, costs, expenses and disbursements of professionals retained by the Debtors and any statutory committee appointed in these Chapter 11 Cases (the "**Committee**"), and other bankruptcy related costs as allowed by the Court, including amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, .all in accordance with the terms of the Budget.

49.    The proposed DIP Financing will operate in two stages. First, under the proposed Interim Order, the initial loans and advances will be used to pay for the Debtors' working capital needs and operating requirements prior to the entry of the Final Order, pursuant to the Budget. Upon approval at the final hearing (the "**Final Hearing**") and subject to and upon entry of the Final Order, the Debtors seek on a final basis to continue to utilize the proceeds of the DIP Financing in accordance with the Budget and pursuant to the terms and conditions set forth in the DIP Loan Agreement.   The other significant terms of the DIP Financing and DIP Loan Documents include the following[2]:

    (a)    <u>DIP Financing</u>: The DIP Financing shall be in the maximum amount of $4.5 million. Funding is based on the Budget.

    (b)    <u>Interest, Fees and Expenses</u>:   Interest on the outstanding balance of the DIP Revolving Loans shall be payable at an interest rate of seven percent (7%)

---

[2]    The terms and conditions set forth herein are qualified in their entirety by reference to the provisions of the DIP Loan Documents, copies of which are available upon request to Counsel for the Debtors. The description of the terms of the DIP Loan Documents set forth in this Motion is provided for the convenience of the Court and the parties-in-interest. In the event of any inconsistency between the description of the terms of the DIP Loan Documents contained in this Motion and the actual DIP Loan Documents, the terms of the DIP Loan Documents shall govern.

2722843v.6

per annum, except in the Event of Default in which event the Default Interest Rate of ten percent (10%) shall apply.

(c)     Collateral for the DIP Financing:

(d)     Superpriority Administrative Expense Claim; Carve-Out.   Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Loan Obligations shall have the status of an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**").   The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out and shall otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code.   The DIP Superpriority Claims shall not extend to Avoidance Actions under chapter 5 of the Bankruptcy Code or the proceeds of Avoidance Actions.

(e)     Nature of Liens Securing the DIP Loan Obligations, Waiver under 506(c). The DIP Loan Obligations shall be secured, (i) pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out, by a first-priority senior perfected lien on, and security interest in, all present and after-acquired assets and property of the Borrowers not subject to a lien on the Petition Date (excluding Avoidance Actions and the proceeds of Avoidance Actions), (ii) pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out, by a lien on, and security interest in, all other property of the Borrowers that is subject to a Lien on the Petition Date (excluding Avoidance Actions and the proceeds of Avoidance Actions), and (iii) pursuant to Bankruptcy Code § 364(d)(1), subject to the Carve-Out, by a first-priority, senior priming perfected lien on, and security interest in the Komanoff Collateral (excluding Avoidance Actions and the proceeds of proceeds of Avoidance Actions).   Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 364(c)(1), 503(b), 506(c), 507(b) or otherwise, and those resulting from the conversion of the Bankruptcy Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with, the Super-Priority Claims of the Lender arising out of the Loans.

(f)     Use of Proceeds:  The proceeds of the DIP Financing will be used: (i) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (ii) the costs and expenses associated with these Chapter 11 Cases, including the fees and expenses of counsel and other retained professionals, all in accordance with the terms of the Budget.

(g)     Limitation on Use of Proceeds.  Until the DIP Facility is satisfied in full, the DIP Facility, DIP Collateral, and Carve Out may not be used: (a) in

connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the Lender or its respective rights and remedies under the DIP Financing Documents or the Financing Orders, as applicable, including, without limitation, for the payment of any services rendered by professionals retained by the Debtors or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief; (ii) for invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Loan Obligations; (iii) for monetary, injunctive, or other affirmative relief against the Lender or its collateral; or (iv) for preventing, hindering, or otherwise delaying the exercise by the Lender of any rights and/or remedies under the Financing Orders, the DIP Financing Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by the Lender upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any of the Chapter 11 Cases; (c) to make any payment in excess of $10,000 in settlement of any claim, action, or proceeding, before any court, arbitrator, or other governmental body without the prior written consent of the Lender; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the Lender; (e) to object to, contest, or interfere with in any way the Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as to any challenge as to the occurrence or continuation of such Event of Default ; (f) to sell or otherwise dispose of DIP Collateral with a value in excess of $50,000 in the aggregate without the consent of the Lender; (g) to use or seek to use any insurance proceeds constituting DIP Collateral without the consent of the Lender; (h) to incur indebtedness outside the ordinary course of business without the prior consent of the Lender; (i) to object to or challenge in any way the claims, liens, or interests (including interests in the Prepetition Collateral or DIP Collateral) held by or on behalf of the Lender; (j) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Lender; (k) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Loan Obligations, DIP Liens, or any other rights or interests of the Lender; or (l) to prevent, hinder or otherwise delay the exercise by the Lender of any rights and remedies granted under the Financing Orders.

(h)     Joint and Several Liability. Each Borrower shall be jointly and severally liable for all of the obligations of all Borrowers under the DIP Loan Agreement. Each Borrower acknowledges, that the DIP Financing would not be made available on the terms herein in the absence of the collective credit of all of the Debtors named as the Borrowers therein, the joint and several liability of all such Debtors, and the cross-collateralization of the collateral of all such Debtors.

(i)     Term:  All obligations and commitments of SNCH under the Interim Order and Final Order, and the Debtor's authorization to borrow funds pursuant to the DIP Loan Documents shall terminate on the earlier of (i) June 30, 2014, or (b) the occurrence of an Event of Default (as defined below) (in either case, the "**Termination Date**").

(j)     Termination and Default:  Each of the following, among other items set forth in the DIP Loan Agreement, shall constitute a Default (an "**Event of Default**") under the DIP Loan Documents: (i) The failure by Borrowers to pay any principal, interest or other charge or amount required to be paid under the DIP Loan Agreement, under the Note, or under any other DIP Loan Document, within five (5) days after the date on which such payment becomes due in accordance with the terms thereof; (ii) The failure to cure the violation of any covenant set forth in Article IV or Article V of the DIP Loan Agreement within five (5) days after receiving written notice from Lender; (iii) the failure of Borrowers to properly and timely perform or observe any covenant or condition set forth in the DIP Loan Agreement or any other DIP Loan Document and the continuance thereof which is not cured within ten (10) days of Lender's notice to Borrowers of such Default; (iv) The use of any funds advanced for any purpose or to any Person other than as specified in the applicable Advance Request; (v) any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Borrowers pursuant to or in connection with the DIP Loan Agreement, any other DIP Loan Document or otherwise or as an inducement to Lender to extend any credit to or to enter into this or any other agreement with Borrowers in connection with this Loan or other loans now existing or hereafter created, proves to have been false in any material respect at the time when the facts therein set forth were stated or certified, or proves to have omitted any substantial contingent or unliquidated liability or claim against Borrowers or on the Execution Date there shall have been any materially adverse change in any of the facts previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Lender in writing at or prior to the time of such execution; (vi) the occurrence of any materially adverse change in the financial condition or prospects of either Borrower; (vii) a final judgment, which shall not be subject to the automatic stay in the Bankruptcy Cases, for the payment of money in excess of $10,000 shall be rendered against Borrowers (or either of them) (other than a judgment as to which a financially sound and reputable insurance company has acknowledged coverage of such claim in writing or otherwise covered by an appeal bond), and either (a) within thirty (30) days after the entry of such judgment, shall not have been discharged or stayed pending appeal (or if stayed pending appeal, shall not have been discharged within thirty (30) days after the entry of a final order of affirmance on appeal), or (b) enforcement proceedings shall be commenced by any holder of such judgment; (viii) the entry of an order dismissing any Bankruptcy Case or converting any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or either Borrower shall file a motion or other pleading seeking the dismissal or conversion of any Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; (ix) the entry of an order appointing a

