**GARFUNKEL WILD, P.C.**
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A. Shah
Adam T. Berkowitz

*Proposed Counsel for the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:

LONG BEACH MEDICAL CENTER, et al.[1]

                        Debtors.
------------------------------------------------------------x

Chapter 11
Case No. 14-_____ (____)

(Joint Administration Pending)

## DEBTORS' *EX PARTE* APPLICATION FOR ENTRY OF A SCHEDULING ORDER AND DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' REAL ESTATE AND DESIGNATED PERSONAL PROPERTY ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING RELATED THERETO, (C) APPROVING THE FORM OF NOTICE OF THE AUCTION AND SALE HEARING, (D) APPROVING A TERMINATION FEE AND EXPENSE REIMBURSEMENT AND EXPENSE REIMBURSEMENT; AND (II) AN ORDER (A) APPROVING SUCH SALE OF THE ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE, (C) ALLOWING THE PAYMENT OF CERTAIN VALID LIEN CLAIMS AND (D) RELATED RELIEF

Long Beach Medical Center ("**LBMC**") and Long Beach Memorial Nursing Home, Inc.

*dba* The Komanoff Center for Geriatric and Rehabilitative Medicine ("**LBMNH**" or

"**Komanoff**"), as debtors-in-possession (each a "**Debtor**, and collectively sometimes referred to

as the "**Debtors**" or the "**Medical Centers**") in these chapter 11 cases (the "**Chapter 11**

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: Long Beach Medical Center (5084) and Long Beach Memorial Nursing Home, Inc. dba The Komanoff Center for Geriatric and Rehabilitative Medicine (3422).

Cases"), by and through their proposed attorneys, Garfunkel Wild, P.C., hereby file a motion for the entry of the pre-fixed scheduling order (the "**Scheduling Order**") and (I) the entry of an order substantially in the form attached hereto as Exhibit A (the "**Bidding Procedures Order**") (a) approving bidding procedures and bidder protections (the "**Bidding Procedures**") substantially in the form attached as Schedule 1 to the Bidding Procedures Order for the sale and auction (the "**Auction**") of the Acquired Assets (as hereinafter defined); (b) scheduling an Auction and a hearing to approve the sale of the Acquired Assets (the "**Sale Hearing**"); (c) approving the form and manner of the Notice of the Auction and Sale Hearing substantially in the form attached as Schedule 2 to the Bidding Procedures Order (the "**Sale Notice**"); and (d) approving the Termination Fee and Expense Reimbursement (as hereinafter defined); and (II) entry of an Order, substantially in the form attached hereto as Exhibit B (the "**Sale Order**"), (i) approving a sale of the Acquired Assets, free and clear of all liens, claims and encumbrances, security interests and other interests except as expressly assumed in the Purchase Agreement (as hereinafter defined), to South Nassau Communities Hospital ("**SNCH**" or "**Buyer**") or any other successful bidder at the Auction as determined by the Bidding Procedures; (ii) approving certain procedures related to the assumption and assignment of certain executory contracts and unexpired leases related to the Acquired Assets (the "**Assignment Procedures**"), and fixing the Cure Amounts (as hereinafter defined), and (iii) related relief (the "**Sale Motion**"). In support of the Sale Motion, the Debtors rely in part upon the Affidavit of Douglas Melzer pursuant to Local Rule 1007-4 and in Support of First Day Motions filed on the Petition Date (the "**Melzer Affidavit**"), and respectfully state the following:

2726382v.6

## I.    SUMMARY OF RELIEF SOUGHT

1.    The relief sought by this Motion encompasses a two part request pursuant to which the Debtors are seeking to sell all of their real property and certain related personal property assets including the operating assets of Komanoff (collectively, the "**Acquired Assets**") to SNCH (or its designee(s)), subject to higher or better offers and this Court's approval. After a marketing process described below and extensive negotiations, the Debtors and SNCH have entered into an Asset Purchase Agreement dated as of February 18, 2014 (the "**Purchase Agreement**"), a copy of which is attached hereto as Exhibit C[2].

2.    As an initial matter, the Debtors are requesting entry of a Bidding Procedures Order, substantially in the form of Exhibit A hereto, approving among other things (i) the Bidding Procedures, (ii) the time, date, and place for the Auction of the Acquired Assets and the Sale Hearing, (iii) the Sale Notice, annexed as Schedule 2 to the Bidding Procedures Order, and (iv) approval of, and authorization to pay, a Termination Fee and Expense Reimbursement (the "**Termination Fee and Expense Reimbursement**") to SNCH in accordance with the terms of the Purchase Agreement (the "**Bidding Procedures Motion**").

3.    By the second prong of this Motion the Debtors seek entry of the Sale Order, substantially in the form of Exhibit B, approving, among other things, at the conclusion of the Sale Hearing, (i) the sale of the Acquired Assets, free and clear of all liens, claims, encumbrances, and other interests with such liens, claims and encumbrances and other interests to attach to the proceeds of such sale, and the assumption and assignment of the Assigned Contracts (as hereinafter defined) to SNCH or any other Successful Bidder at the Auction; and

---

[2]    Capitalized terms used in this Motion, unless herein defined, are used with the meanings ascribed to such terms in the Purchase Agreement.

2726382v.6

(ii) the segregation of funds for the payment of the Termination Fee and Expense Reimbursement, as may be allowed by the Court (the "**Sale**" or "**Sale Transaction**"). The sale of the Acquired Assets to SNCH or any other Successful Bidder will maximize value for the Debtors' estates and their creditors.

4.    Over the last several years, the Medical Centers have been beset by the financial pressures caused by cuts in Medicare and Medicaid funding, declining indigent pool payments, and changing demographics in the communities served by the Debtors.  For a number of years the Debtors experienced a progressive decline in patient volume and discharges and reduction in acuity of the case mix.  Operating revenues have steadily decreased, leading to significant losses in the years preceding these filings.  Cash book balances were frequently negative, and past due vendor payables increased.

5.    In an attempt to address its financial difficulties, the Medical Centers undertook to implement new initiatives including, among other things, the hiring of highly skilled physicians and the introduction of new advances and technologies.  These initiatives started to translate into improved performance, but that all was undermined when LBMC sustained significant damage during Superstorm Sandy.  Many infrastructure operating systems, the computer systems, boiler plant, laundry, kitchen, electrical distribution systems, and emergency generators were among the damaged systems and equipment that were essential for operations.  While LBMC had been able to re-house its Family Care Center and its behavioral health outpatient clinics in temporary locations, it represened only a skeleton of health care services.  The acute care hospital, however, remained shuttered.

6.      At Komanoff, 120 nursing home residents had to be evacuated to other facilities in anticipation of the superstorm. They were not able to return until late January, 2013, and the physical plant still has not been fully restored.

7.      Despite significant efforts by the Debtors and their management to improve performance, the Debtors have not been able to survive the year long closure of the Hospital occasioned by the superstorm. The operations at Komanoff do not generate sufficient revenue to carry the closed facility while emergency funding is sought and repairs are made. Further, the New York State Department of Health (**"DOH"**) has made it clear it will not support the reopening of a 162 bed acute care facility that LBMC previously operated. DOH has urged LBMC to find a financially viable partner.

8.      Thus, the Debtors face the eventual and real risk that costs will outstrip its revenue stream, jeopardizing patient care and the Debtors' ability to continue funding operations. Absent the proposed sale to SNCH, the closure of the Medical Centers and a potential forced liquidation of the Debtors' assets could be necessary. A sale on the other hand would permit an orderly transition of the Debtors' nursing home operations to SNCH, potential access to federal funds to restore the hospital property and reconfigure its healthcare delivery model and allow for the continued delivery of healthcare services at and/or in the vicinity of the Debtors' sites under the SNCH banner. Given the geographic isolation of the Long Beach island, the continuing of healthcare services at the existing site is of critical importance to the community.

9.      Significantly, the New York State Department of Health (**"DOH"**) has indicated that it supports the proposed transaction. With DOH's support, the receipt of any required regulatory approvals should be substantially easier to obtain.

10.     Under the circumstances, the proposed sale of the Acquired Assets to SNCH unquestionably represents an exercise of the Debtors' sound business judgment. It is further anticipated that the procedures proposed by this Motion and the sale of the Acquired Assets to SNCH will maximize value for the Debtors' estates to the benefit of the creditors generally.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory predicates for the relief sought herein are sections 105(a) and 363(b)(d) and (f), 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 6004-1, 6006-1 and 9006-1 of the Local Rules of the Bankruptcy Court for the Eastern District of New York (the "**Local Rules**"), and General Order 557 of the Bankruptcy Court for the Eastern District of New York ("**General Order 557**").

## III.     CASE BACKGROUND AND HISTORY OF DEBTORS

13.     On February 19, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their business and/or continue to manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108. Contemporaneously with the filing of this Motion, the Debtors have filed an application seeking the joint administration of their cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

2726382v.6

14.    No trustee, examiner or creditors' committee has been appointed in these cases.

## A.    THE DEBTORS' HISTORY AND THEIR BUSINESSES

15.    Prior to Sandy, a significant portion of the Debtors' core business was focused around LBMC.  LBMC is a not-for-profit 162-bed, community-based hospital offering primary, acute, emergency and long-term health care to the residents of Long Beach.  Located at 455 East Bay Drive, Long Beach, New York 11561 and founded in 1922, LBMC was a teaching facility for the New York College of Osteopathic Medicine, with residency programs in Physical Medicine and Rehabilitation and Family Medicine.  It also hosted several centers of excellence including Arthritis and Osteoporosis; Diabetes; Wound Care & Hyperbaric; Behavioral Health and Addiction Treatment.

16.    In the 12 months prior to superstorm Sandy, LBMC discharged approximately 3,800 patients, administered 1,600 surgeries, and treated 12,500 patients in the emergency room.  For the same time period, two years prior to the storm, LBMC discharged approximately 4,100 patients, administered 1,750 surgeries, and treated 13,000 patients in the emergency room.

17.    Komanoff is a 200-bed skilled nursing facility affiliated with LBMC which was founded in 1974.  It provides services for residents requiring long term nursing home care and short term post-acute (sub-acute) care.  Although most of the residents are over 65 years of age, it also serves younger residents.  Residents largely come from communities within the southern portion of Nassau County.  Currently there are 127 residents of Komanoff, of which 118 are long term nursing residents and 9 require only short term care.

18.    Historically, in furtherance of their charitable mission, the Debtors provided critical healthcare services to large uninsured and indigent populations on a sliding scale based

7

on the ability to pay. The Debtors do not pursue amounts due for charity care through collection, and, as such, any such amounts due to the Debtors are not reported as revenue. However, the Debtors are entitled to distributions from the New York State Charity Care pools for the provision of such charitable care. In 2011 and 2012, the Debtors provided over $1.7 million in charitable care.

## B.    PREPETITION OPERATIONAL AND LIQUIDITY ISSUES

19.    As is true with many community hospitals, the Medical Centers suffered financially because of cuts in federal and state funding and reimbursement rates, changing demographics in the communities served by the Debtors, decreased utilization of acute care beds given modernization of healthcare and surgical techniques and increased competition. Thus, over the last several years, the Debtors experienced a progressive decline in patient volume and discharges and reduction in acuity of the case mix. Operating revenues have steadily decreased, leading to significant losses in the years preceding these filings. Cash book balances were frequently negative, and past due vendor payables increased.

