# EXHIBIT C

## Asset Purchase Agreement

EXECUTION COPY

ASSET PURCHASE AGREEMENT

by and among

LONG BEACH MEDICAL CENTER,

LONG BEACH MEMORIAL NURSING HOME, INC., d/b/a THE KOMANOFF CENTER
FOR GERIATRIC AND REHABILITATIVE MEDICINE

and

SOUTH NASSAU COMMUNITIES HOSPITAL

Dated as of February 18, 2014

Table of Contents

Page

ARTICLE I DEFINITIONS ..............................................................................................1
  1.1 Definitions................................................................................................................1
  1.2 Other Definitional and Interpretative Provisions...................................................14
ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ........15
  2.1 Assets to be Sold to Buyer .....................................................................................15
  2.2 Excluded Assets .....................................................................................................17
  2.3 Assumed Liabilities ................................................................................................18
  2.4 Excluded Liabilities ................................................................................................18
  2.5 Cure Amounts ........................................................................................................18
ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING....................18
  3.1 Payment of Purchase Price......................................................................................18
  3.2 Deposit ...................................................................................................................19
  3.3 Closing and Closing Date .......................................................................................19
  3.4 Closing Deliveries...................................................................................................19
  3.5 Transfer Taxes ........................................................................................................22
  3.6 Delivery of Records and Contracts .........................................................................22
  3.7 Further Conveyances ..............................................................................................22
  3.8 Bulk Sales Laws.....................................................................................................22
  3.9 Allocation of Purchase Price...................................................................................22
ARTICLE IV SELLERS' REPRESENTATIONS AND WARRANTIES .................................23
  4.1 Organization of Sellers ...........................................................................................23
  4.2 Authorization of Transaction ..................................................................................23
  4.3 Qualification ...........................................................................................................23
  4.4 Non-Contravention .................................................................................................23
  4.5 Brokers' Fees .........................................................................................................24
  4.6 Events Subsequent ..................................................................................................24
  4.7 Tax Matters ............................................................................................................25
  4.8 Property and Assets.................................................................................................27
  4.9 Financial Information...............................................................................................28
  4.10 Intellectual Property.............................................................................................29
  4.11 Contracts ..............................................................................................................30
  4.12 Sellers' Consents and Approvals ..........................................................................32
  4.13 Powers of Attorney ..............................................................................................32
  4.14 Litigation..............................................................................................................32
  4.15 Certain Healthcare Matters ...................................................................................33
  4.16 Employees.............................................................................................................37
  4.17 Books and Records ...............................................................................................38
  4.18 Information Systems..............................................................................................39
  4.19 Foreign Operations...............................................................................................39
  4.20 Insurance Coverage...............................................................................................39
  4.21 Restrictions on Business Activities........................................................................39
  4.22 Environmental Matters..........................................................................................39
  4.23 Full Disclosure .....................................................................................................41

4.24 No Other Representations or Warranties; Schedules......................................41
ARTICLE V  BUYER'S REPRESENTATIONS AND WARRANTIES................................42
  5.1 Organization of Buyer..................................................................42
  5.2 Authorization of Transaction .......................................................42
  5.3 Non-Contravention .....................................................................42
  5.4 Brokers' Fees ...........................................................................43
  5.5 Buyer's Consents and Approvals..................................................43
  5.6 Acknowledgement Regarding Condition of the Business .................43
  5.7 Financial Capability ...................................................................43
  5.8 No Other Representations or Warranties; Schedules......................43
ARTICLE VI  BANKRUPTCY COURT MATTERS ........................................43
  6.1 Approval of the Termination Fee and Expense Reimbursement ........43
  6.2 Competing Transaction ...............................................................44
  6.3 Bankruptcy Court Filings.............................................................45
  6.4 Notice of Sale...........................................................................45
  6.5 Treatment of Monetary Obligations.............................................45
ARTICLE VII  PRE-CLOSING COVENANTS ............................................46
  7.1 General   ..................................................................................46
  7.2 Regulatory Approvals .................................................................46
  7.3 Operation of Business .................................................................47
  7.4 Access   ...................................................................................48
  7.5 Notice of Developments .............................................................49
  7.6 Employment and Physician Contracting Matters ...........................49
  7.7 Schedules  ................................................................................50
ARTICLE VIII  POST-CLOSING COVENANTS. .......................................50
  8.1 General   ..................................................................................50
  8.2 Access to Records .....................................................................50
  8.3 Non-Disclosure .........................................................................50
  8.4 Further Assurances....................................................................52
  8.5 Cost Reports.............................................................................52
  8.6 Cooperation Regarding Restricted Assets ....................................53
  8.7 Accounts Receivable..................................................................53
  8.8 Set-off Right.............................................................................54
  8.9 FEMA Advanced Funds ...............................................................54
ARTICLE IX  EMPLOYEES.....................................................................54
  9.1 Buyer Not Assuming Sellers' CBAs or Benefit Plans.......................54
  9.2 Offers of Employment Made to Sellers' Employees ........................55
  9.3 No Successor Liability.................................................................55
ARTICLE X  CONDITIONS TO OBLIGATION TO CLOSE ..........................55
  10.1 Conditions to Buyer's Obligation ...............................................55
  10.2 Conditions to Sellers' Obligations..............................................58
ARTICLE XI  DISPUTE RESOLUTION .....................................................59
  11.1 Dispute Resolution...................................................................59
ARTICLE XII  TERMINATION .................................................................59
  12.1 Termination of Agreement........................................................59
  12.2 Procedure For Termination .......................................................61