trustee in any Chapter 11 Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); (x) the entry of an order granting any other super-priority claim or lien equal or superior in priority to that granted to the Lender, other than as permitted in the DIP Loan Agreement and the DIP Orders, without the Lender's prior written consent; (xi) the entry of one or more orders granting relief from or modifying the automatic stay so as to allow third parties to proceed against any asset of Borrowers having a fair market value in excess of $10,000 in the aggregate; (xii) the termination or rejection, or the filing by Borrowers of a motion terminating or rejecting material leases, material contracts or any other material agreement, document or instrument following the Petition Date to which either Borrower is a party, except those approved by the Lender; (xiii) the entry of an order staying, reversing, vacating or otherwise modifying the Loans, liens securing the DIP Loan Obligations or the DIP Orders or the filing of a motion or other pleading seeking any of the foregoing or a motion for reconsideration with respect to the DIP Orders; (xiv) if either Borrower's Board of Trustees or other controlling Persons shall authorize the liquidation of such Borrower's business or the sale or other disposition of such Borrower's assets (whether as a going concern or otherwise) pursuant to one or more Section 363 sales or otherwise, or shall file any motion to pursue such action or actions under Section 363 of the Bankruptcy Code, other than as consented to in writing by the Lender; (xv) if either Borrower shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Interim Order and/or the Final Order; (xvi) if the Final Order has not been entered within 30 days after the Petition Date; (xvii) the bringing of a motion, the execution of a written agreement, or the filing of any plan of reorganization or disclosure statement attendant thereto by either Borrower in either of the Bankruptcy Cases: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; (x) to grant any lien other than Permitted Liens upon or affecting any Collateral; (y) except as provided in the Interim Order or Final Order, as the case may be, to use Cash Collateral of the Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender or (z) any other action or actions materially adverse to Lender or its rights and remedies hereunder or its interest in the Collateral; (xviii) The filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by either Borrower or any other person to which Lender does not consent or otherwise agree to the treatment of their claims or the entry of any order terminating such Borrower's exclusive rights to file a plan of reorganization, unless such plan of reorganization provides for the immediate and indefeasible payment in full in cash of all DIP Loan Obligations; (xix) the entry of an order in either of the Bankruptcy Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the DIP Loan Agreement and indefeasible repayment in full in cash of all of the obligations under the DIP Loan Agreement on or before the effective date of such plan or plans; (xx) the payment of, or application for authority to pay, any pre-petition claim without the Lender's prior written consent unless otherwise in

23

accordance with the Approved Budget or permitted under the DIP Loan Agreement; (xxi) subject to entry of the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Lender; (xxii) the sale without the Lender' consent, of all or substantially all of either Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Bankruptcy Cases, or otherwise that does not provide for indefeasible payment in full in cash of the obligations and termination of the DIP Loan Agreement; (xxiii) the commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than Borrower, an officer or employee of Borrower, the continuation thereof without dismissal for thirty (30) days after service thereof on the Lender, that asserts or seeks by or on behalf of Borrower, any official committee in any Bankruptcy Case or any other party in interest in any of the Bankruptcy Cases, a claim or any legal or equitable remedy that would (1) have the effect of subordinating any or all of the obligations or liens of Lender under the DIP Loan Documents to any other claim, or (2) have a material adverse effect on the rights and remedies of the Lender under any DIP Loan Document or the collectability of all or any portion of the DIP Loan Obligations; (xxiv) the entry of an order in any Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Loan Obligations owing under the DIP Loan Agreement or the other DIP Loan Documents; (xxv) the Borrowers' failure to achieve any Reorganization Milestone as and when required pursuant to Schedule 4.10 of the DIP Loan Agreement; (xxvi) any attempt by any creditor (other than the Lender) to attach, seize or repossess property owned by, or in the possession of, Borrowers having a fair market value individually in excess of $50,000; or (xxvii) either Borrower shall enter into any binding agreement or arrangement (after the Closing Date) for the settlement or compromise of claims or causes of action which constitute Collateral without the prior written consent of the Lender (which consent may be granted or withheld in its sole and absolute discretion).