20.    Given the Medical Centers' historical losses, DOH urged the Debtors to partner or otherwise affiliate with a financially viable healthcare system. In the years preceding the filings, the Debtors had, at various times, engaged in active discussions with several regional healthcare providers, including Mount Sinai Hospital, Winthrop Hospital, South Nassau Community Hospital and North Shore Hospital. None of those bore fruit as an affiliation was not consistent with the geographical footprint or strategic plan of any of those systems.

21.    On a parallel track, as previously noted, the Debtors undertook a number of initiatives in an attempt to address the Debtors' operating and liquidity concerns. LBMC made a concerted push to hire highly skilled physicians and upgrade its technology. For example,

LBMC's radiology and emergency departments made significant investments in enhanced equipment, which included a new 16 slice CT scanner, new ultrasound equipment, and a Picture Archiving Computer System (PACS) to compliment LBMC's expanding electronic medical record system in the Emergency Department.  LBMC was also in the process of implementing a total hospital clinical information system that, similar to PACS, would have permitted physicians and ultimately patients to access medical records online.

22.    In addition, consistent with the hospital's tailored focus on community needs, LBMC voluntarily discontinued underutilized services (e.g., maternity, pediatrics), added ones urged by neighboring agencies (e.g., inpatient psychiatry, inpatient detoxification), or responded to identified community needs (e.g., diabetes education, outpatient medical and behavioral health clinics). Recently, LBMC expanded its medically managed drug and alcohol detoxification unit and established a patient centered health care delivery model that provides comprehensive and continuous medical and mental health care.  LBMC also opened a modern, comfortable Dialysis Center to provide community residents with dialysis treatments in nearby pleasant surroundings with the personal care for which the hospital has been known.  The Dialysis Center provided the added benefit of allowing residents of Komanoff who require dialysis to obtain their treatment without having to go outdoors and travel by ambulance to more distant facilities.

23.    These initiatives were beginning to yield positive results with patient satisfaction scores at all time highs.   However, in October, 2012, superstorm Sandy devastated the communities of Long Beach and left the Debtors largely incapacitated.  The storm further exacerbated an already precarious financial situation and left the Debtors in a situation from which they have not been able to recover.

9

24.     In the month following the storm, the Debtors undertook tremendous efforts to reopen both LBMC and Komanoff.  On January 28, 2013, those efforts led to the reopening of Komanoff, allowing 120 nursing home residents to return home and reinstituting more than 200 employees to their jobs.  While rebuilding and repair efforts persist, the acute care portion of the hospital remains closed with extensive damage to its boilers, mechanical and electrical distribution systems, fire alarm systems, communications, food services and laundry services. LBMC continued to operate a family health service clinic at one of its adjacent properties and a behavioral health clinic in a rented facility in Baldwin, NY.

25.     On January 13, 2014, LBMC received notification from Centers for Medicare and Medicaid Services ("**CMS**") that because the provision of inpatient services had not resumed since the initial storm related closure in November 2012, LBMC's provider agreement with the Medicare was to be terminated as of February 1, 2014.  As a result, LBMC was no longer able to participate in the Medicare program, which severely limited its ability to receive payment for services in connection with the Family Care Clinics as well of the Behavioral Health Clinic.  As of the Petition Date, the Debtors were in the process of transferring the clinic operations and patients to SNCH.

## C.     THE MARKETING EFFORT AND PROPOSALS TO DOH TO RESTRUCTURE HEALTHCARE

26.     Senior management took the initial days and weeks after Superstorm Sandy to focus on essential emergency measures.  The Federal Emergency Management Agency ("**FEMA**") established a command center in Long Beach and the hospital's CEO was charged with coordinating health services.  Although Long Beach was under a mandatory evacuation order, an estimated 10,000 residents never left the island.  Thus, LBMC requested of the U.S. Department of Health and Human Services ("**HHS**") that a Disaster Medical Assistance Team

10

("**DMAT**") be dispatched and temporary emergency facilities were erected. As DMAT could only be available for a short term, HHS coordinated to make available a mobile satellite emergency department which was erected in the parking lot of the hospital. The unit was demobilized a short time later when DOH determined that regulations did not permit the operation of a free standing emergency department without a fully functioning hospital. In lieu, a basic primary care mobile van staffed by a physician or a nurse practitioner was positioned in its place.

27.     In December, 2012 with the approval of DOH, LBMC engaged a consulting firm to analyze the hospital's pre-storm services and existing community needs and make recommendations to restructure services in a more financially feasible model. In March 2013 the consultant's plan was presented to DOH but the plan was rejected. An amended proposal was rejected the following month.

28.     In February, 2013 LBMC separately engaged FEMA and construction consultants to facilitate completion of the temporary repairs necessary to reopen two of the five wings of the Hospital housing vital services including the emergency department. LBMC also enlisted many of its elected representatives over the course of ensuing months to assist the hospital in obtaining financial support including designation as a Vital Access Provider, Community Development Block Grants or Social Services Block Grants but none of these requests materialized. LBMC also urged officials to advocate for the reopening of services at LBMC. DOH concluded that the facility could not be reopened without the joinder of a strong provider.

29.     Simultaneously, the Debtors renewed efforts to find a financially viable healthcare system to partner with. In March, 2013, while rebuilding efforts continued, the Debtors issued a request for proposal ("**RFP**") from five hospital providers that might have

11

sights on the South Shore Long Island market as part of their strategic plans. Thus RFPs for an affiliation were sent to NYU Medical Center ("**NYU**"), North Shore Long Island Jewish Hospital ("**NS-LIJ**"), New York Presbyterian Healthcare System ("**NYPH**"), the Catholic Health System of Long Island ("**CHS**") and South Nassau Communites Hospital ("**SNCH**"). The RFPs were issued in conjunction with management's ongoing discussions with DOH regarding alternative healthcare models at the LBMC site, the potential use of grant dollars to restructure the Medical Center's balance sheet and the use of FEMA and Community Development Block grants to upgrade the physical plant.

30.    No responses were received from NYU, NYPH or NS-LIJ. CHS expressed initial interest in an affiliation arrangement and several meetings among executive management followed, but CHS ultimately determined that there was not the geographical match to capture the Long Beach patient base.

31.    The only serious interest came from SNCH, which neighbors the Long Beach facility. SNCH also brought financial strength to the equation and was best positioned to assure the continuity of healthcare in the Long Beach area. In August, 2013, the parties entered into a memorandum of understanding (the "**MOU**") to explore proposed transactions which contemplated the sale of substantially all of the Medical Centers' real property and operating assets to SNCH, changes to the healthcare delivery model at the Long Beach site, the restructuring or satisfaction and discharge of LBMC and Komanoff indebtedness, and the provision of financing to fund continued operations and maintenance of the assets until any transaction could be completed. The MOU was submitted to DOH for its review and ultimately received the Department's strong support.

32.    Recognizing that the damage sustained to the Medical Centers' facilities and the changes to the demographics of the Long Beach area did not permit the continuation of a full service, 162 bed acute care hospital, the parties embarked on an analysis of how services could be restructured in a financially sound manner consistent with community needs. As an initial matter, SNCH sought, and subsequently obtained, certificate of need approval to establish an urgent care center on the LBMC campus and obtained a community block grant to fund its development and operation. The project is in the developmental stages.

33.    On a larger scale, the parties entered into negotiations for SNCH to acquire all of the real property and substantially all of the operating assets of both the LBMC campus and Komanoff. This Sale Motion seeks, *inter alia*, to approve the sale to of the Acquired Assets to SNCH (or its designee(s)) pursuant to an Asset Purchase Agreement between the parties (the "**Purchase Agreement**"). As is more fully described below, the consideration under the Purchase Agreement for the assets being acquired (collectively, the "**Acquired Assets**") is $21,000,000. It is anticipated that SNCH will continue to operate the Komanoff nursing home. The parties also will continue to pursue FEMA funding to repair and reconfigure the LBMC campus facilities. What proposed uses the LBMC campus will be put to by SNCH, other than the implementation of an urgicare center, still remains in the developmental stages and depends in large measure on the ability to obtain, and the amount of, any FEMA funding to restore and rebuild the physical plant.

34.    It is a condition of the Purchase Agreement that the Sale Transaction be consummated pursuant to the provisions of section 363 of the Bankruptcy Code, and subject to higher and better offers. In furtherance of that effort, the Debtors' respective Boards voted to approve the filing of Chapter 11 petitions for the Debtors.

13

## IV.    CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

### A.    NEW YORK STATE HOUSING FINANCING AGENCY.

35.    During 1973, Komanoff entered into an agreement with the State of New York and the New York State Housing Finance Agency in order to finance the construction of a new facility. A total of $6,155,000 was borrowed via the issuance of $5,105,000 of 1974 Series A Bonds and $1,050,000 of 1977 Series A Bonds. Principal and interest payments are made monthly. The average interest rate was 5.9% per annum on the 1974 Series and 7.0% on the 1977 Series. The bonds were scheduled to be redeemed forty years from the date of issuance.

36.    During 1998, Komanoff entered into an agreement with the New York State Housing Finance Agency to refinance its 1974 Series A and 1977 Series A Bonds. The mortgage agreement, with a remaining balance of approximately $3,762,527, was refinanced with an average interest rate of 4.9% per annum. The 1998 Series A Project Revenue Bonds are scheduled to be redeemed 16 years from the date of refinancing. The mortgage loan payable is collateralized by substantially all assets and future revenues of Komanoff.

37.    Under the terms of the mortgage and the subsequent refinancing, Komanoff is required to make monthly deposits equal to 1/12 of its current annual principal amortization and interest expense into the mortgage repayment escrow fund, which is restricted for the payment of bond interest and principal.

38.    Monthly deposits are also required, under this agreement, into the operating escrow fund. This fund consists of a reserve for equipment replacement and structural repairs and a reserve for contingencies. Komanoff may draw monies out of these reserves with the approval of DOH.

14

39.     As of the Petition Date, the balance due on the 1998 Series A Project Revenue Bonds is $172,527, and the balance of the mortgage repayment and operating escrow sum is $41,118 and $345,307, respectively

## B.     DORMITORY AUTHORITY OF THE STATE OF NEW YORK ("DASNY").

40.     Pursuant to a Reimbursement Agreement dated as of November 1, 2007, DASNY made a non-interest-bearing loan to LBMC in the initial principal amount of $2,000,000 (the "**DANSY Loan**") for the purpose of funding the restructuring of its operations to improve operating performance, consistent with the recommendations of the Commission of Health Care Facilities in the 21st Century. As security for the DASNY Loan, DASNY was given a mortgage in certain of the Medical Center's real property constituting the parking lots adjacent to the facilities. Commencing January 2010, the Medical Center was to begin repaying the balance in sixty monthly installments of $33,333. In 2011, the Medical Center only made nine payments. In April 2012, the repayment terms were revised and the Medical Center began to make monthly payments of $10,000, with interest being charged at 1%, scheduled through December 31, 2013. Those payments were schedule to increase to $31,500 in January of 2014, and were to remain at that amount until the balance is repaid. The last payment made in respect of the DASNY Loan was in September of 2012, approximately one month prior to Sandy. As of the Petition Date, the outstanding balance of the DASNY Loan is approximately $1.252 million.