39680675v17

12.3 Effect of Termination ..................................................................................61
ARTICLE XIII  TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS..61
  13.1 Title Insurance ........................................................................................61
  13.2 Permitted Exceptions ...............................................................................62
  13.3 Apportionments .......................................................................................63
ARTICLE XIV  MISCELLANEOUS ................................................................66
  14.1 Survival .....................................................................................................66
  14.2 Press Releases and Public Announcements ...........................................66
  14.3 No Third-Party Beneficiaries ..................................................................66
  14.4 Entire Agreement .....................................................................................66
  14.5 Succession and Assignment ....................................................................66
  14.6 Counterparts .............................................................................................67
  14.7 Headings ...................................................................................................67
  14.8 Notices .....................................................................................................67
  14.9 Governing Law; Waiver of Jury Trial ....................................................68
  14.10 Submission to Jurisdiction; Consent to Service of Process ................68
  14.11 Amendments ..........................................................................................68
  14.12 Severability ............................................................................................68
  14.13 Expenses .................................................................................................68
  14.14 Construction ...........................................................................................69
  14.15 Incorporation of Exhibits and Schedules .............................................69
  14.16 No Waiver ..............................................................................................69

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Certain Individuals |
| Schedule 2.1(d) | Assigned Contracts |
| Schedule 2.2(h) | Certain Excluded Assets |
| Schedule 3.4(a)(vii) | Certain Tenancies |
| Schedule 4.6 | Events Subsequent |
| Schedule 4.7(b) | Tax Returns |
| Schedule 4.7(c) | Tax Compliance |
| Schedule 4.7(d) | Tax Jurisdictions |
| Schedule 4.7(e) | Lien or Claims for Taxes |
| Schedule 4.7(h) | Extension or Waiver of Tax |
| Schedule 4.7(i) | Tax Proceedings |
| Schedule 4.7(j) | Subpoenas |
| Schedule 4.8(a)-1 | Owned Real Property |
| Schedule 4.8(a)-2 | Leased Real Property |
| Schedule 4.8(a)-3 | Oral Leases |
| Schedule 4.8(c) | Condition of Real Property and Acquired Assets |
| Schedule 4.8(e) | Real Property Defaults by Sellers |
| Schedule 4.8(f) | Real Property Defaults by Third-Parties |
| Schedule 4.8(h) | Violations |
| Schedule 4.9 | Historical Financial Information |
| Schedule 4.10 | Intellectual Property |

| | |
|---|---|
| Schedule 4.11 | Contracts |
| Schedule 4.11(d) | Notices and Approval for Contracts |
| Schedule 4.11(f) | Related Party Transactions |
| Schedule 4.11(f) | Notes Receivable |
| Schedule 4.12 | Consents and Approvals |
| Schedule 4.13 | Powers of Attorney |
| Schedule 4.14 | Litigation of Sellers |
| Schedule 4.15(a)(i) | Governmental Authorizations |
| Schedule 4.15(a)(ii) | Filing of Cost Reports |
| Schedule 4.15(a)(iii) | Amounts Due Under Cost Reports |
| Schedule 4.15(a)(v) | Hill-Burton Act |
| Schedule 4.15(a)(vi) | Non-Compliance with Government Reimbursement Programs |
| Schedule 4.15(b)-1 | Medical Staff Disputes |
| Schedule 4.15(b)-2 | Medical Staff |
| Schedule 4.15(c) | Licenses |
| Schedule 4.15(e) | Compliance Audits |
| Schedule 4.15(h) | Billings |
| Schedule 4.15(i) | Audits |
| Schedule 4.15(j)-1 | Overpayments or Refunds to Payment Programs |
| Schedule 4.15(j)-2 | Notice of Overpayments or Refunds |
| Schedule 4.16(a) | Employee Schedule |
| Schedule 4.16(b) | Reemployment Rights |
| Schedule 4.16(c) | Foreign National employees |
| Schedule 4.16(d) | Labor Disputes |
| Schedule 4.16(f) | Collective Bargaining Agreements |
| Schedules 4.16(g) | Claims Before NLRB or Similar Agency |
| Schedule 4.16(h) | Violation of Applicable Laws Related to Employees |
| Schedule 4.16(i) | Occupational or Safety Violations |
| Schedule 4.16(j) | Rights in Property by Board, etc. |
| Schedule 4.18 | Information Systems |
| Schedule 4.20 | Insurance Coverage |
| Schedule 4.22(a) | Environmental Matters |
| Schedule 13.2(a) | Permitted Exceptions |

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Bidding Procedures Order |
| Exhibit B | Sale Order |
| Exhibit C | Medical Records Custody Agreement |

iv

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of February 18, 2014, (the "Execution Date") is by and among LONG BEACH MEDICAL CENTER, a New York not-for-profit corporation ("LBMC"), LONG BEACH MEMORIAL NURSING HOME, INC., d/b/a THE KOMANOFF CENTER FOR GERIATRIC AND REHABILITATIVE MEDICINE, a New York not-for-profit corporation ("LBMNH"), and SOUTH NASSAU COMMUNITIES HOSPITAL, a New York not-for-profit corporation ("Buyer"), each a "Party" and collectively the "Parties." LBMC and LBMNH are each referred to as "Seller" and are collectively referred to as "Sellers."