(k)     Rights and Remedies on Default.  Immediately upon the occurrence and during the continuation of an Event of Default, SNCH may declare (i) all DIP Loan Obligations owing under the DIP Financing Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains in effect, and/or (iii) the termination of the DIP Loan Agreement and any other DIP Financing Documents as to any future liability or obligation of the Lender, but without affecting any of the DIP Liens or the DIP Loan Obligations (any such declaration by the Lender shall be referred to herein as a "**Termination Declaration**").  The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to the Lender, counsel to any Committee, and the United States Trustee (the date any such Termination Declaration is made shall be referred to herein as the "**Termination Declaration Date**").  The DIP Loan Obligations shall be due and payable, without notice or demand.  Any automatic stay otherwise applicable to the Lender is hereby modified so that seven (7) days after the Termination Declaration Date (the

"**Remedies Notice Period**"), the Lender shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Financing Documents and this Interim Order and shall be permitted to satisfy the DIP Loan Obligations and DIP Super-Priority Claims, subject to the Carve Out. Notwithstanding anything to the contrary, during the first three (3) days of the Remedies Notice Period, the Debtors or the Committee shall be entitled to continue to use cash on hand, including any Cash Collateral, in accordance with the Budget. During the Remedies Notice Period, the Debtors or any Committee shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing, and seeking other relief in the event it is determined that an Event of Default has not occurred and/or is continuing. Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and the Lender shall be permitted to exercise all remedies set forth herein, in the DIP Agreement and the DIP Financing Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interests in the DIP Collateral or any other rights and remedies granted to the Lender with respect thereto pursuant to the DIP Agreement, DIP Financing Documents, or this Interim Order subject to the Carve-Out. The Lender's failure to exercise any or all of its rights under this paragraph shall not constitute a waiver of any of its rights under DIP Agreement, DIP Financing Documents, or this Interim Order.

(l)     Right to Credit Bid. Subject to the entry of the Final Order, the Lender shall have the right to "credit bid" (i) the Carve-Out and (ii) the allowed amount of its claim in the manner set forth in the APA and the Court's order approving the bidding procedures in connection with the APA or during any sale of all or substantially all of the Prepetition Collateral, including without limitation, sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code or otherwise. An amount equal to the quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) for the period prior to the closing of the sale, any fees payable to the clerk of the Bankruptcy Court on the date of the closing of the sale, and the fees payable to a chapter 7 trustee in an aggregate amount not to exceed $25,000, and any remaining amount for the Professionals Carve Out Cap will be funded in cash by Lender, which cash shall be held in escrow by Debtors' counsel to be used for the purposes as set the forth Financing Orders. For the avoidance of doubt, notwithstanding the escrow of any payments made in respect of the Carve-Out, such payments made in respect of the Carve-Out are to be credited toward satisfaction of the purchase price under the APA.

C.      **Use of Cash Collateral**

50.     In the ordinary course of business, the proceeds of substantially all of the Debtors receivables, including the those receivables generated prior to the petition date, constitute the cash collateral of certain of the Komanoff Prepetition Secured Creditors, including, without limitation, the PBGC and SNCH.  These funds had been used by the Debtors to fund ongoing operations.  By this Motion, the Debtors propose to use the proceeds of the Cash Collateral of the Komanoff Prepetition Secured Creditors in accordance with the Budget, and to provide Adequate Protection Liens (as defined below) to those Komanoff Prepetition Secured Creditors with liens in Cash Collateral (as defined below).

51.     Cash Collateral shall include: (a) all cash proceeds of Prepetition Collateral in which any of the Komanoff Prepetition Secured Creditors have an interest, whether such interest existed as of the Petition Date or arises thereafter, and (b) proceeds of the Prepetition Obligations.

D.      **Granting of Additional and Adequate Protection Liens**

52.     As noted above, the Debtor's obligations under the DIP Loan Documents will be secured by (x) security interests in all of the Collateral, pursuant to sections 364(c)(2) and 364(c)(3) and (y) first priority security interests in all of the Komanoff Collateral pursuant to section 364(d) of the Bankruptcy Code subject and junior only to the Carve Out.

53.     The Lender has consented to such priming liens and pursuant to sections 361, 364 and 507(b) of the Bankruptcy Code, as adequate protection to the Komanoff Prepetition Secured Creditors against any Diminution of Value, the Debtors propose to grant the Komanoff Prepetition Secured Creditors automatically perfected, replacement liens on the Komanoff Collateral (an "**Adequate Protection Lien**") to the same extent and priority of their respective Prepetition Liens.  The Adequate Protection Liens shall be deemed a Permitted Lien within the

26

meaning of the DIP Loan Agreement. The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases.