## C.     FIRST CENTRAL SAVINGS BANK ("FIRST CENTRAL").

41.     LBMC holds several properties which it used as off-site storage, employee housing and physician office space. LBMC purchased these properties over a number of years as part of a strategic expansion plan. The properties include: 757 Lincoln Blvd., 758 Lincoln Blvd.,

759 Lincoln Blvd., 760 Lincoln Blvd., 762 Lincoln Blvd., 711 Lincoln Blvd., 415 State St., 425 State St., 479 State St., 765 Franklyn Blvd., and 761 Franklyn Blvd (the "**Offsite Premises**").

42.     In order to refinance the loan obligations with respect to the aforementioned properties, LBMC borrowed from First Central $1.8 million, evidenced by a permanent loan note (the "**Mortgage Loan**") and obtained a line of credit in the amount of $1 million (the "First Central Line"), evidenced by a commercial line of credit note (the "**Line Note**") and security agreement ("**Line Security Agreement**"), each dated as of March 7, 2008.  In connection therewith, LBMC executed and delivered to First Central a blanket mortgage on the Offsite Premises (the "**First Central Mortgage**").  Subsequently, LBMC requested a complete draw of the First Central Line.  As a condition to authorizing the full draw, First Central required LBMC to consolidate the Mortgage Loan and the First Central Line into a consolidated note (the "**First Central Consolidated Note**").  On or about August 1, 2008, LBMC drew down on the First Central Line.  The principal balance upon consolidation, after taking into account payments previously made, was $2,704,606.26.  As of the Petition Date, obligations under the First Central Consolidated Note are approximately $2,641,000.00.

### D.    PENSION PLAN/PENSION BENEFIT GUARANTY CORPORATION ("PBGC").

43.     The Medical Center sponsored two noncontributory defined benefit pension plans (the "**Pension Plans**") covering substantially all employees.  The Pension Plans provided benefits based primarily on years of service and career average pay.

44.     The Medical Center applied to PBGC for distress terminations of the Pension Plans effective July 31, 2009.  By letters dated September 14, 2010 and July 29, 2011, PBGC approved the distress application for the LBMC and Komanoff, respectively.  As a result of the

16

termination of the Pension Plans, through the executed trusteeship agreement with the PBGC, benefit accruals under the Pension Plans ceased as of July 31, 2009, the PBGC became the Pension Plans' trustee, and the PBGC has become responsible for paying the Pension Plans' benefits, up to insured limits. The termination of the Pension Plans and previously unpaid pension contributions and premiums resulted in liabilities for the Medical Center arising under the provisions of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), and the Internal Revenue Code ("**IRC**"), for pension termination underfunding, past contributions due to the Pension Plans, unpaid special termination and pension insurance premiums due to PBGC with respect to the Pension Plans, and unpaid excise taxes plus interest and penalties.

45.     As of the Petition Date, LBMC owes PBGC approximately $20.5 million for termination underfunding, unpaid premiums, and excise taxes and Komanoff owes PBGC approximately $6.6 for the same. LBMC and Komanoff are jointly and severally liable for the Pension Plan liabilities. Of the aforementioned liabilities, PBGC has federal liens against the properties of the Medical Center in the aggregate amount of approximately $9 million, of which approximately $7.2 million relates to LBMC and $1.8 million relates to Komanoff.

E.      **SOUTH NASSAU COMMUNITIES HOSPITAL PREPETITION CREDIT AGREEMENT**

46.     As the Medical Center's liquidity continued to deteriorate in the weeks before the Chapter 11 filing, there became an increased need for immediate additional funding. As the Debtors were unable to secure such financing from traditional sources, they turned to SNCH to provide the necessary liquidity and working capital to maintain operations pending completion of the Sale Transaction, as well as to fund expenses in connection with the preparation and filing of these Chapter 11 Cases. After extensive arms length negotiations, SNCH agreed to provide such funding and, pursuant to that certain Loan and Security Agreement, dated as of December 30,

17

2013 (as amended, modified or otherwise supplemented from time to time, (the "**Pre-Petition Credit Agreement**"), among SNCH and the Debtors signatory thereto (collectively, the "**Pre-Petition Borrowers**"), SNCH made available to the Debtors up to $1.5 million in financing.

47.    Under the Pre-Petition Credit Agreement, SNCH is owed, as of the Petition Date, approximately $1,500,000 in principal obligations, plus interest, fees, costs and expenses and all the "Obligations" under and as defined in the Pre-Petition Credit Agreement (the "**Pre-Petition Obligations**"). The Pre-Petition Obligations are secured by liens on and security interests in substantially all of the Debtors' real and personal property assets, subject to all previously existing liens and security interests in any such property.

### F.    MECHANICS LIENS

48.    As noted above, in the wake of superstorm Sandy the Medical Center undertook substantial efforts to restore the physical plant to a condition suitable for the reinstatement of health care services to the Long Beach communities. Accordingly, the Medical Center contracted with various entities to make necessary, and in many instances emergency, repairs to their facilities with the understanding that the majority of the funding for such work would be coming from FEMA. The FEMA reimbursement process is not an expedient one, and without any significant operating revenue, the Medical Center quickly amassed sizeable payables associated with this work. Many of the contractors performing repair work at the Medical Center filed mechanic's liens against the property of LBMC and/or Komanoff as applicable.

49.    The FEMA process involves an in-depth review of all invoices submitted for reimbursement. Once approved by FEMA, funds are obligated for reimbursement based on specific projects and vendors. FEMA will only reimburse for 90% of the actual costs associated with any given project. By agreement between FEMA and the New York State Office of

18

Emergency Management ("**OEM**"), FEMA authorizes OEM to remit funds to the Medical Center. Upon receipt, these funds are treated as any other restricted assets and are paid to the vendors for which the funds were obligated.

50.    To date the Medical Center has received approximately $17.6 million from FEMA, which has been used to satisfy a substantial portion of the mechanics' liens. As of the Petition Date, there remains approximately $3.7 million in mechanics' liens against he property of LBMC and approximately $500,000 in mechanics' liens against the property of Komanoff, each after taking into account duplicative filings by general and subcontractors. Based on FEMA's reimbursement scheme, the Debtors anticipate that approximately 90% of the remaining mechanics' liens will be satisfied by FEMA reimbursements. The Debtors anticipate that the remaining 10% of outstanding mechanics liens, or approximately $2,000,000, may be satisfied by Community Block Grants.

### G.    NEW YORK STATE DEPARTMENT OF LABOR

51.    The Debtors are each not-for-profit corporations under Section 501(c)(3) of the federal Internal Revenue Code, and, as such, are able to elect one of two payment methods for discharging its obligations to the New York State Department of Labor (the "**DOL**"), referred to as either the "reimbursement" or "tax contribution" options. Those employers that elect the tax contribution basis remit funds to the DOL periodically as a tax. This tax is based on the employer's applicable tax rate and the annual compensation paid to its employees. Employers that elect the reimbursement option do not make periodic payments and instead are only obligated to repay the DOL for unemployment benefits actually paid out to former employees. The Debtors elected to satisfy its unemployment obligations on a reimbursement basis. Accordingly, after superstorm Sandy the Debtors' obligation to DOL rose precipitously at the

19

same time their revenue stream collapsed, giving rise to a claim for non-payment. DOL asserts that it is owed $3,012,334.14 and $358,763.50 on account of unemployment benefits DOL paid to the LBMC and Komanoff's respective terminated employees. In order to secure LBMC's obligation to pay such amounts, DOL filed state tax liens against it. The aggregate amount due DOL as of the Petition Date is approximately $3.37 million.

## V.    THE PROPOSED SALE

### A.    THE SALE TO SNCH

52.    As noted above, after efforts to reconfigure the hospital on a stand alone basis were rejected by DOH and the Debtors were urged to partner with a more stable system, the Debtors' entered into discussions with SNCH about developing alternative uses for the hospital property. As an initial matter, it was agreed that SNCH would lease a portion of the hospital building and open an urgent care center on the site to provide ready access for emergency care to area residents. SNCH made application for, and was granted a certificate of need ("**CON**") by DOH to build out and operate the center. A Community Block Grant was awarded SNCH to fund the project.

53.    Several weeks ago, the parties commenced negotiations over the purchase of all or substantially all of the assets of LBMC and Komanoff. On February ___, 2014, simultaneously with the filing of the Chapter 11 Petitions, the Debtors and SNCH entered into the Purchase Agreement pursuant to which SNCH has agreed to purchase the Acquired Assets, free and clear of liens, claims and encumbrances (except as expressly assumed) for aggregate consideration to the Debtors' estates in the amount of $21,000,000 (the "**Purchase Price**"). In addition, to fund the costs of preparing and prosecuting the Chapter 11 cases, and operating shortfalls until the sale to SNCH (or its designee(s)) can be consummated. SNCH agreed to

20

provide the Debtors: (i) a prepetition secured credit facility in the principal amount of $1.5 million; and (ii) a postpetition secured debtor-in-possession loan facility in the additional principal amount of $4.5 million (collectively, the "**SNCH Financing**").

54.    The total Purchase Price is comprised of: cash, less the amount of (a) the SNCH Financing, (b) any Assumed Employee Liabilities (inclusive of Accrued PTO and other liabilities owed to Komanoff employees employed by SNCH) and (c) Government Settlements that may be payable to Medicare, Medicaid or any other Governmental Authority to the extent paid or payable by Buyer.    The Purchase Agreement contemplates the sale to SNCH of all of the Debtors' real estate and substantially all of the Debtors' other assets to SNCH.

55.    The Debtors believe that SNCH has the financial capability and logistical resources to purchase and integrate the Acquired Assets and implement critical upgrades to existing systems and facilities so as to ensure the continued provision of health care to the communities currently served by the Medical Center for years to come.    SNCH has received a HEAL grant in the amount of almost $22 million from New York State to effectuate the purchase, a Community Block Grant to build and capitalize the urgicare facility and a $6 million loan from DASNY to fund the SNCH Financing.    The Debtors believe that DOH's support for the transaction should facilitate and expedite the approval process.

56.    An expeditious sale of the Debtors' assets will (i) ensure the continuation of essential healthcare services to an island community which has no other healthcare resources of this proportion; and (ii) optimize the value of the Debtors assets, all of which will inure to the benefit of the Debtors, their employees, patients, creditors, and communities at large.    Komanoff fully expects to continue operating in the ordinary course of business pending the consummation of the sale, which is anticipated to occur not later than May 31, 2014.    Absent such a sale, the

21

Debtors will face a liquidity crisis which could force them to immediately curtail and ultimately shut down operations entirely, to the detriment of their patients, the communities they serve and the public interest.

57.     The Debtors believe that the Purchase Agreement is fair and reasonable and in the best interest of the Debtors' estates, their creditors and all other parties in interest. Notwithstanding, it is contemplated that the proposed Sale will be tested by an additional solicitation process and Auction during which higher and/or better offers will be considered. Accordingly, in order to ensure that the highest and best offer is realized for the Acquired Assets, the Debtors are seeking approval of the Bidding Procedures which will enable the Debtors to continue marketing the Acquired Assets, and conduct an Auction if additional parties are interested in making higher or better offers.  The Debtors believe the Bidding Procedures, in conjunction with the Purchase Agreement, are the best possible means for maximizing value for the benefit of the Debtors' estates and their respective creditors.