### RECITALS

WHEREAS, each Seller will be filing substantially contemporaneously herewith a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 *et seq*. (the "Bankruptcy Code") (the date on which such petitions are filed, is referred to herein as the "Petition Date"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") (collectively, the "Bankruptcy Case"); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer (or Buyer's designee(s)), and Buyer desires to purchase, acquire and assume from Sellers (or have Buyer's designee(s) do so), pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Acquired Assets and Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1    Definitions. The following terms, as used herein, have the following meanings:

"Accrued PTO" has the meaning set forth in Section 4.16(a).

"Acquired Assets" has the meaning set forth Section 2.1.

"Affiliate" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"Affiliate Agreement" means any agreement between a Seller and an Affiliate of such Seller.

"Agreement" has the meaning set forth in the preface above.

"Alternate Transaction" means a transaction or series of related transactions consummated by either Seller or both Sellers within 1 year of the Execution Date pursuant to

which either Seller or both Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization, or bankruptcy plan of reorganization or liquidation, sale, or other similar transaction (by Seller(s) or otherwise), including a Bankruptcy Court approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets owned by such Seller or Sellers, (or agree to do any of the foregoing) in either case to a party or parties other than Buyer (or one or more designees of Buyer).

"Applicable Law" means, with respect to any Person, any foreign, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, plan, order, injunction, judgment, decree, ruling, charge or other similar requirement, including any Labor and Employment Law and Requirements or any Health Care Laws and Requirements, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"Assigned Contracts" shall mean the Contracts described on Schedule 2.1(d).

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.4(a)(v).

"Assumed Employee Liabilities" means those Liabilities owed by LBMNH (and by LBMC, if applicable) to those Employees of LBMNH (and LBMC, if any) that are to be employed by Buyer (or its designee) on the Closing Date, which Buyer (or its designee), in its sole discretion, may agree in writing to assume. Assumed Employee Liabilities, if any, may include the Accrued PTO with respect to such Employees that are employed by Buyer (or its designee), if Buyer (or its designee) elects in writing to assume such Accrued PTO. Nothing contained in this Agreement shall be deemed to require Buyer (or its designee) to assume the Accrued PTO of any Employee or any other Liabilities pertaining to Employees.

"Assumed Liabilities" has the meaning set forth Section 2.3.

"Auction" has the meaning set forth in Section 6.2(c).

"Balance Sheet Date" has the meaning set forth in Section 4.9(a)(ii).

"Bankruptcy Case" has the meaning set forth in the recitals above.

"Bankruptcy Code" has the meaning set forth in the recitals above.

"Bankruptcy Court" has the meaning set forth in the recitals above.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in the form of Exhibit A hereto, with such changes as are acceptable to Buyer and Sellers

39680675v17

"Board of Directors" means the governing board of an entity, including the board of directors, board of governors, board of trustees, or board of managers, as applicable.

"Budget" means the budget approved under any order entered in the Bankruptcy Case authorizing any of Sellers to use cash collateral and/or advances under a debtor in possession loan facility.

"Business" means the business operations of any one Seller or both Sellers, as the context shall require (in each case not including the Excluded Liabilities), including the operation of the business of the Nursing Home and, prior to its closure, the operation of the Hospital.

"Business Confidential Information" has the meaning set forth in Section 8.3(b).

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Buyer" has the meaning set forth in the preface above.

"Buyer Confidential Information" has the meaning set forth in Section 8.3(c).

"Buyer's Consents and Approvals" has the meaning set forth in Section 5.5.

"Buyer's Objection Notice" has the meaning set forth in Section 13.1.

"CBA" means collective bargaining agreement.

"Claim" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.3(a).

"Closing Date" has the meaning set forth in Section 3.3(a).

"Closing Documents" has the meaning set forth in Section 3.4(a).

"CMS" means the Centers for Medicare and Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 6.2(b).

"CON Application" means the Certificate of Need application with respect to the transfer of the operation of the Nursing Home from LBMNH to Buyer (or its designee), to be submitted by Buyer (or its designee) to DOH.

"Contemplated Transactions" has the meaning set forth in Section 2.1.

"Contract" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense or other agreement or arrangements of any kind relating to the

3

Business, the Acquired Assets or the operation thereof to which either Seller or any of its Affiliates is a party or by which any of the Acquired Assets are bound.

"Cost Reports" means all cost reports related to the Nursing Home filed pursuant to the requirements of any applicable Government Reimbursement Programs for cost-based payments or reimbursement due to or claimed by LBMNH from any applicable Government Reimbursement Programs or its MAC or payor agent, including all Cost Report receivables or payables and all related appeals and appeal rights, but excluding from this definition form UB-92, UB-04, CMS 1450, CMS 1500 and other forms or claims filed or submitted by LBMNH to any applicable Government Reimbursement Programs or its MAC or payor agents with respect to the Nursing Home for payment or reimbursement due to or claimed on a fee-for-service, fee schedule or other similar basis.

"Covered Person" means a current or former Employee, officer, director or consultant of either Seller.

"Creditors' Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Case pursuant to section 1102 of the Bankruptcy Code by the United States Trustee for the Southern District of New York, as it may be reconstituted from time to time.

"Cure Amounts" has the meaning set forth in Section 2.5.

"Damages" has the meaning set forth in Section 8.8.

"DASNY" means the Dormitory Authority of the State of New York.

"Debarment or Suspension" means the exclusion of LBMNH from participation in any federal healthcare program, including Medicare, Medicaid, or any state health care program, in each case pursuant to 42 U.S.C. § 1320a-7 and 42 C.F.R. §§ 1001 *et seq.* or the corresponding Applicable Law of the State of New York.