54. The Adequate Protection Liens proposed to be granted to the Komanoff Prepetition Secured Creditors shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien under section 363 and 364 of the Bankruptcy Code.

**E.    Granting of Super-Priority Administrative Expense Claims**

55. Only to the extent Adequate Protection Liens fail to protect the Komanoff Prepetition Secured Creditors against any Diminution in Value, the Komanoff Prepetition Secured Creditors shall be entitled, pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, to an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases of the Applicable Debtors (collectively, the "**Komanoff Prepetition Secured Creditor Superpriority Claims**"). The Komanoff Prepetition Secured Creditors Superpriority Claims, if permitted, shall be subordinate in payment and priority only to the DIP Loans, the DIP Superpriority Claims and the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code. Notwithstanding, the Komanoff Prepetition Secured Creditor Superpriority Claims shall not extend to any Avoidance Actions or the proceeds thereof.

2722843v.6

**F.      Carve Out**

56.      Notwithstanding the granting of the DIP Liens, the Adequate Protection Lien, the

DIP Superpriority Claims, and the Komanoff Prepetition Secured Creditor Superpriority Claim,

the Carve Out shall have priority in payment over the claims of SNCH and all other secured

creditors, such that all proceeds received by such parties shall be subject to the prior payment of

the Carve Out.

**G.      Disclosures Respecting Bankruptcy Rule 4001(b) and (c) and Local Rule 4001-5**

57.      Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) are satisfied by the disclosures set forth in

paragraphs 1(g) and 50 through 54 hereof.

58.      The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set forth at

the following sections of the DIP Loan Agreement and/or Interim Order, as applicable:

> (a)      Grant of Priority or a Lien on Property of the Estate: Interim Order ¶¶
> 2(g), (h), and (i); Dip Loan Agreement ¶¶ 2.2 and 2.3;

> (b)      Adequate Protection for a Claim that Arose Before the Commencement of
> the Case: Interim Order: ¶¶ (I, 3(a), (b), and (c);

> (c)      Determination of the Validity, Enforceability, Priority, or Amount of a
> Claim that Arose before the Commencement of the Case, Subject to the Rights of
> a Creditors' Committee or Other Parties in Interest: Interim Order ¶¶  E and 6(a);
> Dip Loan Agreement @ recitals;

> (d)      Waiver or Modification of the Automatic Stay: Interim Order ¶¶ 5(a) and
> (b); Dip Loan Agreement ¶ 6.2(e)

> (e)      Release, Waiver, or Limitation on Rights under Section 506(c) Under
> Final Order: Interim Order ¶¶ J and 10; DIP Loan Agreement ¶¶ 2.3(e) and 6.1(u)

59.      Moreover, Rule 4001-5(a) of the Local Bankruptcy Rules for the Eastern District

of New York (the "Local Rules") requires that certain provisions contained in a DIP Financing

Agreement be highlighted and that the Debtors provide justification for the inclusion of such

highlighted provisions. The Debtors believe that the only provision which needs to be

highlighted pursuant to Local Rule 4001-5 is that no loans made pursuant to the DIP Facility nor any portion of the Carveout may be used to challenge the prepetition loans and security interests of SNCH. There are limited funds available to successfully and safely effectuate a sale of the Debtors assets. Moreover, SNCH was unwilling to lend where loans made under the DIP Loan Documents could be used to fund any challenges. Therefore, the Debtors assert that such provisions are justified and necessary in the context and circumstances of this case.

## VI.    BASIS FOR RELIEF REQUESTED

60.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the debtor to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, a junior lien on encumbered property, or a combination of these protections. 11 U.S.C. § 364(c). A debtor in possession may also obtain postpetition credit secured by liens senior to prior existing liens pursuant to Section 364(d) of the Bankruptcy Code. Section 363(c)(2) of the Bankruptcy Code also contemplates that the Bankruptcy Court may authorize the use of cash collateral without the consent of secured parties. Courts may authorize such use if adequate protection is provided pursuant to section 363(e).

## A.    The DIP Financing Should be Approved Under Section 364 of the Bankruptcy Code

61.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." 11 U.S.C. § 364(c). See e.g., In re Photo Promotion Assocs., 89 B.R. 328, 333 (Bankr.

29

S.D.N.Y. 1988) (Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.)