58.     Additionally, as is customary in a Sale Transaction of this nature, the Purchase Agreement provides for the payment of a Termination Fee in the amount equal to $630,000 and an Expense Reimbursement for fees incurred by Buyer in connection with its due diligence, negotiation, documentation and implementation of the Sale Transaction in an amount not to exceed $210,000 (together aggregating 4% of the sale price) subject to this Court's approval. The Termination Fee and Expense Reimbursement are payable in the event that a higher or better offer (a "**Competing Bid**") is accepted by Seller and the Bankruptcy Court issues an order approving a transaction with the party making such Competing Bid or confirming a plan which does not involve the sale of the Acquired Assets to SNCH (an "**Alternate Transaction**"). Separately the Expense Reimbursement is payable if (i) the Purchase Agreement is terminated

22

because of a material breach of the Purchase Agreement by the Debtors, (ii) a Material Adverse Effect, (iii) the Sale Order is not entered within 60 days after the Petition Date, (iv) the Closing does not occur by the Outside Closing Date or (v) a Title Defect exists which is not removed by Seller, in case of (iii)-(v) only where the failure is due in whole or in part to any action or inaction by Sellers. The Termination Fee and Expense Reimbursement are in consideration of SNCH having expended considerable time and effort in negotiating the Purchase Agreement. The Termination Fee and Expense Reimbursement are payable solely from the proceeds of the Alternate Transaction and upon the consummation of a sale resulting from a Competing Bid, or as otherwise set forth in the Purchase Agreement.

59.    The Sale Transaction and Purchase Agreement are also conditioned upon (i) Attorney General and New York State Supreme Court approval consistent with the New York Not-For-Profit Laws; and (ii) all requisite approvals required by DOH and any other regulatory authority asserting jurisdiction over the Debtors.

## B.    The Purchase Agreement

60.    The following is a summary of the material terms of the Purchase Agreement[3]:

(a)    Purchase Price. Buyer shall provide Sellers with aggregate consideration of $21,000,000, less the amount of: (a) the SNCH Financing, (b) any Assumed Employee Liabilities (inclusive of Accrued PTO and other liabilities owed to Komanoff employees employed by SNCH); and (c) Government Settlements that may be payable to Medicare, Medicaid or any other Governmental Authority to the extent paid or payable by Buyer.

(b)    Deposit. Buyer shall be deemed to have made a cash deposit in the total outstanding principal amount of the Pre-Petition Obligations. The Debtors shall be

---

[3]    The summary contained below is intended to provide the Court and parties in interest with the salient terms of the Purchase Agreement, to the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the actual terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control. Capitalized terms contained in the summary description of the Purchase Agreement that are not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

permitted to retain $1,050,000 of the Deposit to be applied against amounts owed under the Pre-Petition Loan Documents as liquidated damages in the event the Debtors properly terminate the Purchase Agreement because of a material breach by SNCH.

(c)    _Acquired Assets._ The assets being sold to SNCH include, inter alia, (i) all Owned Real Property of Sellers; (ii) the interests of Sellers under certain designated Real Property Leases, if any; (iii) Sellers' Furniture and Equipment and Inventory; (iv) all Assigned Contracts listed on Schedule 2.1(g), including all of Sellers' rights of set-off under such Assigned Contracts; (v) the Medicare and Medicaid provider agreements and numbers with respect to the Nursing Home; (vi) all Intellectual Property of Sellers; (vii) all books, records and data of LBMNH including, all files, charts and other information held or used by LBMNH in connection with the operation of the Nursing Home (including, patient records, medical records, therapy records, pharmacy records, clinical records, financial and accounting records, and resident trust fund records), maintenance records; employment, and administrative compliance records with respect to LBMNH; (viii) all rights in and to the domain names of LBMC and LBMNH; (ix) all future FEMA claims (other than funds paid or payable to Sellers with respect to claims submitted by Sellers to FEMA prior to the Closing for restoration work already performed by Sellers) and FEMA Advanced Funds; (x) any Prepaid Deposits; (xi) all insurance claims with respect to the Real Property (subject to Sellers' right to remediate any such damage with insurance proceeds) (xii) the going concern value and goodwill of the Nursing Home; and (xiii) the Debtors' restricted assets and endowment funds to the extent transferable and subject to any approvals required by applicable law.

(d)    _Excluded Assets._ Property excluded from the Sale includes: (i) Sellers' accounts receivable accruing prior to the Closing; (ii) all cash, cash equivalents, bank deposits and similar items (other than Restricted Assets); (iii) the Excluded Contracts; (iv) the Medicare and Medicaid provider agreements with regard to the Business of LBMC; (v) all rights of Sellers in or to distributions from the Indigent Care Pool and the GME Pool; (vi) medical records of LBMC pertaining to patients of the Hospital; and (vi) all organizational documents, corporate records and minute books of Sellers (the "Excluded Assets").

(e)    _Assumed Liabilities._ The Buyer has agreed to assume only the liabilities of Sellers that are owed under (a) any Assigned Contracts, but only to the extent of they accrue from and after the Closing Date and relate solely to dates of service from and after the Closing Date; (b) the Cure Amounts relating to any Assigned Contracts; and (iii) any Assumed Employee Liabilities.

(f)    _Excluded Liabilities._ Buyer is assuming only the Assumed Liabilities, and Buyer shall not have any obligation with respect to any other Liabilities of Sellers, regardless of whether such obligation arises before, on or after the Closing Date.

(g)    _Warranties._ Except as expressly set forth in the Purchase Agreement, neither Sellers nor any of their respective affiliates make any representation or warranty, express or implied, at law or in equity, as to the accuracy or completeness of any information regarding the Sellers, the Business, the Acquired Assets, or Liabilities

24

(including the Assumed Liabilities), or the transactions contemplated by the Agreement, and shall not have any liability to Buyer for the distribution of such information.

(h)    As Is Transaction.    Except as otherwise expressly warranted and represented by Sellers in the Purchase Agreement, Sellers are transferring and Buyer shall accept the Acquired Assets at the Closing "as is" and "where is" as of the Closing Date.

(i)    Employees.    SNCH is not assuming any of the Debtors' collective bargaining agreements or any other obligations relating to the Sellers' employees. Notwithstanding, SNCH will offer employment on a probationary basis to such employees of the Debtors whom SNCH determines, in its sole discretion, to employ.

(j)    No Successor Liability.    Except as to specific liabilities that Buyer expressly assumes in writing, Buyer shall have no liability, as successor or otherwise, for (a) any breach by Sellers of any of their CBAs nor for any arrears by Sellers in payments to Employees or contributions due to any Employee Benefit Plan or Multiemployer Plan pursuant to any such CBA or any trust agreement, or for any liability or claim arising out of or relating to the termination of Sellers' obligations under any CBA or any trust agreement, including termination of Sellers' obligations to contribute to any Multiemployer Plan; and (b) any of the Debtors' pre-petition and post-petition arrears to any such Employee Benefit Plans and Multiemployer Plans and for any Withdrawal Liability associated with their ceasing to contribute to any Multiemployer Plan.

(k)    Closing Conditions Required by SNCH.    SNCH's closing conditions include, among other things:   (i) the accuracy of the Sellers' representations and warranties; (ii) compliance by the Sellers with all of their covenants and agreements hereunder in all material respects through the Closing; (iii) no Material Adverse Change shall have occurred with respect to Seller, (iv) no order shall have been entered or applicable law passed that would prohibit the consummation of the Closing; (v) Sellers and Buyer shall have received all required regulatory approvals from Government Authorities ("**Regulatory Approvals**"); (vi) no Governmental Authority, including CMS, DASNY, PBGC or IRS, shall have objected to the sale of the Acquired Assets pursuant to the Sale Order or, if any Governmental Authority shall have objected to the sale of the Acquired Assets pursuant to the Sale Order, such objection shall have been overruled or consensually resolved; (vii) the Bankruptcy Court shall have entered the Bidding Procedures Order within 20 days of the Petitiion Date; (viii) the Bankruptcy Court shall have entered the Sale Order, which shall have become a Final Order; (ix) Buyer shall have received reasonably acceptable assurances, in Buyer's sole discretion, from counsel and/or appropriate regulatory agencies that Buyer shall have no successor liability resulting from the Contemplated Transaction; (x) FEMA shall have confirmed, in a writing acceptable to Buyer in its sole discretion, that Buyer (or its designee) will succeed to the proceeds of all funds otherwise payable by FEMA to Sellers, and that FEMA will provide to Buyer (or its designee) such funding to implement and complete Buyer's (or its designee's) alternative use project for developing replacement health care services in the Long Beach community; (xi) Buyer shall have received all of the Closing Documents; (xii) all Governmental Authorities conducting investigations with respect to LBMNH, including investigations by The Attorney General of the State of New York, Medicaid

Fraud Control Unit, shall have agreed to cap any potential liability of LBMNH at an amount acceptable to Buyer; (xiii) Buyer shall have received written assurances from the Medicare and Medicaid programs limiting Buyer's (or its designee's) potential Liability for obligations owed by LBMNH, to an amount acceptable to Buyer in its sole discretion; (xiv) Buyer shall have received current Phase I environmental site assessments acceptable to Buyer; (xv) the Title Company shall have irrevocably committed to issue a title policy to Buyer with respect to the Owned Real Property; (xvi) Buyer shall have received the entire proceeds of a HEAL Grant in an amount of $21,962,357, as described in an award letter from DOH and DASNY to Buyer, dated December 17, 2013; and (xvii) the Bankruptcy Court shall have approved and authorized Sellers' assignment of the Assigned Contracts to, and the assumption thereof by, Buyer.

(l)      Closing Conditions Required by the Debtors. The Debtors' closing conditions will be limited, among other things, to: (i) the accuracy of Buyer's representations and warranties (ii) compliance by the Buyers with all of their covenants and agreements hereunder in all material respects through the Closing; (iii) no order shall have been entered or applicable law passed that would prohibit the consummation of the Closing; (vi) Sellers and Buyer shall have received all Regulatory Approvals; (iv) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order; (v) Sellers shall have received all of the Closing Documents; and (vi) Buyer shall have paid, or shall pay simultaneously with the Closing, or shall have made arrangements to pay, any and all Cure Amounts with respect to any Assigned Contracts.

(m)      Termination of the Purchase Agreement. The Purchase Agreement may be terminated upon, including, but not limited to, the occurrence of the following events: (i) by mutual agreement of the Parties; (ii) if: (A) the Bidding Procedures Order is not entered within 20 days after the Petition Date; (B) the Bankruptcy Court has not entered the Sale Order within 60 days after the Petition Date (C) if an order approving a Competing Bid (subject to the limitations in the Bidding Procedures Order); or (D) the sale of substantially all of the assets of Sellers occurs; (iii) dismissal or conversion of the Chapter 11 Cases or the appointment of a Chapter 11 trustee, examiner or other person with expanded powers in the Debtors' Chapter 11 Cases;  (iv) granting of relief from the automatic stay to permit foreclosure or the exercise of other remedies on the material assets of any the Debtor; (v) Debtor's modification or consent to any modification of the Purchase Agreement, in each case, without the prior agreement of the Purchaser; (vi) by Buyer if (A) there is a Material Adverse Effect; (B) if there is a material breach by Seller of any of the provisions of the Purchase Agreement; (C) if the Termination Fee and Expense Reimbursement are not approved by the Bankruptcy Court; (D) if Sellers (x) fail to obtain either interim or final orders from the Bankruptcy Court authorizing and approving post-petition debtor-in-possession financing, or (y) breach and are in default of any agreement relating to such debtor-in-possession financing, causing a termination of funding to Sellers; (E) if there is a Title Defect, which Seller shall be unwilling or unable to remove or (F) if the conditions to Buyer's closing become incapable of fulfillment; (vii) by Seller if (A) there is a material breach by Buyer of any of the provisions of the Purchase Agreement; or (B) the conditions to Seller's closing become incapable of fulfillment; and (viii) by Seller or Buyer if (A) 90 days after the entry of the Sale Order

by the Bankruptcy Court, DOH has disapproved or indicated that it will disapprove the CON Application; or (B) either of or both Sellers consummate an Alternate Transaction.