"Debt" means, with respect to either Seller, the aggregate amounts of long-term and short-term indebtedness of such Seller, including any amounts owing under any capital lease arrangement, amounts outstanding under notes payable to any financial institution or Governmental Authority, amounts owed to an Employee Benefit Plan or any Multiemployer Plan, amounts outstanding under lines of credit, amounts owing under notes or dividends or distributions payable or other amounts payable by such Seller, any other amounts outstanding under notes payable, and any prepayment penalties or expenses payable in connection with the foregoing transactions, but excluding the accounts payable arising in the Ordinary Course of Business of such Seller.

"Deeds" has the meaning set forth in Section 3.4(a)(i).

"Deposit" has the meaning set forth in Section 3.2.

"DIP Budget" has the meaning set forth in Section 7.3.

"DOH" means the New York State Department of Health.

"DOH Approval" means the written approval of DOH and the New York State Public Health and Health Planning Council of (a) the acquisition by Buyer (or its designee) of the Acquired Assets from Sellers as of the Closing as contemplated by this Agreement, and (b) the approval of the CON Application, in each case without any contingency except as expressly permitted hereby.

"Effective Time" has the meaning set forth in Section 3.3(b).

"Eligible Employees" has the meaning set forth in Section 9.2.

"Employee Benefit Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation disability, accident, sick, vacation, holiday, unemployment incentive, commission, retention change in control, non-competition, and other plans, agreements, policies, trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Sellers or an ERISA Affiliate, or (b) with respect to which Sellers or any ERISA Affiliate has or has had any obligation, in each case, under which any Employee of Sellers may receive benefits or may otherwise be subject and other than a Multiemployer Plan.

"Employee List" has the meaning set forth in Section 4.16(a).

"Employees" means all individuals who are employed by either Seller (including any employees not actively at work as of the Closing Date, as well as any employees who are on medical disability or leaves of absence and who worked for either Seller immediately prior to such disability or leave).

"Employment Loss" means (a) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (b) a layoff exceeding 6 months, or (c) a reduction in hours of work of more than 50%.

"Environmental Claim" means any demand, assessment, Lien, investigation, claim, action or cause of action, complaint, citation, directive, information request issued by a Governmental Authority, legal proceeding, order, or notice of potential violation or potential responsibility arising under any applicable Environmental Law.

"Environmental Law" means any applicable statute, law, common law, rule, regulation, ordinance, or order of any federal, state, or local Government Authority in effect on or before the Closing Date relating to pollution, protection of human health (to the extent relating to exposure to Hazardous Materials) or the environment, or the processing, generation, management, distribution, use, handling, treatment, storage, transport, disposal, Remediation, or Release of Hazardous Materials.

"Environmental Permit" means any permit, registration, license, approval, identification number, exemption or other authorization required under or issued pursuant to any applicable Environmental Law.

5

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or 414(c) of the Code (or, solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, or Sections 414(m) or 414(o) of the Code of which either Seller is a member).

"Exceptions" has the meaning set forth in Section 13.1.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means every Contract of Sellers that is not an Assigned Contract.

"Excluded Liabilities" has the meaning set forth Section 2.4.

"Execution Date" has the meaning set forth in the preface above.

"Expense Reimbursement" means the reimbursement of the reasonable out-of-pocket costs, fees and expenses (including legal, financial advisory, accounting and other similar costs, fees and expenses) incurred by Buyer or its Affiliates in connection with the conduct of due diligence, the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and all proceedings incident thereto; provided, that under no circumstances shall the amount of the Expense Reimbursement exceed two hundred ten thousand dollars ($210,000) in the aggregate.

"Facilities" means the Hospital and the Nursing Home.

"FEMA" means the Federal Emergency Management Agency.

"FEMA Advanced Funds" means funds received by Sellers from FEMA (either directly from FEMA or indirectly, including from a Governmental Authority other than FEMA) in anticipation of specific work to be performed by Sellers.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or

39680675v17

applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Sellers and either used (currently and/or immediately prior to superstorm Sandy) by Sellers in the conduct of the Business or otherwise located on the Owned Real Property or the Leased Real Property, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Sellers, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

"GME Pool" means all payments under the graduate medical education pool of the State of New York, including all cash and non-cash proceeds, accretions or substitutions thereof as funded and/or provided for pursuant to any relevant statutes, rules or regulations of the State of New York or any agency or instrumentality thereof, including Article 28 of the New York Public Health Law and Part 86 of Title 10 of the New York Codes, Rules and Regulations, as such statutes, rules and regulations may be modified from time to time, and all such mechanisms as may replace the GME Pool as the means by which a party is reimbursed by the State of New York for its costs of graduate medical education.

"Government Payor" means any Governmental Authority that sponsors or administers a Government Reimbursement Program.

"Governmental Authority" means any domestic or foreign federal, state or local governmental authority, department, court or government, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other division, subdivision, department or branch of any of the foregoing, including any state Medicaid agency.

"Governmental Authorizations" means any approval, consent, license, permit, waiver, registration, accreditation or other authorization issued, granted, given, made available or otherwise required by any Governmental Authority or pursuant to Applicable Law.

"Government Reimbursement Programs" means the Medicare program, the Medicare Advantage program, the Medicaid program, the federal TriCare program, and any other, similar or successor federal, state or local health care payment programs with or sponsored by any Governmental Authority.

"Governmental Settlements" means any Liabilities of LBMNH to any Governmental Authority or under any Government Reimbursement Program that are paid by Buyer (or its designee) or which Buyer (or its designee) will be responsible for paying on or after the Closing Date.