62.    In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).    A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c) and 364(d). See e.g. In re Snowshoe, 789 F.2d. at 1088.    When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff' d sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

63.    As described in this Motion and the Melzer Affidavit, the Debtors' management has concluded after appropriate investigation and analysis that SNCH's proposal was the best - and only viable alternative available to them for postpetition financing.    Postpetition financing cannot realistically be procured on an unsecured basis.    Negotiations with SNCH have been arms' length and conducted on a good faith basis.    SNCH is only willing to extend Postpetition Financing on the terms outlined above, including the additional protections of Liens and Priming Liens on the Collateral subject only to the Carve Out.

64.    Given the immediacy of the Debtors' financing needs, and the pressing need to move the sale process quickly to stem consistent and mounting losses, the Debtors were required to move quickly and in a targeted manner to ensure that the Debtors would be able to negotiate a new financing facility to preserve ongoing operations.    There is no reason to believe that a

different postpetition lender offering terms more favorable than SNCH could have been located, and certainly not before all of the Debtors' limited cash resources were depleted. The Debtors' decision to proceed with the proposed DIP Financing with SNCH was a reasonable exercise of business judgment.

**B.**     **The Priming Lien Under the Postpetition Financing Should be Approved Under Section 364(d) of the Bankruptcy Code**

65.     The Debtors also seek approval of the DIP Financing under section 364(d)(1) of the Bankruptcy Code to permit the Debtors to grant priming liens on the Komanoff Collateral. The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In addition, unless the secured creditors whose liens are being "primed" by a new postpetition lender under section 364(d) of the Bankruptcy Code consent to such treatment, they must be provided with adequate protection of their interests in collateral. See In re Swedeland Dev. Group, Inc., 16 F. 3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); In re Dunes Casino, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (noting that '[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy"). SNCH has consented to such priming liens, and the Komanoff Prepetition Secured Creditors are being provided with replacement liens as adequate protection.

66.     After reasonable inquiry of other potential lenders, the Debtors determined that no other financing is available on terms better than proposed under the DIP Loan Agreement based on responses that the Debtors received.

67.      In addition, under section 364(d)(1) of the Bankruptcy Code, if interests in collateral are to be "primed," then such "primed" parties must be adequately protected.    11 U.S.C. §364(d)(1).  The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11 case); In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (same); In re Beker Indus Corp., 58 B.R. 725, 738 (Bankr. S.D.N.Y. 1986) (same).

68.      Courts determine the means for providing adequate protection on a case by-case basis.  See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).

69.      The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code.  Section 361 sets forth three non-exclusive forms of adequate protection:  (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property;  (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property;  and (c) such other relief as will result in a entity realizing the indubitable equivalent of its interest in property.  11 U.S.C. § 361.  As the foregoing is neither exclusive nor exhaustive, there is a great deal of flexibility in terms of what may constitute adequate protection.  In re O'Connor, 808 F. 2d 1393, 1396-97 (10th Cir. 1987).  Ultimately, adequate protection is determined on a case-by-

32

case basis in light of the particular facts and circumstances presented. Id. (stating that "the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis); In re 495 Central Park, 136 B.R. at 631 (stating that, although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive and suggests a broad and flexible definition); In re Constable Plaza Assocs., L.P. 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n. 3 (Bankr. E.D. Pa. 1982) ("While "adequate protection" is not defined in the Bankruptcy Code, the legislative history of section 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles." (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977)).

70.    In this case, SNCH has consented to the granting of the priming liens and, as set forth above, the Komanoff Prepetition Secured Creditors will be granted Adequate Protection Liens to the extent of any Diminution in Value of their interests in their prepetition collateral as well as a Prepetition Secured Creditor Superpriority Claim.    The Debtors submit that the foregoing suffices as adequate protection in a case that is anticipated to be expeditiously conducted, and based on the proposed purchase price there will be sufficient value in the transaction to provide adequate protection with respect to the liabilities sought to be primed against the Komaneff Collateral. See generally, In re YL West 87th Holdings I LLC, 423 B.R. 421, 441–42 (Bankr. S.D. N.Y. 2010) (existence of an equity cushion seems to be "the preferred test in determining whether priming of a senior lien is appropriate under section 364").