**C.    Termination Fee and Expense Reimbursement**

61.    As noted above, the Purchase Agreement contemplates the payment of the Termination Fee and Expense Reimbursement in certain circumstances. The Termination Fee and Expense Reimbursement will be granted an administrative expense priority pursuant to Bankruptcy Code sections 503(b) and 507(b) and shall be payable solely from the first proceeds of such Alternate Transaction, or as set forth in the Purchase Agreement.

62.    The Debtors believe that (a) approval of the Termination Fee and Expense Reimbursement is an integral part of the Purchase Agreement, (b) in the absence of the Debtors' obligation to pay the Termination Fee and Expense Reimbursement, SNCH would not have entered into the Purchase Agreement, (c) the entry of the Purchase Agreement is necessary for preservation of the Debtors' estates and is beneficial to the Debtors, and (d) the Termination Fee and Expense Reimbursement are reasonable in relation to SNCH's efforts and to the magnitude of the transactions and consideration contemplated by the Purchase Agreement.

63.    The Purchase Agreement further provides that if the Termination Fee and Expense Reimbursement are not approved by the Bankruptcy Court, SNCH shall have the right, but not the obligation, to terminate the Purchase Agreement and neither party shall have any further obligations to the other.

**VI.    THE PROPOSED BIDDING PROCEDURES AND AUCTION**

**A.    The Scheduling Order**

64.    The Debtors seek entry of the prefixed Scheduling Order setting the time and notice requirements for the hearing on the Bidding Procedures and the Termination Fee and

27

Expense Reimbursement. Specifically, the Debtors request that notice of the hearing on the Bidding Procedures, Termination Fee and Expense Reimbursement and related relief be sufficient if the Scheduling Order and the Motion are served by (i) overnight mail, or (ii) electronic transmission followed by regular first class mail, within two (2) days of entry of the Scheduling Order on: (a) the Debtor's thirty (30) largest unsecured creditors (on a consolidated basis) and, upon its appointment, counsel for the official committee of unsecured creditors (the "**Creditors Committee**"); (b) each of the Debtor's secured creditors (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) all counter-parties to the Assigned Contracts (hereinafter defined); (f) the following state and local taxing and regulatory authorities: (i) the Centers for Medicare and Medicaid Services, (ii) the New York State Department of Health, (iii) the United States Attorney for the Eastern District of New York, (iv) the Attorney General of the State of New York; (v) Corporation Counsel for the City of Long Beach; (vi) the New York State Department of Labor; (vii) the Pension Benefit Guaranty Corporation; (viii) the Internal Revenue Service; and (ix) the New York State Department of Taxation and Finance; (g) counsel to the Buyer; (h) the United States Department of Justice, Commercial Litigation Division; (i) the United States Department of Health and Human Services; (j) International Union of Operating Engineers, Local 30; (k) 1199 SEIU Healthcare Workers East; (l) all parties who are known to assert a Lien on the Purchased Assets and Properties; and (m) all parties identified by the Debtors as potentially having an interest in acquiring some or all of the Acquired Assets (collectively, the "**Notice Parties**").

65. The shortened notice period is necessary given the limited remaining resources of the Debtors and the surmounting losses being incurred by the Debtors on a continual basis.

28

### B.    Summary of the Bidding Procedures

66.    In order to ensure that the maximum potential value for the Acquired Assets is obtained, the Debtors seek entry of the Bidding Procedures Order and approval of the Bidding Procedures.  The Debtors believe that the solicitation procedures and Auction contemplated pursuant to the Bidding Procedures will maximize value of the Assets.  The Purchase Agreement expressly provides that the sale of the Acquired Assets is subject to higher and better offers.

67.    The Purchase Agreement provides that the Buyer shall act as the "stalking horse bidder" in the Auction for the Acquired Assets with the right to receive the Termination Fee and Expense Reimbursement (collectively, the "**Bidding Protections**"), in the event, *inter alia,* of an Alternate Transaction.

68.    As noted above, the Buyer has provided the Debtors with debtor in possession financing to administer their chapter 11 cases (the "**DIP Financing**").    Such DIP Financing, under the terms of the related agreements (the DIP Financing Agreements"), matures upon approval of an Alternate Transaction.  Thus, in order to administer the Chapter 11 Cases through closing and thereafter, it is necessary that any Successful Bidder satisfy and assume such DIP Financing obligations.  **Thus, the Bidding Procedures require that upon the entry of an order approving the Sale of the Acquired Assets to an entity other than the Buyer (or its designee(s)), the Successful Bidder shall be required to: (i) repay to the Buyer, within five (05) business days of the entry of such order, any outstanding amounts of the DIP Financing; and (ii) assume and continue to perform all of Buyer's rights and obligations in connection with the DIP Financing and under the DIP Financing Agreements.**

69.    The Bidding Procedures (annexed as Schedule 1 to the Bidding Procedures Order) provide, in relevant part, as follows:

(a)    Qualified Bidders:    In order to participate in the bidding process and to have a bid considered by the Debtors, each potential bidder (a "**Potential Bidder**") must deliver a written, irrevocable offer, for some or all of the Debtors' Acquired Assets, satisfying the below criteria.  A BID MAY BE MADE FOR ALL OR ONLY A PORTION OF THE ASSETS.  A "Qualified Bidder" is a Potential Bidder that delivers a binding bid, which, in the Debtors' discretion, after consultation with the Creditors Committee, satisfies the following (a "**Qualified Bid**"):

(b)    Bid Deadline.  Each Bid Package (as defined below) must be delivered in written form to: (i) counsel to the Debtors, Burton Weston, Esq., Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, (ii) counsel for the Creditors Committee, and (iii) counsel to the United States Trustee, in each case so as to actually be received no later than 4:00 p.m. (prevailing Eastern Time) on April [to be set], 2014 (the "**Bid Deadline**").

(c)    Bid Package.  Each bid must include (collectively, the "**Bid Package**"): (i) a written and signed irrevocable offer stating that (x) the bidder offers to consummate a sale transaction on terms and conditions no less favorable than in the Purchase Agreement and in an amount at least equal to the Minimum Bid (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order, and (ii) closing with the Successful Bidder and (z) that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representation except as expressly provided with the Modified Purchase Agreement (as defined below); (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "**Modified Purchase Agreement**"); and (iii) an electronic markup of the Agreement clearly showing the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtors) and the electronic markup of the Purchase Agreement.  The Debtors, in consultation with the Creditors Committee, shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the agreement is a Qualified Bid.

(d)    Minimum Bid.  The amount of the purchase price in such bid must provide for net cash (or cash equivalent) that is at least in the amount of: $100,000 more than the base price contained in the Purchase Agreement, plus the amount of the Bidding Protections (the "**Minimum Bid**").  Any Minimum Bid must provide for sufficient cash consideration to fully fund (i) the cash amounts necessary to satisfy, upon the entry of an order approving the Sale of the Acquired Assets, any outstanding amounts and remaining loan commitments under the DIP Financing Agreements (collectively, the "**Assumed DIP Obligations**"); and (ii) the Bidding Protections..

(e)    Financial Information.  The Bid Package must contain such financial and other information that will allow the Debtors to make a determination, in consultation with any Creditors' Committee, as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, including any proposed conditions to Closing and adequate assurance of such bidder's

2726382v.6

ability to perform under any Assigned Contracts (and to pay all cure amounts required to assume and assign any such Assigned Contracts.

(f)    Additional Bid Protections.  The bid must not request or entitle the Potential Bidder to any termination fee, transaction or break-up fee, expense reimbursement, or similar type of payment.

(g)    Identity of Bidders.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Acquired Assets, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtors.  Potential Bidders shall be required to provide such additional information as the Debtors may require regarding the bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

(h)    Due Diligence.  Except for required Regulatory Approvals, the bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence.  Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Acquired Assets prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

(i)    Consents.  Each Potential Bidder must represent that it obtained all necessary organizational (not regulatory) approvals to make its competing bid and to enter into and perform the Modified Purchase Agreement.

(j)    Deposit.  A Potential Bidder must deposit 5% of the initial purchase price set forth in the Modified Purchase Agreement (inclusive of the Assumed DIP Obligations), plus the amount of the Bidding Protections, with the Debtors in the form of a certified check or wire transfer on or before the Bid Deadline (the "**Deposit**").  The Potential Bidder or the Backup Bidder (defined below) shall forfeit the Deposit if (i) the Potential Bidder of the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder, or (ii) the bidder is a Successful Bidder (defined below) and (x) modifies or withdraws the bid without the Debtors' consent before the consummation of the sale contemplated by the bid, or (y) breaches any of the Modified Purchase Agreement.  The Deposit shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder; provided, however, in the event Buyer is not the Successful Bidder, its Deposit shall be returned to it promptly upon termination of the Purchase Agreement, but

31

in no event later than five (5) business days from such termination. The Debtors will maintain any Deposit in a non-interest bearing Debtor account.

(k)     As Is, Where Is: Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in the Modified Purchase Agreement of the Successful Bidder. Any Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

(l)     Debtors' Considerations: The Debtors, after consultation with the Creditors' Committee, will have the right to determine that a bid is not a Qualified Bid if either of the following conditions is satisfied: (A) the ability of the Potential Bidder to use the Acquired Assets is not consistent with the Debtors' mission; or (B) the terms of the bid are materially more burdensome or conditional than the terms of the Purchase Agreement and are not offset by a material increase in purchase price, which determination may take into consideration: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including professionals' fees and the Bidding Protections); (3) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (4) any other factors the Debtors, after consultation with the Creditors' Committee, may deem relevant.[4]

(m)     Sale to SNCH. The Purchase Agreement shall be deemed a Qualified Bid and the Buyer shall be deemed a Qualified Bidder. If no Qualified Bid other than Buyer's is submitted by the Bid Deadline, the Debtors shall not hold the Auction, but shall proceed with the Sale Hearing and seek approval of the Purchase Agreement and the transactions contemplated thereby.

(n)     Auction.     In the event that the Debtors timely receive at least one Qualified Bid (excluding Buyer's) by the Bid Deadline for all or any portion of the Acquired Assets, the Debtors shall conduct the Auction with respect to the Acquired Assets. The Auction will take place at the offices of counsel to the Debtors, Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021 on April _____, 2014, starting at 10:00 a.m. (prevailing Eastern Time), or at such other later date and time or other place, as may be determined by the Debtors at or prior to the Auction. The Auction shall be governed by the following procedures:

(i)     Participation. Only the Qualified Bidders that have submitted a Qualified Bid and provided a Deposit(s) will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney for a Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder). In

---

[4] Notwithstanding the Qualifying Bid procedures, the Debtors reserve the right to entertain bids for the Assets that do not conform to one or more of the requirements set forth herein and in the Bidding Procedures.

the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith. The Debtors, in consultation with the Creditors' Committee, will evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest or best offer for all or any portion of the Acquired Assets, and otherwise complies with the bid requirements set forth herein, as the "**Starting Auction Bid**." The Debtors may consider a variety of factors to determine the Starting Auction Bid including changes to the Purchase Agreement and the Qualified Bidder's ability to consummate the Sale. At the Auction, the Debtors shall announce the material terms of each overbid and the basis for calculating the total consideration offered in each such overbid.