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Materials" means: (i) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance,"

"solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (ii) any substance regulated under any applicable Environmental Law; (iii) petroleum or any derivative or by-product thereof; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, methyl tertiary butyl ethyl, radioactive material, or radon; (v) mold; and (vi) any asbestos-containing materials.

"Health Care Laws and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) the provision, payment, reimbursement or administration of health care benefits or insurance, including requirements of or with respect to Government Reimbursement Programs and the Applicable Laws governing insurance, insurance companies, managed care plans, managed care organizations, third party administrators or other payors; (b) the administration of claims or benefits for health care services or processing or payment of claims for health care services, including patient management, disease management or provider network services, including third party administrators, utilization review agents and Persons performing quality assurance, credentialing or coordination of benefits; (c) ERISA; (d) the Patient Privacy Requirements; (e) Title XVIII of the Social Security Act (Medicare); (f) Title XIX of the Social Security Act (Medicaid); (g) the Referral Laws; (h) the False Claims Act, 31, U.S.C. Section 3729 *et seq.* as amended, and 42 USC Section 1320a-7k(d), 42 U.S.C. 1320a-7a(a); (i) New York State laws and regulations prohibiting false claims and fraud and abuse, including N.Y. State Fin. Law § 187 *et seq.*, 13 N.Y.C.R.R. § 400.1 *et seq.*, N.Y. Soc. Serv. Law §§ 145-b, 366-b, 18 N.Y.C.R.R. § 515.2 and N.Y. Penal Law § 177.00 *et seq.*; (j) N.Y. Gen. Bus. Law §§ 349, 350-b; and (k) N.Y. State Fin. Law § 191, N.Y. Lab. Law §§ 740, 741.

"Healthcare Program Liabilities" means all Liabilities under any Health Care Laws and Requirements, including any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs for open cost report periods ending on or before the Closing Date.

"Healthcare Regulatory Consents" means in respect of Sellers or Buyer, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained and such notifications to any Governmental Authority as shall be required to be given by such Party in order for it to consummate the Contemplated Transactions in compliance with Applicable Law relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health and Health Planning Council, CMS and DOH and shall include Buyer obtaining a Certificate of Need from DOH with respect to its operation of the Nursing Home and the Parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Government Authority needed for them to consummate the Contemplated Transactions hereby.

"Historical Financial Information" has the meaning set forth in Section 4.9(a).

"Hospital" means Long Beach Medical Center, the hospital formerly operated by LBMC.

8

"Indigent Care Pool" means the Indigent Care Pool, being the successor to the Regional Bad Debt and Charity Care Pool and the Statewide Financially Distressed Hospital Pool promulgated under the New York Health Care Reform Act of 1996, codified as New York Public Health Law § 2807(k), and all cash and non-cash proceeds, accretions or substitutions thereof or thereto as funded and/or provided for pursuant to any relevant Laws of the State of New York or any agency or instrumentality thereof including Article 28 of the New York Public Health Law and Part 86 of Title 10 of the New York Codes, Rules and Regulations, as such Laws may be modified from time to time.

"Intellectual Property" means any rights and interests that either Seller has in all copyrights (both registered and unregistered), mask works, trademarks (both registered and unregistered), trade names, service marks, service names, patents, patent applications, proprietary information, trade secrets, technical information and data, computer programs and program rights, domain names and other similar intangible property rights and interests (and any goodwill associated with any of the foregoing) arising under all Applicable Laws but excluding any derivatives of such marks, rights and interests.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Nursing Home.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after due inquiry of those officers or Representatives of Buyer or of those officers of Sellers or senior managers of the Business as of or prior to the Closing each of which is identified in Schedule 1.1.

"Labor and Employment Law and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work and/or payment of wages, (b) notices to Employees, (c) discrimination, harassment and retaliation, (f) leaves of absence, (g) employee benefits, or (h) duty to bargain collectively with bargaining unit representative of Employees.

"LBMC" has the meaning set forth in the preface above.

"LBMNH" has the meaning set forth in the preface above.

"Leased Real Property" has the meaning set forth in Section 4.8(a).

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Licenses" means any licenses, approvals, authorizations, consents, permits, orders, registrations, certificates, decrees, franchises, permits variances, and similar rights obtained from any Governmental Authority.

9

"Lien" means any claim, charge, easement, encumbrance, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Loan Documents" has the meaning set forth in Section 3.1(b)(i).

"MAC" means Medicare Administrative Contractor.

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has or could be reasonably expected to have a material adverse effect on (a) the business, operations, property, condition (financial or otherwise), liabilities or results of operations of either Seller or its Business or Sellers or their Business or the material assets of either Seller, (b) the value of the Acquired Assets, (c) a significant portion of the Nursing Home or other Owned Real Property is destroyed or damaged by fire or other casualty, or (d) the ability of Sellers to consummate the Contemplated Transactions on a timely basis, in each case as determined by Buyer.

"Material Contracts" has the meaning set forth in Section 4.11(b).

"Material Development" means any change in the nature, scope, strategy, parties or other aspect of a Material Litigation or Proceeding that would have a Material Adverse Effect.

"Material Litigation or Proceeding" means any action, suit, investigation proceeding or audit (a) the settlement or adjudication of which would (i) cause a material breach of this Agreement, (ii) have the effect of making the Contemplated Transactions illegal or (iii) materially prohibit or interfere with the consummation of the Contemplated Transactions, or (b) by any Government Authority or Person, including a qui tam whistleblower proceeding, alleging a material violation or noncompliance on the part of either Seller with any Health Care Laws and Requirements.