**C.**     **The Postpetition Financing is Necessary to Preserve the
Assets of the Debtors' Estates**

71.     The Debtors' need for immediate access to a new working capital facility is
apparent. As described above and in the Melzer Affidavit, the immediate access to credit is
necessary to meet the substantial day-to-day operating needs associated with the Debtors
operations while the sale process proceeds. Thus, access to sufficient cash is therefore critical to
the continuation of patient care. In the absence of immediate access to cash and credit, the
Debtor's suppliers and third party vendors will likely refuse to sell critical supplies to the Debtor
on reasonable trade terms on which the Debtor's business depend, and absent which the Debtor
will be unable to meet its current obligations.

**D.**     **The Terms of the DIP Financing are Fair, Reasonable and Appropriate
and Represent the Sound Exercise of Business Judgment**

72.     In the Debtor's business judgment, the DIP Financing was the best financing
option available under the circumstances of these cases. The proposed terms of the DIP
Financing were negotiated in good faith and at arms' length among the parties. They are fair,
reasonable, and adequate in that the terms do not prejudice the powers and rights that the
Bankruptcy Code confers for the benefit of all creditors, and they do not abridge the rights of
other parties in interest. As contemplated by the policies underlying the Bankruptcy Code, the
purpose of the DIP Financing is to enable the Debtors to maintain the value of their estates while
formulating a confirmable plan of reorganization. See generally, In re First S. Sav. Assn, 820
F.2d 700, 710-15 (5th Cir. 1987).

73.     Bankruptcy courts routinely defer to the debtor's business judgment on most
business decisions, including the decision to borrow money. In re Lifeguard Indus., Inc., 37 B.R.
3, 17 (Banr. S.D. Ohio 1983) (Business judgments should be left to the board room and not to
this Court.). See also, In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981)

(In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious).  Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513-14 (footnotes omitted).

74.    The Debtors submit that they have exercised their sound business judgment in determining the merits and necessity of the DIP Financing and have aptly demonstrated that its terms are fair and reasonable and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted the requested relief to borrow funds from SNCH on a secured and superpriority basis, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

**E.    The Other Secured Creditors are Adequately Protected**

75.    The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in collateral during the reorganization process, not to compensate the creditor for the delay imposed by the bankruptcy on its ability to pursue non-bankruptcy remedies against the property. See In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Saypol, 31 B.R. 796, 799-802 (Bankr. S.D.N.Y. 1983).

76.    To the extent that the value of a debtor's collateral as of the filing of the bankruptcy case exceeds the value of the claimed lien, such equity cushion can itself constitute adequate protection. See, e.g., In re Triplett, 87 B.R. 25, 26 (Bankr. W.D. Tex. 1988) (holding that an equity cushion is generally considered to be sufficient, although not necessary, to a finding of adequate protection);

77.    Furthermore, where a debtor's proposed use of cash collateral augments the value of the secured creditor's collateral, adequate protection exists.  See In re Pine Lake Village

Apartment, 19 B.R. 819, 826 (Bankr. S.D.N.Y 1982) (creditor had adequate protection where the debtor used cash collateral to maintain and preserve the value of the collateral). In fact, such use would generally give rise to a claim under section 506(c) of the Bankruptcy Code, which provides that a debtor may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving such property, to the extent of any benefit to the holder of such claim. 11 U.S.C. § 506(c); see also, In re Trim-X, Inc., 695 F.2d 296 (7th Cir. 1982).

78.     Adequate protection also exists for the Komanoff Prepetition Secured Creditors who are receiving Adequate Protection Liens in the DIP Collateral. Fundamentally, their positions will not change. The Debtor thus submits that the proposed adequate protection is fair and reasonable beyond any question.

**F.      Modification of the Automatic Stay is Warranted**

79.     As set forth more specifically in the Interim and Final Orders, the proposed DIP Financing contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to permit SNCH, in its sole discretion, (a) to file financing statements, deeds of trust, mortgages or other similar documents to evidence their respective security interests under the DIP Financing, the Interim Order, and the Final Order, (b) subject to certain notice requirements, to execute upon such security interests or exercise other remedies under the DIP Loan Documents following an Event of Default under, or other termination of, the DIP Financing, and (c) to take other actions required or permitted by the DIP Loan Documents.