(ii)    Bidding. Bidding at the Auction shall commence at the amount of the Starting Auction Bid. Qualified Bidders may then submit successive bids in increments of $100,000 (the "**Bid Increment**"); provided, however, that the Debtors, in consultation with the Creditors' Committee, shall retain the right to modify the Bid Increment at the Auction. Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

(iii)    Higher and Better. The Debtors reserve the right, in consultation with the Creditors' Committee, to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtors may consider a variety of factors in making this decision, including without limitation, the ability of a Bidder to obtain the necessary Regulatory Approvals, whether the bid is materially more burdensome than the terms of the Modified Purchase Agreement, any proposed conditions to closing, whether the bid includes any non-cash components and provides significant cash consideration for the payment of required costs of the transaction, and any other factors deemed relevant.

(iv)    Successful Bid. The Auction shall continue until there is only one collective offer or separate offers for the Acquired Assets, that the Debtors, in consultation with the Creditors' Committee, determines, subject to Court approval, is (or are) the highest or otherwise best offer(s) from among the Qualified Bids submitted at the Auction (the "**Successful Bid(s)**") and the Debtors announce that the Auction is closed. The Qualified Bidder submitting such Successful Bid shall become the "**Successful Bidder(s)**," and shall have such rights and responsibilities of the purchaser, as set forth in the Modified Purchase Agreement, or the Purchase Agreement, as applicable. Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder(s) shall (i) complete and execute all Purchase Agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid(s) was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals 5% of the Successful Bid(s) plus the amount required for the payment of the Bidding Protections..

(v)    Anti-Collusion. At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other Qualified Bidder or potential bidder with respect to the bidding or the sale contemplated by the Purchase Agreement (the "**Sale**").

(vi)    <u>Conduct of Auction</u>. The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid; the Debtors or its counsel may meet privately with any Qualified Bidder to negotiate the terms of its bid. The Debtors, in consultation with the Creditors' Committee, may adopt other rules for the conduct of the Auction at the Auction which, in their judgment, will better promote the goals of the Auction.

(vii)    <u>Backup Bid</u>. At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid(s) from among the Qualified Bids submitted at the Auction (the "**Backup Bid(s)**"). The Qualified Bidder(s) submitting such Backup Bid(s) shall become the "Backup Bidder(s)," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities of the Buyer, as set forth in the Modified Purchase Agreement or the Purchase Agreement, as applicable. The Backup Bid shall remain open and irrevocable until the earlier of (x) ninety (90) days following entry of the Sale Order and (y) closing of the Sale, provided, however, if the Buyer's bid is deemed the Backup Bid, the Buyer's rights and obligations with respect to such bid shall be subject to the terms of the Purchase Agreement. The Backup Bidder's Deposit will be returned by the Debtors upon consummation of the Sale of the Acquired Assets to the Successful Bidder(s) or will be otherwise applied or forfeited as provided in Section (ix) above, and the Bid Procedures, if the Backup Bidder is determined to be the Successful Bidder, except for the Deposit of the Buyer, if deemed the Backup Bidder, which shall be subject to the terms of the Purchase Agreement.

(viii)    <u>Extensions/Adjournment</u>. The Debtors reserve their rights, in the exercise of their judgment, in consultation with the Creditors' Committee, to modify any non-material provisions of the Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice consistent with the Purchase Agreement and Bid Procedures Order.

## C.    <u>Auction and Sale Hearing Notice</u>

70.    Within three (3) days after entry of the Bidding Procedures Order, the Debtors shall cause to be served copies of the Bidding Procedures Order, the Bidding Procedures and the Sale Notice (annexed as Schedule 2 to the Bidding Procedures Order) on the Notice Parties, all creditors of the Debtors who are listed on the Schedules filed by the Debtors or who have filed proofs of claim against the Debtors' estates ("**Scheduled and Filed Creditors**") and all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 ("**2002 Parties**").

34

71.    No later than twenty-one (21) days prior to the Sale Hearing, the Debtors shall supplement service by causing a copy of the Sale Notice to be served on any additional parties disclosed by the title reports as asserting a lien on or interest in the Acquired Assets.  Further, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will submit the Sale Notice to be published once in the New York Times (Local Edition).

**D.    Objections to Bidding Procedures and Sale**

72.    The Debtors propose that objections, if any: (i) to the Bidding Procedures shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven days prior to the Bidding Procedures Hearing (the "**Bidding Objection Deadline**"), and (ii) to the Sale Motion shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven days prior to the Sale Hearing (the "**Sale Objection Deadline**"), by: (a) the Office of the United States Trustee, Office of The United States Trustee, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, NY 11722,, Attn: Christine H. Black, Esq., Assistant U.S. Trustee, (b) counsel to the Debtors, Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck New York, 11021, Attn: Burton Weston, Esq., Afsheen Shah, Esq. and Adam Berkowitz, Esq.; (c) counsel for SNCH, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036-8299 Attention Rick Zall, Esq. and Lee Barkan, Esq. and Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attention: Frank A. Oswald, Esq. and Scott Griffin, Esq.; and (e) counsel to the Creditors' Committee.

**E.    Sale Hearing**

73.    The Successful Bid and Backup Bid will each be subject to entry of the Sale Order after the Sale Hearing. to be held on a date to be set by this Court. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than

by announcement of the adjournment in open court. Upon approval of the Backup Bid by the Court, the Backup Bid (except for the Buyer if its bid is deemed the Backup Bid) shall remain open and irrevocable until the consummation of the Successful Bid.

## VII.    EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

74.    Pursuant to this Court's Guidelines for the Conduct of Asset Sales, adopted by General Order No. 383, dated as of December 1, 2009, the Debtors are required to highlight any "extraordinary provisions" of the proposed Sale. The extraordinary provisions in the proposed Sale are as follows:

(a)    Use of Proceeds. Under the Purchase Agreement, the first proceeds from the Sale pursuant to a Competing Bid will be used to pay the Termination Fee and Expense Reimbursement. The Sale Order also provides that: the liens existing on the Acquired Assets will attach to the net proceeds of the sale to the same extent, validity and priority that existed prior to the sale after taking into account the costs of the Sale and the Debtors shall be authorized to use such proceeds to pay any such secured claims in the order of their relative priority, as allowed by the Court.

(b)    Record Retention. The Purchase Agreement provides that the Debtors will retain or otherwise have reasonable access to their books and records to enable the Debtors to be able to administer their estates. Patient records will be maintained in accordance with applicable law.

(c)    Relief from Bankruptcy Rule 6004(h). The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtors submit such relief is appropriate under the circumstances because there is an immediate need for the successful Buyer to commence the lengthy DOH approval process.

(d)    Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Buyer's successor liability. The parties intend that the transfer of the Acquired Assets to SNCH will not subject SNCH to any liability other than any Assumed Liabilities and a finding that the Sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law. The Debtors propose to provide notice of the Sale in accordance with the notice procedures set forth herein and submit that such notice is appropriate and adequate under the circumstances.

## VIII.    ASSIGNED CONTRACTS

36

75.    Section 365 of the Bankruptcy Code provides in relevant part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the Debtors." 11 U.S.C. § 365(a). Pursuant to Schedule 2.1(d) of the Purchase Agreement, the Assigned Contracts consist of specified executory contracts and unexpired leases which have been designated to be assumed by the Debtors and assigned to Buyer.

76.    In connection with the Sale of the Assets, the Debtors may seek to assume and assign to SNCH, and may if provided by the Successful Bid, assume and assign to the Successful Bidder(s) if different from SNCH, certain executory contracts and/or leases designated by SNCH or another Successful Bidder (the "**Assigned Contracts**") pursuant to Section 365 of the Bankruptcy Code and in accordance with the procedures set forth herein (the "**Assignment Procedures**").

77.    The Debtors will file a schedule of the potential Assigned Contracts (the "**Assumption Schedule**") no later than fifteen (15) days prior to the Objection Deadline, and concurrently serve notice of such filing upon all counterparties to the Assigned Contracts, the Notice Parties and the 2002 Parties. The Assumption Schedule will include any amount the Debtor believes is required to be paid pursuant to section 365(b) of the Bankruptcy Code to cure any defaults under the agreements listed on the Assumption Schedule (the "**Cure Amounts**"). Subject to the terms of the Purchase Agreement, the Successful Bidder(s) will be fully responsible for satisfying the requirements of section 365(b), including payment of the Cure Amounts and establishing adequate assurance of future performance.

78.    Counter-parties to the Assigned Contracts will have until the Objection Deadline to file an objection to the proposed assumption and assignment of any Assigned Contract or any

Cure Amount. Any such objection must set forth with specificity the basis for the objection and, if applicable, any counter-proposed Cure Amount.

79.     The Assumption Schedule may be awarded at any time prior to the Closing Date to add or remove an Assigned Contract. In such event, the Debtor shall file and serve an applicable notice of amendment (the "**Amendment Notice**"), reflecting appropriate changes to the Assumption Schedule, including changes to any proposed Cure Amounts, on all counter-parties to the Assigned Contracts removed or added to, or otherwise modified by, the amendment to the Assumption Schedule. All affected parties shall thereafter have fifteen (15) days to object to file an Assumption Objection to the Amendment Notice.

80.     If an Assumption Objection is filed, and is not consensually resolved, the Debtors propose the Court hold a hearing on the objection on a date specified by the Court. To the extent the objection relates solely to a proposed Cure Amount, the Debtors propose that they have the right to have the Assigned Contract assumed and assigned to SNCH or Successful Bidder(s), as applicable, with an appropriate amount being held in escrow for payment of the Cure Amount pending the resolution of the Assumption Objection by the parties or the Court. The Debtors further request that the parties be authorized to settle, compromise or otherwise resolve any disputed Cure Amounts without the need for further Court Order or notice to other parties.

81.     If no Assumption Objection is timely filed and served, and subject to entry of an Order by this Court at the Sale Hearing approving the Sale and proposed assumption and assignment of the Assigned Contracts in connection therewith, the Cure Amounts set forth in the Assumption Schedule, as may be amended, shall be controlling, notwithstanding anything to the contrary in such Assigned Contracts, and the non-debtor parties shall be barred from asserting

against the Debtors or the Buyer (or the Successful Bidder(s)) any other claim arising from the applicable Assigned Contracts.

82.    The effective date of the assumption and assignment of any Assigned Contract shall be the Closing Date of the Sale.  All Cure Amounts will be paid by SNCH (or Successful Bidder(s)) either prior to, upon, or promptly after the closing of the Sale, or as otherwise agreed upon between the parties to the Assigned Contracts.

2726382v.6

## IX.   THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED

### A.   The Bidding Procedures Should be Approved

83.   The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtors' estates receive the greatest benefit available from the sale of the Acquired Assets.  The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Acquired Assets while allowing the Debtors the flexibility to select the bid or bids that provide the greatest overall value to the Debtors' estates giving weight to the Debtors' not-for-profit healthcare mission and the best likelihood of closing.  Finally, the Bidding Procedures set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids, while still providing for the expeditious sale of the Acquired Assets.