"Medical Records Custody Agreement" means the Medical Records Custody Agreement in the form annexed hereto as Exhibit C.

"Multiemployer Plan" means a multiemployer plan as defined in Section 3 of ERISA to which Sellers or an ERISA Affiliate contribute or have or have had an obligation to contribute.

"Nursing Home" means the skilled nursing facility known as the Komanoff Center for Geriatric and Rehabilitative Medicine, operated by LBMNH on the date hereof.

"Ordinary Course of Business" means the ordinary course of business of the applicable Person, consistent with past custom and practice (including with respect to quantity and frequency), *subject, however*, in respect to the business of Sellers during the period after the Petition Date, to those actions ordinary and usual in the context of the Bankruptcy Case.

"Outside Closing Date" means the earlier of (a) June 30, 2014, or (b) the date that is 60 days after the entry of the Sale Order.

"Owned Real Property" has the meaning set forth in Section 4.8(a).

39680675v17

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Patient Privacy Requirements" means the applicable requirements of Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, as amended by the American Recovery and Reinvestment Act of 2009, and the implementing regulations thereunder governing the privacy of individually identifiable health information and the security of such information maintained in electronic form or of any similar state law.

"Payment Programs" has the meaning set forth in Section 4.15(j).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Exceptions" has the meaning set forth in Section 13.2.

"Petition Date" has the meaning set forth in the recitals above.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Authority.

"Physician" means any licensed doctor of medicine or osteopathy, doctor of dental surgery or dental medicine, doctor of podiatric medicine, doctor of optometry, or chiropractor, or any group, partnership, corporation, of whatever form, made up of one or more of such persons.

"Pre-Closing Accounts Receivable" means (a) accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products at the Nursing Home or the Hospital for dates of service occurring on or prior to the Closing Date and (b) any accounts receivable due Sellers from their Affiliates on or prior to the Closing Date.

"Pre-Petition Loan Documents" has the meaning set forth in Section 3.1(b)(i).

"Post-Closing Accounts Receivable" means (a) accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products at or with respect to the Nursing Home for dates of service occurring after the Closing Date.

"Pre-Closing Tax Returns" has the meaning set forth in Section 4.7(b).

"Predecessor" means (a) any Person that has ever merged with or into either Seller, (b) any Person, a majority of whose capital stock (or similar outstanding ownership interests) or equity securities has ever been sold, transferred or assigned by either Seller and (iii) any Person that has had all or substantially all of its assets acquired by either Seller.

"Prepaid Deposits" means all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned

11

Contract), escrows and prepaid charges and expenses of Sellers as of the Closing Date in connection with or relating to any Acquired Assets.

"Protected Health Information" shall have the meaning assigned to that term in Section 103 of 45 C.F.R. Part 160.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Real Property" means the Owned Real Property and the Leased Real Property.

"Real Property Laws" means all Applicable Laws relating to the Owned Real Property.

"Real Property Lease" has the meaning set forth in Section 4.8(a).

"Reference Balance Sheet" has the meaning set forth in Section 4.9(a)(ii).

"Referral Laws" means Section 1128B(b) of the Social Security Act, as amended; 42 USC Section 1320a7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute;" Section 1877 of the Social Security Act, as amended; 42 USC Section 1395nn and related regulations (Prohibition Against Certain Referrals), commonly referred to as "Stark Law;" 42 USC Section 1320a-7a(a)(5); N.Y. Soc. Serv. Law § 366-d, -f; N.Y. Pub. Health Law §§ 238-a, -b, 587; 10 N.Y.C.R.R. § 34-2.3, -2.4; N.Y. Educ. Law §§ 6509-a, 6530; 8 N.Y.C.R.R. § 29.1; 10 N.Y.C.R.R. § 34-1 *et seq.*; 10 N.Y.C.R.R. § 34-2.3, 2.4; 10 N.Y.C.R.R. § 600.9; and 18 N.Y.C.R.R. § 515.2.

"Reimbursement Claims" has the meaning set forth in Section 4.15(j).

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, or disposing of Hazardous Materials into the environment, including the ambient air, surface and subsurface soils, surface water and groundwater.

"Remediation" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, reclamation, closure, or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Restricted Assets" has the meaning set forth in Section 2.1(n).

"RE Tax Returns" means that returns, questionnaires, certificates, affidavits and other documents required by the Title Company in connection with the payment of any Transfer Taxes.

39680675v17

"Sale Motion" means the motion or motions of Sellers, in form and substance reasonably acceptable to Buyer and consistent with this Agreement and the Contemplated Transactions, seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court in the form of Exhibit B hereto, with such changes as are acceptable to Buyer and the Sellers.

"Seller" has the meaning set forth in the preface above.

"Seller Confidential Information" has the meaning set forth in Section 8.3(a).

"Sellers" has the meaning set forth in the preface above.

"Sellers' Consents and Approvals" has the meaning set forth in Section 4.12.

"Seller Plan" means any Employee Benefit Plan maintained by or with respect to which contributions are made by Sellers or either Seller has any liability.

"Stark Law" has the meaning set forth in Section 4.15(a)(vii).

"Straddle Payment" has the meaning set forth in Section 8.7(e).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock or membership interests entitled (without regard to the occurrence of any contingency) to vote in the election of or name directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership, limited liability company, or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successor Liabilities" means Claims or liabilities of Sellers not expressly assumed by Buyer which, under federal common law or otherwise, might be asserted against Buyer due to Buyer's hiring of Sellers' Employees and/or continuing the Business of LBMNH after the Closing.