**G.      The Debtor's Request for Interim  Relief is Appropriate**

80.     Pending the Final Hearing, the Debtors require immediate financing for, among other things, the purchase of new supplies, the funding of payroll obligations, the operation of their healthcare facilities and other working capital needs required for the provision of critical

2722843v.6

patient care. The Debtors' interim request represents the minimum amount of cash necessary to operate during the period prior to the Final Hearing.  It is essential that the Debtors immediately stabilize their operations and resume paying ordinary operating expenses postpetition in order to minimize the damage occasioned by its current cash flow problems, facilitate the sale process, and maximize the value of its assets.

81.    Absent immediate financing for their continuing business operations, the Debtors will not have any funding to pay operating expenses and, therefore, will be unable to continue to conduct their business pending the Final Hearing.  Consequently, if the emergency relief sought herein is not obtained, the Debtor's attempt to continue operations without compromising patient care and ultimately realize the maximum values of their assets will likely be immediately, if not irreparably, jeopardized, to the detriment of their estates, their creditors and other parties in interest.

82.    Accordingly, the Debtors request that, pending the Final Hearing, the Court conduct an interim hearing (the "**Interim Hearing**") as soon as practicable to consider the Debtor's request for authorization to use Cash Collateral and to obtain the DIP Financing in accordance with and pursuant to the terms and conditions contained in the DIP Loan Documents and the Interim Order.

83.    Bankruptcy Rule 4001 (b) and (c) permits a court to approve a debtor's request for use of cash collateral or to incur postpetition financing during the 15-day period following the filing of a motion requesting such authorization the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2) and (c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., <u>Simasko</u>, 47 B.R. at 449.  After the 15-

day period, a debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., Simasko, 47 B.R. at 449. Under this standard, as described herein and in the Melzer Affidavit, the Debtors' request for entry of the Interim and Final Orders, in the time periods and for the financing amounts requested herein, is appropriate.

## VIII. <u>NOTICE</u>

84.    Notice of this Motion where possible will be provided by facsimile, electronic transmission, overnight mail or hand delivery (except as noted otherwise) to (a) the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis); (b) each of the Debtors' secured creditors; (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) the following state and local taxing and regulatory authorities: (i) the Centers for Medicare and Medicaid Services, (ii) the New York State Department of Health, (iii) the United States Attorney for the Eastern District of New York, (iv) the attorney General of the State of New York, (v) Corporation Counsel for the City of Long Beach, (vi) the New York State Department of Labor, (vii) the Pension Benefit Guaranty Corporation, (viii) the Dormitory Authority of the State of New York (ix) the Internal Revenue Service, (x) the New York State Department of Taxation and Finance; (f) counsel to the Buyer; (g) the United States Department of Justice, Commercial Litigation Division; and (h) the United States Department of Health and Human Services; (i) International Union of Operating Engineers, Local 30; and (j) 1199 SEIU Healthcare Workers East (collectively, the "<u>**Notice Parties**</u>"). The Debtors submit that no other notice need be given..

85.    No prior request for the relief sought in this Motion has been made to this or any other court in connection with these Chapter 11 Cases.

2722843v.6

## IX.    CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) enter an Interim Order substantially in the form annexed hereto as Exhibit C and a Final Order after an Interim Hearing and Final Hearing, respectively, (i) authorizing the Debtors to use Cash Collateral and granting Adequate Protection therefor, (ii) authorizing the Debtors to incur Postpetition Financing on a secured basis and with administrative superpriority pursuant to the terms and conditions of the DIP Loan Documents; (iii) granting Liens (including Replacement Liens), and Superpriority Claims, (iv) modifying the automatic stay to allow certain actions with respect to the Debtors' postpetition indebtedness, and (b) grant such other and further relief as the Court may deem just and proper.

Dated: Great Neck, New York
          February 19, 2014

GARFUNKEL WILD, P.C.

By: _____
Burton S. Weston
Afsheen A. Shah
Adam T. Berkowitz
111 Great Neck Road
Great Neck, NY 11021
Telephone: (516) 393-2200

*Proposed Attorneys for the Debtors and
Debtors in Possession*

2722843v.6