84.   The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors' estates receive the maximum benefit available from the sale of the Acquired Assets, and therefore warrant Court approval.

### B.   The Termination Fee and Expense Reimbursement Should Be Approved

85.   The Debtors are also requesting approval of the provisions of the Purchase Agreement and the Bidding Procedures regarding the Termination Fee of $630,000 and an Expense Reimbursement of up to $210,000 (which together is equal to approximately 4% of the Purchase Price).  The Termination Fee and Expense Reimbursement are payable solely from the first proceeds of an Alternate Transaction, or as set forth in the Purchase Agreement.

86.   As noted above, approval of the Termination Fee and Expense Reimbursement is an integral part of the Purchase Agreement, in the absence of which SNCH would not have

2726382v.6

entered into Purchase Agreement. The Debtors submit that the Termination Fee and Expense Reimbursement are reasonable in relation to SNCH's efforts and to the magnitude of the transactions and consideration contemplated by the Purchase Agreement. Further, SNCH's bid establishes an appropriate floor value for the Acquired Assets after diligent marketing and discussions with numerous potentially interested bidders.

87.     Bankruptcy courts have approved bidding incentives similar to the Termination Fee and Expense Reimbursement under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Trustee's or Debtors' decision to agree to the Termination Fee and Expense Reimbursement is not tainted by bad faith or self-dealing, (ii) the Termination Fee and Expense Reimbursement do not hamper bidding, and (iii) the amount of the Termination Fee and Expense Reimbursement is reasonable. See Official Comm. of Subordinated Bondholders v. Integrated Res.. Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). A Termination Fee or break-up fee and Expense Reimbursement serve as an "incentive payment" offered to an unsuccessful bidder who places the Debtors' property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, Termination Fee and Expense Reimbursements (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. *Integrated Res.*, at 661-62.

88.     In the instant case, the Termination Fee and Expense Reimbursement are the product of good faith, arm's-length negotiations between the Debtors and SNCH, each of whom was represented by counsel. The Termination Fee and Expense Reimbursement provide a material benefit to the estates by enabling the Debtors to obtain a commitment from the Buyer

41

which has and will continue to expend money, time and effort formulating and negotiating an offer for the Acquired Assets, notwithstanding that Purchase Agreement is subject to higher or better offers.    In the Debtors' business judgment, the Termination Fee and Expense Reimbursement are fair and reasonable when considering the time, effort, cost, and expense that SNCH has incurred in negotiating the Purchase Agreement, and necessary to reimburse SNCH for its costs and expenses in the event an Alternate Transaction is consummated.

89.    Moreover, the Termination Fee and Expense Reimbursement do not hamper any other party's ability to offer a higher or better bid for the Acquired Assets.    Given the size of the Termination Fee and Expense Reimbursement relative to the total amount of consideration provided for the Acquired Assets pursuant to the Purchase Agreement, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Acquired Assets.    Because the Purchase Agreement has created a floor for any additional bids, SNCH has provided significant value to the Debtors' estates. The Debtors submit that the Termination Fee and Expense Reimbursement are appropriate under these circumstances.

90.    Finally, the Termination Fee and Expense Reimbursement are reasonable in relation to the size of the proposed sale and under the facts and uncertainties of this transaction. The aggregate of the Termination Fee and Expense Reimbursement is approximately four percent (4%) of the Purchase Price.    Courts in this District have approved termination or breakup fees in approximately the  same amount as measured in proportion to the proposed purchase price offered for a debtor's assets. See In re Sound Shore Medical Center of Westchester, et al, Case No. 13-22840 (Bankr. S.D.N.Y. June 29, 2013) (approving a break-up fee of 3% on a $58.75 million purchase price); In re New York Westchester Square Medical Center, Case No.

42

06-13050 (Bankr. S.D.N.Y. Feb. 1, 2013); (approving a break-up fee of 3% on a $15.3 million assets sale); In re HMX Acquisition Corp., Case No. 12-14300 (ALG) (Bankr. S.D.N.Y. Nov. 29, 2012) (approving break-up fee of approximately 3.0% of the purchase price); In re Bos. Generating, LLC, No. 10-14419 (SCC) (Bankr. S.D.N.Y. Oct. 12, 2010);  In re Saint Vincent Catholic Medical Center, et al., Case No. 10-11963 (Bankr S.D.N.Y, June 30, 2011) (approving a break-up fee of 2% on a $34 million sale of assets); In re Cabrini Med. Ctr., Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% for an $80 million sale); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 23, 2009) (approving a break-up fee totaling 3.7% of total purchase price);  In re Bearingpoint, Inc., No. 09-10691 (REG) (Bank. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% on a $350 million sale); In re Silicon Graphics, Inc., Case No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving a break-up fee totaling approximately 6% of total purchase price); In re Fortunoff Fine Jewelry & Silverware, LLC, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee of 2.8% of the purchase price); In re Bally Total Fitness of Greater N.Y., Inc., Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee of 4.3% of the purchase price).

## C.    The Auction and Sale Hearing Notice Should be Approved

91.    Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.  The Sale Notice sets forth all the information a potential bidder and any other party in interest should require about the bidding process for the Acquired Assets, including: notice of the Bidding Procedures and

2726382v.6

information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date and location of the Sale Hearing.

92.     The Debtors submit that the Sale Notice as proposed complies with Bankruptcy Rule 2002 and Administrative Order No. 383, and constitutes good and adequate notice of the sale and the proceedings with respect thereto.  Because the Debtors are providing notice of this Motion, the Bidding Procedures and the Auction to all Notice Parties and Scheduled and Filed Creditors, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied.  The Debtors also propose to publish the Auction and Sale Notice in The New York Times (Local Edition) pursuant to Bankruptcy Rule 2002(l).  Therefore, the Debtors respectfully request that the Court approve the Auction and Sale Notice and the notice procedures proposed above.

## X.     THE SALE ORDER SHOULD BE ENTERED

### A.     Sales Outside the Ordinary Course of Business

93.     Section 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules govern the sale of assets outside the ordinary course of business.  Section 363(b)(1) provides, in relevant part, that a debtors in possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  See 11 U.S.C. § 363 (b)(1) and (f).

94.     The terms of such sale are generally within the sound discretion of the Debtors.  See In re Ionosphere Clubs, Inc., 100 B.R. 670 (Bankr.S.D.N.Y. 1989) (sale of Debtors' airline shuttle assets approved where representing the exercise of independent good faith and non-

44

coerced business judgment by the Debtors, the Debtors articulated a compelling business reason for the sale and represented fair value).

95.    As recognized by the Second Circuit in <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063 (2d. Cir. 1983), a court may approve a section 363 application after expressly determining from the evidence presented at the hearing that a good business reason exists to grant such application.

96.    Bankruptcy Rule 6004(f)(1) further provides that sales of property outside the ordinary course may be conducted by private sale or public auction. <u>See</u> F.R.B.P. 6004(f)(1). Generally, a bankruptcy court has wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under section 363(b). <u>See</u> <u>In re Ancor Exploration Company</u>, 30 B.R. 802 (Bankr. N.D. Okla. 1983).  However, each proposed sale must be examined from its own facts to determine whether the proposed sale is justified with detailed factual findings being made in support thereof.

**B.    The Sale of the Debtors' Assets Represents
the Debtors' Sound Business Judgment**

97.    Under applicable law, a proposed sale must represent the reasonable exercise of business judgment on the part of a debtor-in-possession in order to be approved under section 363(b) of the Bankruptcy Code. <u>See, e.g.</u>, <u>In re Chateaugay Corp.</u>, 973 F.2d 141 (2d Cir. 1992); <u>In re Lionel Corp.</u>, 772 F.2d at 1071.  <u>See also</u>, <u>In re Integrated Res., Inc.</u>, 147 B.R. 650, 656 (Bankr.S.D.N.Y. 1992), <u>appeal dismissed</u>, 3 F.3d 49 (2d Cir. 1993) quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985) (stating that the business judgment rule is applicable in bankruptcy and presumes that when making a business decision the directors of a corporation

2726382v.6

acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company).

98.    Furthermore, Chapter 11 debtors may, in some circumstances, sell all or substantially all of their assets pursuant to section 363(b) prior to confirmation of a plan. In re Lionel Corp., supra, 722 F.2d at 1071.  Such a sale can even be made prior to filing a plan of reorganization. In re Naron & Wagner, Chartered, 88 B.R. 85 (Bankr.D.Md. 1988).  However, in approving such a sale, a court must be able, based on the evidence, "...to articulate sound business justifications for [its] decisions." In re Lionel Corp. at 1066.  A court should consider all of the salient factors and act to further the diverse interests of the debtors, creditors and equity holders alike. Id. at 1070.  See also, In re Chateaugay Corporation, 973 F.2d 141 (2nd Cir. 1992); In re Ionosphere Clubs, Inc., 100 B.R. at 675.

99.    The Second Circuit has indicated that the following factors should be considered during the sale approval process: (i) the proportionate value of the assets to the estate as a whole; (ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions; and (vii) whether the asset is increasing or decreasing in value. See Lionel, 722 F.2d at 1071.  The factors highlighted by the *Lionel* decision are often cited and applied by other courts when determining requests to approve a sale of all or substantially all of the assets of a debtors' estate. See, e.g., In re Narong & Wagner, Chartered, supra; In re Delaware & Hudson Railway Co., 124 B.R. 169 (D.Del. 1991); In re Thomson McKinnon Securities, Inc., 120 B.R. 301 (Bankr.S.D.N.Y. 1990); In re Engineering Products Co., Inc., 121 B.R. 246 (Bankr. E.D.

46

Wis. 1990); In re Channel One Communications Inc., 117 B.R. 493 (Bankr. E.D.Mo. 1990); In re Brethren Care of South Bend, Inc., 98 B.R. 927 (Bankr. N. D. Ind. 1989).

100.    As indicated above, the decision to sell the Acquired Assets was one of necessity and resulted from a lack of remaining viable alternatives.  Absent a sale of their Acquired Assets to a third party, the Debtors would likely be forced to liquidate their assets or otherwise conduct an orderly wind-down of their operations.  Indeed, a prompt sale of the Acquired Assets is necessary in order to prevent the accrual of unnecessary and burdensome administrative expenses and stop the hemorrhaging of cash from the Debtors' operations.

101.    Currently, the Debtors' projected "cash burn" rate is approximately $[      ] per month.  The Debtors have extremely limited cash reserves and limited postpetition financing options.  Further, the sale process to SNCH or any other healthcare user will require Regulatory Approvals.  This alone could take up to six or more months after entry of a Sale Order.  Thus, an immediate sale is necessary if the Debtors are to be able to maintain their assets, limited operations and census levels until the Regulatory Approval process is complete and a closing can occur.

102.    Absent consummation of the proposed sale the Debtors will exhaust their cash resources and would be compelled to close the remaining clinical services and the Nursing Home.  Closure will also impose a significant hardship upon the Debtors' community which will be forced to rely on alternative, far less convenient sources of medical care.  By selling the Acquired Assets to SNCH who will continue providing vital care to the Debtors' patients and community, a significantly greater value can be captured from the assets than would be achieved through liquidation.  Moreover, the needs of the barrier island community currently serviced by the Debtors would continue to be met.  The Debtors' patients will continue receiving basic care

47

without significant disruption, and the Debtors' not-for-profit healthcare mission would be continued.