"Supreme Court Approval" means approval of the Supreme Court of the State of New York pursuant to 510 and 511 of the Not-for-Profit Corporation Law for the sale of all or substantially all of the assets of Sellers.

"Survey" has the meaning set forth in Section 13.1.

39680675v17

"Tax" or "Taxes" means any federal, state, local, or foreign income, prohibited transaction, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, net worth or capital, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"Tax Return" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2) and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" means a fee in the amount of Six Hundred Thirty Thousand Dollars ($630,000).

"Title Company" has the meaning set forth in Section 13.1.

"Title Defect" has the meaning set forth in Section 13.1.

"Title Report" has the meaning set forth in Section 13.1.

"Transfer Taxes" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Contemplated Transactions.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and/or any similar foreign, state, or local law, regulation, or ordinance (as the context shall require).

"Withdrawal Liability" means any sum that may be assessed against Sellers by a Multiemployer Plan providing pension benefits, under the Multiemployer Pension Plan Amendments Act of 1980, resulting from Sellers ceasing to have an obligation to make contributions to such Multiemployer Plan.

1.2    Other Definitional and Interpretative Provisions.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions and headings used herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  The terms "Dollars," "dollars" and "$" shall mean United States

39680675v17

dollars. Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time at or prior to the Closing in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, any substantive amendments, modifications or supplements must also be listed in the appropriate schedule. References to any Person include the successors and permitted assigns of that Person. References herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Assets to be Sold to Buyer. On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Sellers shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of their right, title and interest in the assets described in this Section 2.1 (the "Acquired Assets"), free and clear of all Liens and Claims, other than Liens securing the Assumed Liabilities and Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code ( the "Contemplated Transactions"). The Acquired Assets shall be comprised of all assets of every description, whether real, personal or mixed, tangible or intangible, owned by Sellers (other than Excluded Assets), including the following:

(a)    All Owned Real Property of Sellers including the Owned Real Property listed on Schedule 4.8(a)-1;

(b)    The interests of Sellers, whether as landlord or tenant, under any Real Property Leases listed on Schedule 2.1(d);

(c)    All Inventory and Sellers' Furniture and Equipment;

(d)    All Contracts listed on <u>Schedule 2.1(d)</u>, including all of Sellers' rights of set-off thereunder, which Schedule shall be delivered by Buyer to Sellers prior to the Closing;

(e)    The Medicare and Medicaid provider agreements and numbers with respect to the Nursing Home;

(f)    All Intellectual Property of Sellers, including the Intellectual Property listed on <u>Schedule 4.9</u> related to the Acquired Assets or used in the Business;

(g)    Subject to Section 3.4(a)(xi), all books, records and data of LBMNH of every kind, whether in hard copy, electronic or digital format and however maintained or stored, including, (i) all files, charts and other information held or used by LBMNH in connection with the operation of the Nursing Home (including, patient records, medical records, therapy records, pharmacy records, clinical records, financial and accounting records, and resident trust fund records); (ii) to the extent available, maintenance records; (iii) employment records for any employees hired by Buyer (or its designee) (including medical and health records and all non-medical records, including evaluations); (iv) administrative compliance records with respect to LBMNH (including state surveys and plans of correction); and (v) correspondence and any other written data that was utilized in connection with the operation of the Nursing Home;

(h)    All right, title and interest in and to the domain names of LBMC and LBMNH;

(i)    All right, title and interest in future FEMA claims (other than funds paid or payable to Sellers with respect to claims submitted by Sellers to FEMA prior to the Closing for restoration work already performed by Sellers) and FEMA Advanced Funds;

(j)    Any Prepaid Deposits;

(k)    Subject to Sellers' right to remediate any such damage with insurance proceeds, all proceeds or proceeds receivable of Sellers' insurance and unliquidated or unsatisfied claims that relate to property damage with respect to the Real Property occurring prior to the Closing, and all other insurance proceeds and insurance proceeds receivable (including applicable deductibles, co-payments or self-insured requirements) arising from any claim made under Sellers' insurance policies with respect to the Acquired Assets;

(l)    All rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided to Sellers after the Closing or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(m)    The going concern value and goodwill of the Nursing Home;

(n)    Donor restricted assets and endowment funds held by, or for the benefit of, Sellers, the income and/or corpus of which has been designated for use in support of, for the benefit of, or otherwise relating to, any of Sellers' missions, operations, programs, services, assets and/or facilities (collectively, the "Restricted Assets") to the extent transferable and subject to any approvals required by Applicable Law; and;

(o)    Employment records for any employees of LBMC hired by Buyer (or its designee) (including medical and health records and all non-medical records, including evaluations).

2.2    Excluded Assets.  The following assets are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Acquired Assets (the "Excluded Assets"):

(a)    Sellers' cash, cash equivalents, bank deposits and similar items (other than Restricted Assets);

(b)    Sellers' accounts receivable (other than portion of Straddle Payments payable to Buyer (or its designee));

(c)    Rights of Sellers in or to distributions from the Indigent Care Pool and the GME Pool;

(d)    Organizational documents, corporate records and minute books of Sellers;

(e)    Receivables due to Sellers from Medicare, Medicaid, private third party insurers and patients, arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products at the Hospital or the Nursing Home in the Ordinary Course of Business for dates of service occurring on or prior to the Closing Date, including all rights of Sellers to settlement and retroactive adjustments with respect to such services;

(f)    Any records which by Applicable Law Sellers are required to retain in their possession; provided that Sellers, at their expense, deliver copies of such records to Buyer at the Closing;

(g)    The Excluded Contracts;

(h)    The assets listed on Schedule 2.2(h);

(i)    The Medicare and Medicaid provider agreements and numbers with regard to the Business of LBMC;

(j)    Medical records of LBMC pertaining to patients of the Hospital; and

(k)    Rights that will accrue to Sellers under this Agreement.