103.   As indicated above, the Debtors are well established in their community and continue to provide a high level of quality care, despite their financial difficulties.  SNCH fully appreciates the needs of the Debtors' patients.  SNCH also possesses the financial resources required to proceed with the proposed transaction.  Thus, a compelling business justification exists for the approval of this Motion.

104.   The Debtors further submit that the offer represents fair value for the Acquired Assets and provides the only feasible alternative to a closure of the Debtors' facilities.  Recent appraisals also indicate the approximate aggregate value of the real property, to be approximately $[   ] million.  As such, the Debtors submit that the sale of the Medical Centers and related facilities to SNCH offers the greatest benefit to the estates and are within the sound business judgment of the Debtors.

105.   As contemplated, a Sale of the Acquired Assets will result in the sale of a substantial portion of the Debtors' assets outside of a Chapter 11 plan, although the Debtors intend to propose and file a plan of liquidation as soon as practicable following the sale.

106.   To the extent the Sale is approved, subject to the receipt of DOH and New York State Supreme Court approval, it is essential that the proposed sale be closed as quickly as possible to avoid continuing losses and maximize asset values.  A prompt sale will ensure a seamless transition while providing the greatest potential benefit to creditors.

2726382v.6

**C.    Section 363(d) of the Bankruptcy Code is Satisfied**

107.    Pursuant to Section 363(d) of the Bankruptcy Code, a transfer of property by a not-for-profit entity must be made in compliance with applicable nonbankruptcy law governing such transfer.  Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation...." 11 U.S.C. § 363 (d).

108.    In accordance with these provisions, the Debtors and SNCH will request and expect to obtain, after entry of any Sale Order and prior to the closing, all required Regulatory Approvals for the Sale.  The Debtors anticipate obtaining approvals from the New York State Attorney General, the DOH as well as any other regulatory authority asserting jurisdiction over the Debtors.  To the extent any regulatory body or governmental agency fails to provide approval for the transaction with SNCH, the Debtors reserve all rights to challenge any such determination.  The inclusion of section 363(d) of the Bankruptcy Code was not intended to provide states with a "veto" of sales of a debtor's assets under the Bankruptcy Code that otherwise take into account legitimate interests of the state over the transfer or sale of a non-profit's assets.  See H. REP. NO. 109-31, pt. 1, title XII (Judiciary. Comm.) (listing section 1221 of the BAPCPA under the heading "Technical Amendments").

109.    The Purchase Agreement provides that the Buyer shall, at its own cost and expense, promptly after entry of the Sale Order by the Court, submit to all Regulatory Authorities all applications for healthcare regulatory consents or licenses required for the transfer of the Acquired Assets and the operation of the Nursing Home.  The Debtors shall cooperate, to

the extent necessary, in the preparation and prosecution of any such applications. The approval process could take up to 90 or more days after entry of the Sale Order.

110.    The Debtors submit that the Sale complies with applicable non-bankruptcy law. The Acquired Assets consist primarily of real estate and their transfer does not invoke specific regulatory requirements which might restrict the transfer of the property. The Debtors thus submit that the terms of the Purchase Agreement comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and any applicable federal laws. Accordingly, the Purchase Agreement satisfies the requirements of section 363(d) of the Bankruptcy Code.

**D.    Assumption of the Assigned Contracts and**
**Assignment Procedures Should be Approved**

111.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor".

112.    The business judgment test is the standard applied by courts to determine whether an executory contract or unexpired lease should be assumed. See, e.g., In re Old Carco LL (f/k/a Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); Richmond Leasing Co v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"). A court should approve assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its

50

sound business judgment in determining that assumption of an agreement is in the best interests of its estate. See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr.S.D.N.Y. 1989); see also Sharon Steel Corp v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

113.    When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

114.    Assuming and assigning the Assigned Contracts to the Buyer (or the Successful Bidder) pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment. As the Debtors are selling the Acquired Assets, the Assigned Contracts will no longer have any value to the Debtors.  By assuming and assigning the Assigned Contracts to the Buyer (or the Successful Bidder) the Debtors' estates will benefit from avoiding the damage claims that would arise from rejecting the Assigned Contracts.

115.    In addition, the Buyer has sufficient capital, financing and grant commitments to provide adequate assurance of future performance on all of the Assigned Contracts and the Debtors are requiring any Qualified Bidder similarly to demonstrate its ability to provide adequate assurance of future performance.

116.    The Assignment Procedures proposed by the Debtors for determining Cure Amounts and providing the counterparties to the Assigned Contracts notice and an opportunity to

object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfies the notice requirements of Bankruptcy Rule 6006(c).

117.    Therefore, because assuming and assigning the Assigned Contracts to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the Sale of the Acquired Assets, assumption and assignment to the Successful Bidder(s) of the Assigned Contracts is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

## XI.    The Acquired Assets Should be Sold Free and Clear of Liens

118.    Under section 363(f) of the Bankruptcy Code, a debtor may sell property under the Bankruptcy Code free and clear of liens, claims and encumbrances, provided that: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interests; (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.  11 U.S.C. § 363(f). See In re Smart World Tech., LLC, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) (Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers to acquire assets without any accompanying liabilities); In re Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

119.    In accordance with the provisions of the Purchase Agreement and section 363(f), the Debtors request that they be authorized to conduct the Sale free and clear of all Liens, other

than Assumed Liabilities and Permitted Exceptions (as set forth in the Purchase Agreement). All parties holding liens on the Acquired Assets will be provided notice of the proposed Sale and shall be granted an opportunity to object to the relief requested in this Motion and any such entity that does not object to the sale shall be deemed to have consented. See, e.g., Futuresource LLC v. Reuters, Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets counts as consent); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. 343, 345 (Bankr. E.D.Pa. 1988) citing to In re Gabel, 61 B.R. 661 (Bankr. W.D. La. 1985). See also, In re Enron Corp., 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

120.    Thus, to the extent any parties holding a Lien on the Acquired Assets fail to object to the relief requested in the Motion, a sale of the Acquired Assets free and clear of all Liens, with the exception of any Assumed Liabilities and Permitted Exceptions, satisfies section 363(f)(2) of the Bankruptcy Code.

121.    Alternatively, section 363(f)(5) is also satisfied and provides adequate cause for granting authorization to conduct the Sale free and clear of Liens.   Under the Purchase Agreement, any party holding a Lien may be compelled to accept a monetary satisfaction of its lien. The Purchase Agreement also provides that Liens on the Assets shall attach to the proceeds of the Sale, subject to any claims and defenses the Debtors may have with respect thereto. Liens which cannot be satisfied through a monetary judgment (if any) are included among the Permitted Exceptions or Assumed Liabilities and will not attach to the proceeds of the Sale.

Therefore, it is submitted that section 363(f)(5) can be deemed satisfied upon a sale of the Assets being conducted free and clear of all Liens.

## XII.    Successor Liability

122.    The Debtors are also seeking to sell the Acquired Assets free and clear of any successor liability claims relating to the Acquired Assets.    Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well.  See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing the sale of assets free and clear of successor liability claims); In re Old Carco LLC (f/k/a Chrysler LLC), Case No. 09-50002 (AJG) (Bankr.S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363 (f) barred successor liability claims for employment discrimination and rights under travel voucher program).

123.    The ability of the Debtors to transfer the Acquired Assets free and clear from successor liability is critical to the sale transaction.  In order to dispose of their assets and induce the Buyer to proceed with the Sale, the Debtors must be able to convey the assets free and clear of potential successor liability claims.    Absent such assurance, the Buyer may be unwilling to proceed and significant value for the Debtors' estates may be lost.  See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d. Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

124.    Further, under New York State law as well as the principles of traditional common law, a purchaser of another company's assets will be found liable only for the seller's liabilities where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, and (iv) the transaction is fraudulent.  See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006).  None of these factors are applicable to the proposed Sale Transaction herein.  As such, the Court may authorize the transfer of the Acquired Assets free and clear of any successor liability claims.  See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d. Cir. Feb. 1, 2010) (holding that sale pursuant to § 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

125.    Accordingly, based on the foregoing, the Debtors respectfully submit that the Acquired Assets should be transferred to the Buyer free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on successor liability.

## XIII.  SNCH Should be Afforded Protection Under Section 363(m)

126.    Section 363(m) affords protection to a good faith Buyer in any interest in property purchased from the Debtors, notwithstanding that the sale conducted was later reversed or modified on appeal.  Section 363(m) provides, in pertinent part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal

55

11 U.S.C. § 363(m). See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (Bankr. S.D.N.Y. 1994) ("Section 363(m) provides that good faith transfer of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr.S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.)

127.    The Second Circuit has held that a party would have to show fraud or collusion between a purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"). See also, In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

128.    Here, the parties have established that SNCH is a good faith purchaser as required by section 363(m) of the Bankruptcy Code. As previously indicated, the Purchase Agreement is the product of extensive, good-faith arms length negotiations between the Debtors, its advisors and SNCH. Accordingly, the Debtors request that the Court determine that SNCH was acting in good faith and is entitled to the protections of a good faith purchaser under section 363(m).

## XIV.    THE SALE SHOULD BE EXEMPT FROM TRANSFER AND SIMILAR TAXES

129.    Pursuant to N.Y. Tax Law §1405(b)(8), the Debtors submit that the Sale is exempt from New York State real estate transfer tax because it is being consummated under the

2726382v.6

Bankruptcy Code. Accordingly, the Debtors respectfully request that the Court find that these exemptions apply and that the Debtors' estates are exempt from real estate transfer taxes.

## XV.    THE COURT SHOULD WAIVE OR REDUCE THE REQUIREMENTS OF RULES 6004(H)

130.    Under Rule 6004(h) of the Bankruptcy Code, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless otherwise ordered by the Court. Fed. R. Bankr.P. 6004(h). The stay period is intended to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

131.    Although little guidance is provided by either Rule 6004(h) or the Advisory Committee Notes as to when a court should "order otherwise", it has been suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure". See 10 Collier on Bankruptcy § 6004.09 (Lawrence P. King, et al. eds, 15th ed. rev. rel. 2003). Colliers also proposes that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay pending such appeal. Id. It is thus respectfully requested that the Court waive the 14 day stay period required under Rule 6004(h) or, in the alternative, if an objection is filed to the proposed Sale, reduce the stay period to the minimum amount of time reasonably necessary for the objecting party to file a stay pending appeal. This relief is both necessary and appropriate under the circumstances of this case given the importance of the successful purchaser's immediate need to commence the otherwise lengthy DOH approval process.

2726382v.6

## NO PRIOR REQUEST

132.    No previous request for the relief sought herein has been made to this or any other court.

## XVI.    CONCLUSION

133.    The case law cited herein provides ample authority and justification for the approval of the proposed transaction.  The facts set forth herein also support a finding in favor of an order approving the Sale.  For these reasons, it is submitted that the Sale should be approved on the terms and provisions set forth in the Purchase Agreement.

**WHEREFORE** the Debtors respectfully request that the Court enter an order substantially similar to the proposed order, attached hereto as Exhibit B, granting the relief requested herein, and granting the Debtors such other and further relief as is just and proper.

Dated:   February 19, 2014
         Great Neck, New York

GARFUNKEL WILD, P.C.

By: _____
Burton S. Weston
Afsheen A. Shah
Adam Berkowitz
111 Great Neck Road
Great Neck, NY  11021
Telephone: (516) 393-2200
Facsimile: (516) 466-5964

*Proposed Counsel for the Debtors
and Debtors in Possession*

2726382v.6