39680675v17

2.3     Assumed Liabilities.     On the terms and subject to the conditions of this Agreement, Buyer agrees that at Closing it will assume, and agree to fully pay, perform and discharge, as the case may be, when due, only the obligations and Liabilities under (i) the Assigned Contracts, but only to the extent of contractual obligations and Liabilities which are to be initially performed or which accrue from and after the Closing Date and relate solely to dates of service from and after the Closing Date, (ii) the Cure Amounts as required by Section 2.5; and (iii) the Assumed Employee Liabilities (collectively, the Liabilities described in this Section 2.3, the "Assumed Liabilities").

2.4     Excluded Liabilities.     Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall have the obligation to assume only the Assumed Liabilities, and Buyer shall not have any obligation with respect to any other Liabilities of Sellers, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "Excluded Liabilities").  It shall not affect the status of a Liability as an Excluded Liability to the extent Buyer affirmatively elects in its sole and absolute discretion to assume responsibility for a given Excluded Liability.

2.5     Cure Amounts.     At the Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers shall assume and assign to Buyer the Assigned Contracts.  The cure amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any defaults on the part of Sellers under the Assigned Contracts shall be paid by Buyer at Closing (except as otherwise agreed to by the other party to the Assigned Contracts), and Sellers shall have no liability for any such cure amount.  The cure amount to be paid by Buyer in accordance with an Assigned Contract is hereinafter referred to as a "Cure Amount," and collectively, as the "Cure Amounts."

## ARTICLE III
## PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1     Payment of Purchase Price.

(a)     Consideration.     Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer (or its designee(s)) at Closing, shall be (i) Twenty-One Million Dollars ($21,000,000) (the "Purchase Price"), subject to the adjustments and credits described in Section 3.1(b) and Section 13.3, plus (ii) the amount of the Assumed Liabilities.

(b)     Payment.     Subject to the terms and conditions hereof, on the Closing Date, Buyer shall pay to Sellers the amount of the Purchase Price:

(i)     less an amount equal to the entire outstanding principal amount and accrued interest, and all other outstanding payment obligations, under (A) that certain Loan and Security Agreement between Sellers and Buyer, dated as of December 30, 2013, and related Promissory Note from Sellers to Buyer of the same date (the "Pre-Petition Loan Documents") and (B) any subsequently entered into loan and security agreement and promissory note evidencing DIP financing provided by Buyer to Sellers, (together with the Pre-Petition Loan Documents, the

"Loan Documents"), which will be terminated and deemed paid in full as of the Closing;

    (ii)    <u>less</u> an amount equal to the Assumed Employee Liabilities, if any;

    (iii)    <u>less</u> the amount of any Governmental Settlements.

(c)    <u>Title Discharge</u>.  In the event there is any Lien or Title Defect which Sellers are obligated or elect to pay and discharge at Closing, Sellers may pay and discharge such Lien or Title Defect out of the balance of the Purchase Price, provided Sellers have made arrangements with the Title Company in advance of Closing for Sellers to deposit with the Title Company sufficient monies (which shall include all recording charges) required by the Title Company to issue an ALTA Owner's Title Policy to Buyer free of any such Lien or Title Defect.  The existence of any such Lien, Title Defect or real estate taxes shall not be deemed objections to title if Sellers shall comply with the foregoing requirements.

3.2    <u>Deposit</u>.  Buyer shall be deemed to have made a cash deposit in the total outstanding principal amount loaned to Sellers pursuant to the Pre-Petition Loan Documents, together with all accrued interest (the "<u>Deposit</u>").  Sellers shall retain One Million Fifty Thousand Dollars ($1,050,000) of the Deposit to be applied against the amounts owed under the Pre-Petition Loan Documents as liquidated damages, as their sole remedy, if this Agreement is properly terminated by Sellers pursuant to Section 12.1(c)(ii) or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Sellers of any representation, warranty or covenant contained in this Agreement or the Loan Documents.

3.3    <u>Closing and Closing Date</u>.

(a)    The closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place at a location agreed upon by Buyer and Sellers, within 10 days after receipt of all applicable Governmental Authorizations, subject to the satisfaction or waiver of all other conditions to the obligations of Sellers and Buyer, to consummate the Contemplated Transactions (other than conditions with respect to actions the respective Sellers and Buyer will take at the Closing) or such other date as Buyer and Sellers may mutually determine in writing (the "<u>Closing Date</u>").

(b)    Unless otherwise agreed in writing by the Parties, the Contemplated Transactions shall be effective as of 12:00:01 a.m. on the calendar day immediately following the Closing Date (the "<u>Effective Time</u>").

3.4    <u>Closing Deliveries</u>.

(a)    <u>Sellers Deliveries</u>.  At the Closing, contemporaneously with Buyer's delivery to Sellers of all of the Closing Documents required to be delivered by Buyer hereunder, Sellers shall deliver or cause to be delivered to Buyer, duly executed by Sellers in recordable form, where applicable (the documents and other deliverables described in this Section 3.4(a) and in Section 3.4(b) and all other documents required to