be delivered hereunder are referred to collectively as the "Closing Documents") the following items:

(i)    fully-executed and acknowledged bargain and sale deeds with covenants against grantor's acts conveying the Owned Real Property to Buyer (or its designee(s))(the "Deeds") in a form acceptable to Buyer;

(ii)    copies of any required RE Tax Returns properly executed and acknowledged by Sellers;

(iii)    a Certificate of Non-Foreign Status duly executed by each Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(iv)    a fully-executed bill of sale from each Seller in a form acceptable to Buyer;

(v)    if applicable, a fully-executed assignment and assumption agreement (the "Assignment and Assumption") in a form acceptable to Buyer in its reasonable discretion with respect to any Assigned Contracts (including any assigned Real Property Leases);

(vi)    to the extent in the possession of Sellers or Sellers' agents, all keys or key cards and alarm codes to, and all combinations to, any locks on, all entrance doors to, and any equipment and utility rooms located in, the Real Property, appropriately tagged for identification;

(vii)    except for the tenancies listed on Schedule 3.4(a)(vii), delivery of possession of the Owned Real Property free of any tenancies (other than any tenancies where Buyer or its designee is the tenant);

(viii)    a good standing certificate for Sellers from the appropriate officers of the State of New York, dated within 30 days prior to the Closing Date, and such evidence, delivered to Buyer and the Title Company, as reasonably required to evidence the due authorization, execution, and delivery by Sellers of the Deeds and other Closing Documents to which a Seller is a party;

(ix)    a certificate from an officer of each Seller to the effect that each of the conditions specified in Section 10.1(a), Section 10.1(b), Section 10.1(c) and Section 10.1(d) is satisfied in all respects;

(x)    a secretary's certificate of each Seller dated as of the Closing Date (which shall include a certified copy of such Seller's certificate of incorporation, bylaws, relevant resolutions of such Seller's Board of Directors approving the Contemplated Transactions and such other customary items as Buyer may reasonably request), in form and substance reasonably satisfactory to Buyer;

(xi)    the Medical Records Custody Agreement executed by LBMNH;

(xii)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Sellers; and

(xiii)    any other document, instrument, agreement or other item (A) required to be delivered by Sellers at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transactions as reasonably requested by Buyer or the Title Company; *provided, however*, that Sellers shall not be obligated to cause the delivery of any such documentation under clause (B) to the extent it would increase or expand Sellers' obligations or liability in any material respect.

(b)    Buyer Deliveries.    At the Closing, contemporaneously with Sellers' delivery to Buyer of all of the Closing Documents required to be delivered by Sellers hereunder, Buyer shall deliver or cause to be delivered to Sellers the following items:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price;

(ii)    copies of any required RE Tax Returns properly executed and acknowledged by Buyer;

(iii)    if applicable, a fully-executed Assignment and Assumption;

(iv)    the Medical Records Custody Agreement executed by Buyer;

(v)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(vi)    a certificate from an officer of Buyer to the effect that each of the conditions specified in Section 10.2(a) and Section 10.2(b) is satisfied in all respects;

(vii)    a secretary's certificate of Buyer dated as of the Closing Date; (which shall include a certified copy of Buyer's certificate of incorporation, Buyer's bylaw, relevant resolutions of Buyer's Board of Directors approving the Contemplated Transactions and such other customary items as Sellers may reasonably request), in form and substance reasonably satisfactory to Sellers; and

(viii)    any other document, instrument, agreement or other item (A) required to be delivered by Buyer at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transactions herein reasonably requested by Sellers or the Title Company; *provided, however*, that Buyer shall not be obligated to cause the delivery of any such documentation under clause (B) to the extent it would increase or expand Buyer's obligations or liability in any material respect.

39680675v17

3.5    Transfer Taxes.  To the extent applicable, Buyer and Seller shall each pay at the Closing any Transfer Taxes (or any other transfer, conveyance or similar tax is imposed in connection with the sale, assignment, transfer and conveyance of the Premises) payable by it pursuant to Section 14.3.

3.6    Delivery of Records and Contracts.  Sellers shall make available to Buyer at the premises of the Business on the Closing Date all business records, books, keys and other data in Sellers' possession as of the Closing Date constituting the Acquired Assets under Section 2.1. After the Closing, Buyer shall afford to Sellers and their accountants and attorneys reasonable access, during normal business hours and upon reasonable advance notice, to the books and records of LBMNH delivered or made available to Buyer under Section 3.4 and shall permit Sellers, at Sellers' expense, to make extracts and copies therefrom to the extent reasonably requested in connection with financial reporting and accounting, litigation, tax matters and any other reasonable business purpose.

3.7    Further Conveyances.  From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the other Closing Documents, to ensure that Buyer is relieved of all Excluded Liabilities including Successor Liabilities, and to assure fully to Sellers and their Affiliates and their successors and assigns the assumption of the Assumed Liabilities and to otherwise make effective the Contemplated Transactions.  If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Sellers.  If Sellers or their Affiliates retain or receive any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Sellers shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8    Bulk Sales Laws.  The Parties hereby waive compliance by Sellers with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9    Allocation of Purchase Price.  The Purchase Price shall be allocated among the Acquired Assets in accordance with the allocation protocols (and amounts determined therefrom) as determined by Buyer; *provided, however,* such allocation shall not be binding on Sellers' estates in the Bankruptcy Case.  Buyer acknowledges that Sellers intend to include such allocation in their application for Supreme Court Approval and agrees to provide Sellers with such allocation within 5 Business Days after Buyer's receipt of notice from Sellers that they are ready to submit their proposed application for Supreme Court Approval to the Charities Bureau of the Office of the New York State Attorney General.

ARTICLE IV
SELLERS' REPRESENTATIONS AND WARRANTIES

Each Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1    Organization of Sellers.  Each Seller (a) is duly organized, validly existing and in good standing under the laws of the State of New York, the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) is duly qualified or licensed to do business, and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification.

4.2    Authorization of Transaction.  Except for such authorization as is required by the Bankruptcy Court, each Seller has full not-for-profit corporate power and authority to execute and deliver this Agreement and, subject to such authorization as is required by the Bankruptcy Court, Supreme Court Approval and DOH Approval, to perform its obligations hereunder. Without limiting the generality of the foregoing, the Board of Directors of each Seller has duly authorized the execution, delivery and performance of this Agreement by such Seller. This Agreement constitutes and any and all other Closing Documents to be executed by Sellers pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Sellers, enforceable in accordance with their terms and conditions, except as enforceability against Sellers may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3    Qualification.  Each Seller is duly qualified or licensed to do business, and is in good standing, in the State of New York, which is the only jurisdiction (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification.

4.4    Non-Contravention.  Subject to DOH Approval, Supreme Court Approval and Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Sellers at Closing), nor the fulfillment of the terms hereof by Sellers, will (i) violate or result in a breach of any of the terms and provisions of, constitute a default under, conflict with, or create in any party the right to accelerate, terminate, modify, cancel or require any notice under any agreement (including any Material Contract), mortgage, bond, indenture, franchise or other instrument or obligation to which either Seller is a party or by which it is bound; (ii) violate any order or award of any court, administrative agency or governmental body applicable to either Seller; (iii) result in the imposition of any Lien or Claim upon any Acquired Asset pursuant to the terms of any such mortgage, bond, indenture, lease, franchise or other instrument or obligation; (iv) constitute a violation by either Seller of any Applicable Law; (v) result in the breach of any of the terms or conditions of, or constitute a default under, or

23

otherwise cause any impairment of, any permit, license or other Governmental Authorization held by either Seller; (vi) breach or result in any liability or expense to either Seller under any CBAs or other labor agreements, if any, to which such Seller is a party; or (vii) conflict with or violate any charter document, operating agreement or partnership agreement of either Seller. All of the Assigned Contracts will be assignable to Buyer at the Closing pursuant to Section 365(c)(1) of the Bankruptcy Code without the consent of the counterparty or relevant Governmental Authority, as applicable.

4.5    Brokers' Fees. Neither Seller has any liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated.

4.6    Events Subsequent. Except as set forth in Schedule 4.6, since December 31, 2012, there have not been any of the following:

(a)    Any transaction entered into or carried out by LBMNH other than in the Ordinary Course of Business;

(b)    Any material written modification or termination of any Material Contract;

(c)    Any written modification or termination of any License;

(d)    Any entry into, termination of, or receipt of notice of termination of any Material Contract;

(e)    Any action taken, whether directly or indirectly, actively or passively, by either Seller or, to the Knowledge of Sellers, by another Person on behalf of either Seller that will or may reasonably be expected to cause or constitute a breach of any provision of this Agreement or any Material Contract (other than non-payment of accounts payable that are included in the Cure Amounts) or cause or be reasonably expected to cause a Material Adverse Change;

(f)    To the Knowledge of Sellers, any material abandonment, lapse or infringement of any Intellectual Property owned by or licensed to either Seller;

(g)    Any amendment or other modification or alteration (including through merger, liquidation, reorganization, or restructuring) of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of either Seller;

(h)    Any material damage to or destruction or loss of any Acquired Assets or Real Property, whether or not covered by insurance, material adversely affecting the Acquired Assets, Business, financial condition or prospects of either Seller or the Business;

(i)    Any sale, transfer, lease to others or other disposition of any Acquired Asset unless in the Ordinary Course of Business or if such item has been rendered obsolete;

24

(j)    Any change in any Tax election or Tax status of either Seller; or

(k)    Any claims made or actions, suits or proceedings or, to the Knowledge of Sellers, any investigation by a Governmental Authority commenced or, to the Knowledge of Sellers, threatened, against either Seller or any institution except those that Sellers have settled.

4.7    <u>Tax Matters</u>.

(a)    Each Seller has received a determination letter from the Internal Revenue Service to the effect that it is exempt from federal income taxation under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code. Such determination letters have never been amended or modified and there have been no changes to the factual basis for their original issuance. Neither Seller has taken any action that is inconsistent with or omitted to take any action that is required in order to maintain, tax-exempt status, or that could reasonably be expected to lead to a determination by the Internal Revenue Service that it is not eligible to be treated as an organization exempt from federal income taxation under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code. Each Seller has received recognition of its tax-exempt status from all state and local Taxes in all jurisdictions in which it conducts Business. Such tax-exempt status has never been revoked or suspended, there are not currently any proceedings to revoke or suspend such tax-exempt status, nor has there been any conduct by either Seller of such nature that would warrant modification, limitation or revocation of the determination letters. Each Seller has, since its incorporation, been classified as a public charity under Section 509(a) of the Code and has been operated consistent with the requirements for qualification under Section 501(c)(3) of the Code and has never received notice from a Governmental Authority that its classification was in jeopardy.

(b)    Except as disclosed on <u>Schedule 4.7(b)</u>, all Tax Returns with respect to Sellers, the Business or the Acquired Assets, to the extent required to be filed with any Governmental Authority with respect to any period prior to Closing by or on behalf of each Seller (collectively, the "<u>Pre-Closing Tax Returns</u>"), have been prepared in accordance with all Applicable Laws and have been filed when due (taking into account extensions of filing due dates) in accordance with all Applicable Laws, and all such Pre-Closing Tax Returns are true, correct and complete in all material respects and copies of the Pre-Closing Tax Returns for the calendar years 2009, 2010, 2011 and 2012 have been provided to or made available to Buyer, along with copies of all examination reports of any Pre-Closing Tax Return by any Governmental Authority and statements of deficiencies assessed by any Governmental Authority with respect to the Pre-Closing Tax Returns.

(c)    Except as disclosed on <u>Schedule 4.7(c)</u>, each Seller has duly and timely paid in accordance with all Applicable Law, all Taxes with respect to the Business and the Acquired Assets that are due and payable with respect to any period prior to Closing and has properly accrued on its books and records any Tax with respect to any such period that is not yet due and payable. Except as disclosed on <u>Schedule 4.7(c)</u>, each

25

Seller has duly and timely withheld or collected, paid over and reported all Taxes with respect to it, the Business or the Acquired Assets required to be withheld or collected by it in any period prior to Closing.

(d)    Schedule 4.7(d) contains a list of all jurisdictions (whether foreign or domestic) to which (i) any Tax is properly payable or (ii) any Tax Return is required to be filed by each Seller.

(e)    Except as disclosed on Schedule 4.7(e), to Sellers' Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable, and no issue has been raised by written inquiry of any Governmental Entity respecting Taxes, which, by application of the same principles, would reasonably be expected to (i) result in a Lien or Claim on the Acquired Assets or the Business in any taxable period (or portion thereof) ending after the Closing Date or (ii) threaten the tax-exempt status of any Tax-Exempt Seller.

(f)    None of the Acquired Assets is an interest (other than indebtedness within the meaning of Section 163 of the Code) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for federal income tax purposes.

(g)    All information relating to Tax matters set forth in the Historical Financial Information of LBMNH and in the financial statements of LBMC provided by Sellers to Buyer is accurate in all material respects.

(h)    No extension or waiver of the limitation period applicable to the assessment or collection of any Tax has been granted with respect to either Seller; and neither Seller has entered into any agreement or arrangement with any Governmental Authority with regard to any Liability for any Tax affecting any Tax period for which the applicable statute of limitations, after giving effect to extensions or waivers, has not expired, except as disclosed in Schedule 4.7(h).

(i)    No Governmental Authority has asserted in writing or, to Sellers' Knowledge, orally (i) an adjustment that could result in an additional Tax for which either Seller is or may be liable or that could result in a Lien or Claim on the Acquired Assets or such Seller's Business or (ii) a threat to the tax-exempt status of a Seller. There is no proceeding pending relating to any Liability for any Tax or asset of either Seller or the tax-exempt status of either Seller and, to Sellers' Knowledge, no Governmental Authority has threatened any audit, examination, investigation, inquiry, dispute, proceeding or claim, except as disclosed in Schedule 4.7(i).

(j)    Except as described in Schedule 4.7(j), there is no outstanding closing agreement, ruling request, request to change a method of accounting, subpoena or request for information with or by any Governmental Authority with respect to either Seller. Neither Seller has executed or entered into any agreement with, or obtained any consents or clearances from, any Governmental Authority respecting Taxes, or has been subject to

26

any ruling guidance specific to such Seller respecting Taxes that would be binding on Sellers for any taxable period (or portion thereof) ending after the Closing Date.

(k)    Neither Seller has been a party to a "listed transaction" within the meaning of Treasury Regulations Section 1.6011 4(b)(2).

(l)    Neither Seller is a party to any Tax allocation or sharing agreement. Neither Seller is a party to any agreement, or understanding or arrangement, that constitutes, or the consummation of which constitutes, an excess benefit transaction under Section 4958 of the Code.

4.8    Property and Assets.

(a)    Schedule 4.8(a)-1 contains a complete list of all real property to which Sellers own fee simple title together with any material property rights ("Owned Real Property"). Schedule 4.8(a)-2 contains a complete list by address of all real property leased, subleased, licensed, operated or used by either Seller (whether as lessor, lessee, licensor or licensee) indicating the nature of Sellers' respective interests therein (the "Leased Real Property") and specifies the lessor(s), lessee(s), licensor(s) or licensee(s) of such Leased Real Property and identifies each lease or any other Contract under which such property is leased, subleased, licensed or otherwise occupied, including all amendments and/or modifications thereto (together with all amendments, extensions, renewals, guaranties, and other agreements thereto, each a "Real Property Lease"). Neither Seller has received any written notice of any pending condemnation, expropriation, eminent domain or similar proceeding affecting all or any material portion of any such Real Property or, to Sellers' Knowledge, that any such activities are currently being threatened. There are no oral leases or subleases and, except as set forth on Schedule 4.8(a)-3, there are no (x) written subleases or (y) written or oral licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or occupancy of the Real Property or any portion thereof and there is no Person in possession of the Real Property or any portion thereof other than Sellers. The real property identified on Schedule 4.8(a)-1, Schedule 4.8(a)-2 and Schedule 4.8(a)-3 represents all of the real property owned, leased, subleased, licensed or otherwise occupied by Sellers that is utilized in the operation of the Business.

(b)    Each Seller has title to, or, in the case of personal property held under a lease or other Contract (subject to the terms of the lease or other Contract), an enforceable leasehold interest in, or right to use, the Acquired Assets, free and clear of all Liens and Claims other than Liens securing the Assumed Liabilities and Permitted Exceptions. The foregoing notwithstanding, with respect to the Owned Real Property, Sellers shall convey and Buyer shall accept such title as any reputable title company that is a member of the New York Board of Title Underwriters will be willing to approve and insure at standard rates in accordance with its standard form of title policy, clear of all Liens, except for Permitted Exceptions. Except as otherwise provided, the Owned Real Property shall be conveyed together with (a) all right, title and interest of Sellers in and to all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Sellers, if any, pertaining to its interest in

27

the Owned Real Property, and (b) all right, title and interest of Sellers, if any, in and to all alleys adjoining its interest in the Owned Real Property and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Owned Real Property to the center line thereof, and (c) subject to apportionment if required hereunder, all right, title and interest of Sellers, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Owned Real Property by reason of a change of grade of any street, road or avenue.

(c)     To Sellers' Knowledge, except as set forth on Schedule 4.8(c), the Real Property and Acquired Assets owned by LBMNH (i) are in good working order, operating condition and state of repair (subject to reasonable wear and tear and to deferred maintenance), (ii) have no material defects (whether patent or latent), subject to reasonable wear and tear, and (iii) have been maintained in a reasonable manner (subject to reasonable wear and tear and to deferred maintenance).  None of the Acquired Assets owned or leased by Sellers is subject to any sublease or sublicense or any other agreement granting to any other Person by Sellers any right to the use, occupancy or enjoyment of such property or any portion thereof.

(d)     Sellers have delivered to Buyer true and complete copies of each Real Property Lease.

(e)     Except as listed on Schedule 4.8(e), there exists no default, breach or dispute on the part of either Seller under any Real Property Lease nor has any event occurred which, with the passage of time or the giving of notice or both, would constitute a default or breach by either Seller under a Real Property Lease.

(f)     Except as listed on Schedule 4.8(f), there exists no default or breach by the landlord, sublessor, licensor or other obligor under each Real Property Lease nor, to Sellers' Knowledge, has any event occurred which, with the passage of time or the giving of notice or both, would constitute a default or breach by any such Person under a Real Property Lease.

(g)     Except for the Excluded Assets, the Acquired Assets constitute all of the assets of Sellers that are used or useful in connection with the operation of the Business.

(h)     To Sellers' Knowledge, Schedule 4.8(h) lists all violations of law or municipal ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental authorities having jurisdiction against or affecting the Owned Real Property.

4.9     Financial Information.

(a)     Schedule 4.9 contains the following financial statements and financial information of LBMNH (collectively, the "Historical Financial Information"):

(i)     audited consolidated balance sheets, statements of operations, statements of changes in net assets, and statements of cash flows (including the

accompanying consolidating schedules of balance sheet information and statement of operation information) as of, and for the 12-month period ended December 31, 2012;

(ii)     unaudited consolidated balance sheet (including the accompanying consolidating schedules of balance sheet information) (the "Reference Balance Sheet") as of October 31, 2013 (the "Balance Sheet Date"); and

(iii)     unaudited consolidated statement of operations (including the accompanying consolidating schedules of statement of operation information) for the ten-month period ended on October 31, 2013.

(b)     The Historical Financial Information is true and complete in all material respects and fairly presents the consolidated financial position of LBMNH as at the respective dates thereof and the consolidated results of the operations of LBMNH and changes in financial position for the respective periods covered thereby. The consolidated financial statements included in the Historical Financial Information have been prepared in accordance with sound accounting principles, applied on a consistent basis throughout the periods indicated (subject, in the case of the unaudited Historical Financial Information, to the absence of notes and normal year-end audit adjustments, the effect of which is not material to LBMNH), and are based on the information contained in the books and records of LBMNH. LBMNH has not changed any accounting policy or methodology during the periods presented in the Historical Financial Information (including the accounting policies and methodologies for determining the obsolescence of inventory or in calculating reserves, including reserves for uncollected accounts receivable).

(c)     Except for (i) liabilities reflected in the Reference Balance Sheet and (ii) liabilities that were incurred after the Balance Sheet Date in the Ordinary Course of Business, none of which have had a Material Adverse Effect, LBMNH has no liabilities of any nature relating to the Acquired Assets and the Assumed Liabilities, whether accrued, absolute, fixed, contingent, liquidated, unliquidated, recorded, unrecorded, known, unknown, or otherwise.

4.10    Intellectual Property.

(a)     Schedule 4.10 sets forth a complete and accurate list of all Intellectual Property used by each Seller in connection with the Business. Neither Seller owns or exclusively licenses any trademarks, service marks or patents.

(b)     Each Seller either owns or validly licenses, and possesses the valid and enforceable right to sell to Buyer, all Intellectual Property that is necessary for the operation of the Business and without any known conflict with the rights of others, and no Person has made any claims or threatened that either Seller or any Intellectual Property owned or used by either Seller is in violation or has infringed any such Intellectual Property of such third party. No legal proceedings are pending or, to Sellers' Knowledge, threatened against either Seller that challenge the validity or enforceability

39680675v17

of, or the rights of either Seller in, any of the Intellectual Property owned or used by either Seller. No assignments, grants or licenses to use such Intellectual Property have been granted by either Seller. All licenses, permits and approvals with respect to the Intellectual Property material to the Business (other than off-the-shelf computer software licenses) are listed in Schedule 4.10 and are valid and in full force and effect. Each of such licenses, permits and approvals shall, following the consummation of the Contemplated Transactions, be valid and fully enforceable.

(c)     Neither Seller has Knowledge that any third party is infringing any Intellectual Property owned by such Seller.

4.11   Contracts.

(a)     Schedule 4.11 sets forth a complete and correct list of the following:

(i)     each Contract (or group of related Contracts), in each case, the performance of which will extend over a period of more than one year from the Execution Date or which provides for annual payments to or by either Seller in excess of $50,000;

(ii)     each Contract that relates to the borrowing or lending by either Seller of any money or that creates or continues any Lien or Claim against, or right of any third party with respect to, any asset of either Seller, except for those Liens and Claims not related to the borrowing of any money but arising in the Ordinary Course of Business;

(iii)     each Contract under which any other Person has guaranteed any Debt of either Seller;

(iv)     each Contract (or group of related Contracts) (A) under which either Seller has created, incurred, assumed or guaranteed any Debt, or (B) under which such Seller has permitted any Acquired Asset to become encumbered;

(v)     each Contract by which either Seller leases any real or personal property or pursuant to which either Seller is a lessor of, or permits any third party to operate, any real or personal property;

(vi)     each Contract to purchase any amount of materials, supplies, medicine or other items or services having a purchase price in excess of $50,000;

(vii)     each CBA or other labor agreement to which either Seller is a party;

(viii)     each Contract under which either Seller is, or may become, obligated to pay any amount in respect of indemnification obligations, purchase price adjustment or otherwise in connection with any (A) acquisition or disposition of assets or securities, (B) merger, consolidation or other business

39680675v17

combination, or (C) series or group of related transactions or events of the type specified in clauses (A) and (B) above;

(ix)    each Contract with an Affiliate, or with any entity in which an officer or director of either Seller holds an interest, including any agreement whereby either Seller has advanced or loaned any amount to any director, officer or Employee;

(x)    each Contract in the form of a partnership, limited liability company or joint venture agreement;

(xi)    each Contract (other than any Contract to which Buyer is a party) relating to confidentiality, non-competition or non-solicitation (in cases where either Seller is subject to such obligations) or containing a "most favored nation" clause;

(xii)    each Contract under which either Seller has or may have any Liability to any investment bank, broker, financial advisor, finder or other similar Person;

(xiii)    any Contract under which either Seller has advanced or loaned an amount to any of its Affiliates or Employees that remains outstanding on the Execution Date; and

(xiv)    any Contract with any insurance company, prepaid health plan, health maintenance organization, preferred provider organization, independent practice association, private or public healthcare program, or any other entity to provide services to enrollees, beneficiaries or patients; and

(xv)    any Physician Contract.

(b)    As used in this Agreement, the term "Material Contracts" means all Contracts that are material to the Business. Except (i) as otherwise provided in the Bankruptcy Code and (ii) for events of default arising as a result of such Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of the applicable Seller. Except for Cure Amounts there are no material Liabilities of any party to any Material Contract arising from any breach or default of any provision thereof and no event has occurred that, with the passage of time or the giving of notice or both, would constitute a breach or default by any party thereto.

(c)    Sellers have used best efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

(d)    Each Material Contract is enforceable against the applicable counterparty and is in full force and effect, and, subject to obtaining any necessary consents or

31

delivering any necessary notices, as disclosed on Schedule 4.11(d), will continue to be so enforceable and in full force and effect following the consummation of the Contemplated Transactions.

(e)    (i) Each Seller has the right to assign to Buyer each of the Material Contracts on the Closing Date under section 365 of the Bankruptcy Code and upon such assignment at Closing in the manner contemplated by this Agreement, Buyer shall have all of the rights of such Seller thereunder, and (ii) no Material Contract to which such Seller is a party may be terminated by any other party thereto as a result of the Contemplated Transactions.

(f)    Except as set forth in Schedule 4.11(f), there are no notes receivable of either Seller or any other amount payable to either Seller owing by any director, officer, member or Employee of either Seller.  Except as set forth on Schedule 4.11(f) neither Seller, Employee, officer, director, shareholder or Affiliate of either Seller, no individual, related by blood, marriage or adoption to any such individual, and no entity in which any such Person or individual owns any beneficial interest is a party to any agreement, contract, commitment or transaction with either Seller or any loan, arrangement, understanding, agreement or contract for or relating to indebtedness of Sellers, or has any interest in any property, tangible or intangible, used by either Seller.  The agreements, contracts, commitments or transactions set forth on Schedule 4.11(f) were negotiated at arms-length by the applicable Seller with the other party thereto.

4.12    Sellers' Consents and Approvals.    Schedule 4.12 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Sellers to consummate the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Sellers at Closing) (collectively, "Sellers' Consents and Approvals"), other than (a) DOH Approval, (b) entry of the Sale Order, and (c) Supreme Court Approval.

4.13    Powers of Attorney.    Except as set forth in the Schedule 4.13, there are no outstanding powers of attorney executed on behalf of either Seller.

4.14    Litigation.

(a)    Except as set forth on Schedule 4.14, (i) there is no action, suit, investigation or proceeding pending or, to Sellers' Knowledge, threatened (x) against Sellers with respect to the Acquired Assets before any arbitrator or Governmental Authority, whether any of the same are covered by insurance or whether any applicable carrier has denied coverage or reserved rights with respect to or assumed the defense thereof and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Contemplated Transactions or that questions the validity, legality or propriety of the Contemplated Transactions or that could reasonably be expected to have a Material Adverse Effect; and (ii) neither Seller is subject to any judgment, order or decree of any Governmental Authority with respect to the Acquired Assets or the Business involving an amount in excess of $50,000.

39680675v17

   (b)  Sellers have delivered to Buyer correct and complete copies of all correspondence, pleadings, and other relevant documents in connection with the actions, suits, investigations or proceedings set forth on Schedule 4.14.

4.15  Certain Healthcare Matters.

   (a)  Government Reimbursement Programs.

     (i)  Except as disclosed on Schedule 4.15(a)(i), LBMNH (A) has been granted any and all Governmental Authorizations necessary to carry on its business as such business has been conducted, and to own the assets thereof, all of which are currently valid and in full force and effect, (B) has complied in all material respects with the terms and conditions of its Governmental Authorizations, and there has occurred no event nor is there any event, action, investigation or proceeding pending or threatened which could cause or permit revocation or suspension of or otherwise adversely affect the maintenance of any such Governmental Authorization, (C) is not subject to any material administrative fines in connection with any Governmental Authorizations, (D) is qualified for participation in, and has current and valid provider contracts with, the Government Reimbursement Programs and/or their MAC or paying agent and is in compliance with the conditions of participation or requirements applicable with respect such participation and (E) is eligible for payment under the Government Reimbursement Programs for services rendered to qualified beneficiaries. At no time since January 1, 2010 has LBMNH received any written or oral notice from any Governmental Authority indicating that its qualification as a participating provider in any Governmental Reimbursement Program may be terminated or withdrawn.   To the Knowledge of Sellers, there has been no decision not to renew any provider agreement relating to the Nursing Home.

     (ii)  Except as set forth on Schedule 4.15(a)(ii), the Cost Reports with respect to the Nursing Home were filed when due, and have been audited (with Notices of Program Reimbursement issued), for the Cost Report periods particularly described on Schedule 4.15(a)(ii). All Cost reports accurately reflect the information required to be included thereon.

     (iii)  Except as set forth on Schedule 4.15(a)(iii), all amounts shown as due from LBMNH in the Cost Reports either were remitted with such Cost Reports or will be remitted when required by Applicable Law and are appropriately reflected in the Historical Financial Information, and all amounts shown in the Notices of Program Reimbursement as due have been, or prior to Closing will be, paid when required by Applicable Law.

     (iv)  Neither Seller has received or submitted any claim for payment to the Government Reimbursement Programs (or their fiscal intermediaries or paying agents) with respect to any Facility in excess of the amount provided by Applicable Law or applicable provider contract, and neither Seller has received written or oral notice of any dispute or claim by any Governmental Authority,

39680675v17

fiscal intermediary or other Person regarding any of the Facilities and the Government Reimbursement Programs or the participation by any of the Facilities in such Government Reimbursement Programs.

(v)    Neither Seller is subject to, or the beneficiary of, any outstanding loan, grant or loan guarantee pursuant to the Hill Burton Act (42 USC Section 291a, *et seq.*) except as set forth in Schedule 4.15(a)(v).

(vi)    Except as set forth on the Schedule 4.15(a)(vi), since January 1, 2007, LBMNH has not been subject to any finding, agreement, settlement or fine regarding noncompliance with any Applicable Law (including fraudulent procedures or practices) relating to the Government Reimbursement Programs.

(vii)    Neither Seller has established or maintains a "financial relationship," as that term is defined by The Ethics in Patient Referrals Act, 42 U.S.C. Section 1395nn, and the regulations promulgated thereunder (the "Stark Law"), with any physician or with an immediate family member of any physician who makes referrals to either Seller for "designated health services," as that term is used in the Stark Law, unless such financial relationship or referral, as applicable, meets an exception to the Stark Law.

(b)    Medical Staff. Sellers have made available to Buyer correct and complete copies of the bylaws, rules and regulations of the medical staff of the Nursing Home and all Contracts with Physicians, Physician groups or other members of the medical staff of the Nursing Home. Except as set forth on Schedule 4.15(b), there is no pending or, to Sellers' Knowledge, threatened dispute with any medical staff member of the Nursing Home with respect to medical staff privileges or credentialing. With respect to each Physician or nurse (including registered professional nurses, nurse practitioners and licensed practical nurses) who is a member of the medical staff of the Nursing Home, the credentialing process for such physician included queries to the New York State Board for Medicine, the New York State Board for Nursing, the New York State Board for Professional Medical Conduct, the National Practitioner Data Bank and the National Council of State Boards of Nursing. No member of the medical staff of the Nursing Home has been in the last 6 years, or is currently, excluded from participation in any Governmental Reimbursement Program. Schedule 4.15(b)-2 sets forth a complete and accurate list of the name and specialty, if any, of each member of the medical staff of the Nursing Home.

(c)    Licenses. All Licenses of LBMNH are listed on Schedule 4.15(c). The Licenses are all of the licenses necessary for LBMNH's operation of the Nursing Home and of the Acquired Assets owned or leased by it. LBMNH is duly licensed by the State of New York to operate the Nursing Home as a skilled nursing facility having that number and type of licensed beds as set forth in LBMNH's current skilled nursing facility license. Such Licenses are in full force and effect and no proceeding is pending or, to Sellers' Knowledge, threatened, seeking the revocation, termination, suspension, restriction, modification or limitation of any such License. LBMNH is not in default

under, and to the Knowledge of Sellers no condition exists that with notice or the lapse of time or both would constitute a default under any License.

(d)    Compliance. LBMNH is and has been in material compliance in all respects with all Applicable Laws, including all Healthcare Laws and Requirements, governing the conduct or operation of its Business, and all of its Licenses. LBMNH has timely filed all reports, data and other information related to the Business of LBMNH required to be filed by it with Governmental Authorities. All such reports, data and other information were true, correct and complete in all material respects when filed, complied in all material respects with Applicable Law in effect when filed, and no material deficiencies have been asserted by any such Governmental Authority with respect to such reports, data and other information that have not yet been satisfied, or, if not yet satisfied, where satisfaction is not yet due. LBMNH has not received any written or oral notice of any violation of any such Applicable Law, including all Healthcare Laws and Requirements or License, and, to Sellers' Knowledge, no written or oral notice of such violation has been threatened at any time for the past 5 years. There is no outstanding, or, to Sellers' Knowledge, threatened order or allegation from any Governmental Authority of any alleged, actual, or potential violation by LBMNH of any Applicable Law. Except as set forth in Schedule 4.7(j), no investigation or review by any Governmental Authority is pending or to Sellers' Knowledge threatened, nor has any Governmental Authority notified LBMNH in writing or orally within the 5 year period prior to the Execution Date of its intention to conduct the same. LBMNH has not received any written notice indicating that its qualification as a participating provider in any Governmental Reimbursement program may be terminated or withdrawn, nor, to the Knowledge of Sellers is there any reason to believe that such qualification may be terminated or withdrawn.

(e)    Compliance Programs. LBMNH (i) is not a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, (ii) has no reporting obligations pursuant to any Settlement Agreement entered into with any Governmental Authority, (iii) has not in the last 5 years been a defendant in any qui tam/False Claims Act litigation, or (iv) except as set forth in Schedule 4.7(j), has not in the last 5 years been served with or received any search warrant, subpoena, civil investigative demand, or contact letter by or from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the healthcare businesses conducted by the System or its Subsidiaries). Schedule 4.15(e) includes a description of each audit and investigation conducted by LBMNH pursuant to its compliance program during the last 5 years. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the Office of Inspector General of the Department of Health and Human Services. Sellers have provided to Buyer a copy of the current compliance program materials for the Nursing Home, including, all program descriptions, compliance officer and committee descriptions, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms, and disciplinary policies.

35

(f)     Convictions; Exclusions.   Neither Seller, nor any director, officer or Employee of either Seller, is excluded, or in the last 6 years has been excluded, from participating in the Medicare program or any other Government Reimbursement Programs.   None of Sellers' officers, directors, agents or managing employees (as that term is defined in 42 U.S.C. § 1320a-5(b)), has been (i) excluded from participating in the Medicare program or any other applicable Government Reimbursement Program, (ii) subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8, (iii) convicted of, a criminal offense under the Anti-Kickback Statute (42 U.S.C. § 1320a-7b) or (iv) charged with, or to Sellers' Knowledge, investigated, for any violation of Applicable Law related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of any investigation, or controlled substances.

(g)     Licensed Employees.   All Employees of LBMNH are properly licensed, as required, and in good standing with the applicable Governmental Authority.

(h)     Billings.   All billings of LBMNH with respect to applicable Government Reimbursement Programs have been in the last 6 years and current are in compliance in all respects with Applicable Law, and, to Sellers' Knowledge, LBMNH has not billed or received payment or reimbursement in excess of amounts allowed by Applicable Law (other than refunds, claims, deficiencies, offsets or adjustments allowed by Applicable Law), except as disclosed on Schedule 4.15(h).

(i)     Audits; Settlements.   Schedule 4.15(i) sets forth a summary description of (i) any audits of LBMNH performed within 5 years prior to the Execution Date by any Governmental Authority or other contract auditor on behalf of a Governmental Authority, an identification of any settlement agreements and, to Sellers' Knowledge, any unresolved matters raised in writing with Sellers by any such Governmental Authority, or other contract auditor on behalf of a Governmental Authority, and (ii) the percentage of overpayments to the total charges audited in each audit of LBMNH performed within 2 years prior to the Execution Date by a RAC auditor, an identification of any settlement agreements and, to Sellers' Knowledge, any unresolved matters raised in writing with Sellers by such auditor.

(j)     Third Party Payment Programs.   LBMNH currently participates in health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans and other third party reimbursement and payment programs (the "Payment Programs").   Except as set forth on Schedule 4.15(j)-1, to the Knowledge of Sellers, LBMNH has no outstanding overpayments or refunds due to any Payment Programs.   To the Knowledge of Sellers, all claims for reimbursement submitted with respect to the Nursing Home ("Reimbursement Claims") are timely, comply in all respects with all Laws and all Payment Program contracts, provider manuals, policies and reimbursement requirements governing reimbursement and payment of claims and do not contain any material errors, omissions or disallowances.   Except as set forth on Schedule 4.15(j)-2, to the Knowledge of Sellers, neither LBMNH nor LBMC has received notice of any disallowance, overpayment, refund or dispute regarding any Reimbursement Claims, and there are no facts or circumstances which may reasonably be expected to give rise to any disallowance, overpayment, refund or dispute, in each case

36

4.16    Employees.

(a)    Schedule 4.16(a) is a true and complete list of all of Sellers' Employees, as of the date set forth therein, including the following information, as applicable: (i) the name of the employer; (ii) current position, department and work location; (iii) date of hire; (iv) hourly, weekly, and annualized base rate of pay; (v) shift differential pay, experience differential pay, and/or certification pay; (vi) accrued vacation, holidays, personal leave, and/or sick leave as a result of the individual's employment with LBMNH or LBMC, as applicable ("Accrued PTO"); (vii) health benefits plan (if any), coverage amount, and premium amount; and (viii) union status and bargaining representative (the "Employee List").

(b)    Schedule 4.16(b) identifies all individuals who may have reemployment rights required by Applicable Law with respect to such individual as of or following the Closing Date. Except as described on Schedule 4.16(b), no other individual is anticipated to have reemployment rights after the Closing Date.

(c)    Schedule 4.16(c) identifies all foreign national individuals employed by LBMNH who have been hired or who are working subject to a work permit or visa, including (i) the name of the individual, (ii) the position held, (iii) the type of visa or work permit; (iv) the expiration date thereof; (v) the applicable bargaining unit, if any.

(d)    Except as set forth on Schedule 4.16(d), there are no strikes, work slowdowns or lockouts, or grievances or unfair labor practices pending, or to Sellers' Knowledge, has LBMNH experienced any strike or grievance, claim of unfair labor practices, or other collective bargaining dispute within the past three years. Within the past three years, LBMNH has not committed any unfair labor practice, and has not implemented any plant closing or layoff of LBMNH Employees that could implicate the WARN Act, except for employment losses or layoffs arising from Superstorm Sandy. Sellers have made available to Buyer complete and accurate copies of each employment, consulting, enrollment, appointment, training and similar agreement pertaining to LBMNH or the Business of LBMNH to which either of Sellers is a party. Except as disclosed on Schedule 4.16(d), LBMNH is not a party to or bound by any written agreement or any consent decree, court order or statutory obligation (other than WARN Acts and regulations) pertaining to its Business (i) for the employment, enrollment, appointment or training of any individual, or the provision of services by any individual, who is not terminable by LBMNH without penalty prior to the Closing Date, or (ii) relating to the payment of any severance or termination payment, bonus or death benefit to any LBMNH Employee, former LBMNH Employee or his or her estate or designated beneficiary. In the event of any agreement for such severance or termination payment or death benefit, Sellers represent that Sellers shall satisfy such obligation as provided by the terms of such agreement.

(e)    Sellers shall be solely responsible for any notices to Employees that may be required under the WARN Act, COBRA or any CBA as a consequence of the Contemplated Transaction, and shall defend, indemnify and hold harmless Buyer against any liability resulting from failure to provide such notices as may be required.

39680675v17

(f)    Schedule 4.16(f) identifies the CBAs applicable to the LBMNH Employees. Sellers have delivered to Buyer true and complete copies of each such CBA. Sellers have no obligation to negotiate any other CBA with respect to the Nursing Home. Sellers represent and warrant that they have fulfilled any and all obligations they may have under the National Labor Relations Act to negotiate with the labor unions representing their employees concerning Sellers' decision to enter into the Contemplated Transactions, if required by Applicable Law, and its effects.

(g)    Except as disclosed in Schedule 4.16(g), there is no representation claim or petition pending before the U.S. National Labor Relations Board or any similar state or local labor agency of which either Seller has been notified in writing by any Governmental Authority and, to Sellers' Knowledge, no question concerning representation has been raised or threatened in writing to either Seller by any Governmental Authority respecting the LBMNH Employees.

(h)    Except as disclosed in Schedule 4.16(h), LBMNH is in compliance with all Labor and Employment Laws and Requirements, and Sellers have received no written or oral notice within the 3 years immediately preceding the Execution Date of any complaint or proceeding filed against LBMNH that is unresolved claiming that LBMNH has violated any Applicable Laws relating to employment, denial of employment, or employment opportunity or termination of employment, or, to Sellers' Knowledge, against LBMNH or any of the LBMNH Employees or threatened to be filed against LBMNH before any federal, state or local agency or labor relations board, including the National Labor Relations Board, the Equal Employment Opportunity Commission, the New York State Division of Human Rights or any similar local government agency, the Federal Department of Labor and the New York State Department of Labor that are unresolved. No written notice that remains unresolved has been received by Sellers of the intent of any federal, state or local agency responsible for the enforcement of Applicable Law related to labor or employment to conduct an investigation of LBMNH, and, to Sellers' Knowledge, no such investigation is in progress.

(i)    Except as a result of the Bankruptcy Case and otherwise set forth in Schedule 4.16(i), there are no outstanding orders or charges against LBMNH under any occupational health or safety legislation and, to Sellers' Knowledge, within the 12 months immediately preceding the Execution Date, no such outstanding orders or charges have been threatened.    As of the Execution Date, there are no pending worker compensation claims or New York State Disability Benefits Law claims with respect to the Nursing Home or LBMNH of which Sellers have received written notice.

(j)    Except as set forth on Schedule 4.16(j), neither Seller, nor any of Sellers' current or former Employees, consultants, officers, directors, distributors, resellers, vendors or customers owns, directly or indirectly, or has any right, title or interest (economic or otherwise), in whole or in part, in any Intellectual Property, Leased Real Property, proprietary asset or other rights claimed or used by such Seller.

4.17    Books and Records.  The books of account and other financial records of each Seller, as well as all records required by Applicable Law to be maintained with regard to

employees, all of which shall have been made available to Buyer prior to Closing, are accurate and complete in all material respects. Each transaction of each Seller is properly and accurately recorded on the books and records of such Seller except for immaterial omissions or inaccuracies, the effect of which is insubstantial. To the extent permitted by Applicable Law and to the extent that doing so would not reasonably be expected to result in the waiver of privilege, LBMNH has made available to Buyer a correct and complete copy of the minutes maintained by LBMNH's quality assurance committee since January 1, 2010. All business records of each Seller are in the custody and under the control of such Seller.

4.18    Information Systems.    Schedule 4.18 lists all of the material software and Hardware (including computers, servers and peripheral devices and telecommunications devices) owned or leased by Sellers and used by Sellers in the Business as now conducted. Sellers have not used any outside personnel (including consultants or other independent contractors) in connection with the development of any material Hardware system, program or software developed by either Seller. To the Knowledge of Sellers, no software developed by either Seller and used in the Business as now conducted contains any embedded code owned by a third party.

4.19    Foreign Operations.    Sellers have no operations outside the United States.

4.20    Insurance Coverage.    Schedule 4.20 lists, and Sellers have furnished to Buyer, true and complete copies of, all insurance policies (including any insurance renewal binders) and fidelity or surety bonds currently in force relating to the assets, Liabilities, Business, operations, Employees, officers or directors of Sellers. The policy limits and deductibles of such policies are not subject to claims by any Affiliates of Sellers or other entities. Except as set forth on Schedule 4.20, all premiums currently due and payable under all such policies and bonds have been paid in full. Schedule 4.20 lists all of Seller's current professional liability, commercial general liability and fiduciary liability coverages.

4.21    Restrictions on Business Activities.    There is no agreement, judgment, injunction, order or decree binding upon Sellers or the Acquired Assets or, to Sellers' Knowledge, threatened, that has or could reasonably be expected to have the effect of prohibiting or materially impairing the use of the Acquired Assets, the conduct by Buyer of the business of either Seller as currently conducted or any business practice of either Seller, including the Business, the acquisition of property, the provision of services, the hiring of employees, and the solicitation of customers, in each case either individually or in the aggregate.

4.22    Environmental Matters.

(a)    Except as set forth on Schedule 4.22(a):

(i)    To Sellers' Knowledge, Sellers, their operation of the Facilities, and their ownership or leasing of the Real Property are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws;

(ii)    Sellers have not received any written notice from a Governmental Authority or other Person regarding any Environmental Claim related to or arising out of Sellers' operation of the Facilities or their ownership or leasing of the Real

Property that currently remains pending or unresolved and, to Sellers' Knowledge, there are no events or conditions with respect to their operation of the Facilities or the ownership or leasing of the Real Property or otherwise existing or occurring at the Real Property that could reasonably be expected to result in an Environmental Claim;

(iii)    All Environmental Permits required to operate the Facilities as they are currently being operated by Sellers have been obtained by Sellers and are currently in full force and effect.  Sellers are in compliance in all material respects with such Environmental Permits and there is not now pending nor, to Sellers' Knowledge, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any Environmental Permit, and all of the Environmental Permits are and shall be effective and in good standing now and as of the Closing Date;

(iv)    There has been no Release or threatened Release of Hazardous Materials at, on, under, to or from the Real Property required to be reported or subject to required Remediation, and Sellers have not received any written notice from any Governmental Authority or other Person alleging that Sellers have liability under any applicable Environmental Law with respect to the Release of Hazardous Materials at any real property off-site of the Real Property, including, where Hazardous Materials from the Real Property have been taken for disposal, nor, to Sellers' Knowledge, are there any events or conditions with respect to off-site disposal of Hazardous Materials that are reasonably likely to result in such liability or in the issuance of such notice to Sellers;

(v)    The Real Property contains no underground storage tanks that are owned or operated by Sellers and neither the Owned Real Property nor, to Sellers' Knowledge, the Leased Real Property contain any other underground storage tanks whether in use, closed or abandoned properly or not;

(vi)    There are no above-ground storage tanks for Hazardous Materials that are not in compliance with Environmental Law or are the source of a Release at, on, under, to or from the Real Property;

(vii)    Neither the Owned Real Property nor, to Sellers' Knowledge, the Leased Real Property, is listed on the National Priorities List or similar state lists. No Remediation is pending or being conducted at the Real Property. Sellers have not received any notice from a Governmental Authority that Remediation is required at or about the Real Property, nor to Sellers' Knowledge are there any events or conditions at, about or with respect to the Real Property that could reasonably be expected to result in the need for Remediation or in the issuance of such notice to Sellers;

(viii)    To Sellers' Knowledge, there has been no exposure of any Person to Hazardous Materials in connection with Sellers' operation of the Facilities that

40

would reasonably be expected to form the basis for a claim for damages or compensation; and

(ix)    Sellers have delivered to Buyer copies of all assessment reports, audits, studies, and correspondence in Sellers' possession or control relating to the environmental conditions of the Real Property, Environmental Claims, Environmental Permits, Hazardous Materials, Releases, Remediation or Sellers' compliance with or violation of Environmental Laws and related to the Facilities or the Real Property.

(b)    A list of all Environmental Permits pertaining to the operation of the Facilities, the Real Property and the Acquired Assets as they are currently being operated by Sellers is set forth on Schedule 4.22(b).

(c)    None of the matters set forth on Schedule 4.22(a) could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

4.23    Full Disclosure.    No representation or warranty made by Sellers in this Agreement, or in any schedule, and no statement, schedule or certificate required to be furnished to Buyer pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein not misleading. Each of the separate representations and warranties set forth in ARTICLE IV is intended to be, and shall be interpreted as, an independent representation and warranty as to the matters referred to therein

4.24    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Sellers nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Sellers, the Business, the Acquired Assets, the Assumed Liabilities or the Contemplated Transactions, and Sellers disclaim any other representations or warranties, whether made by Sellers, their Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Sellers (a) expressly disclaim any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Sellers or any of their Affiliates). Sellers make no representations or warranties to Buyer regarding the probable success or profitability of the Business.    Sellers make no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

39680675v17

ARTICLE V
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1    Organization of Buyer.  Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of New York, the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) is duly qualified or licensed to do business, and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification.

5.2    Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court, Supreme Court Approval and DOH Approval, to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite corporate action of Buyer.  This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

5.3    Non-Contravention.

(a)    Subject to DOH Approval, Supreme Court Approval and Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)    Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), except for such notices, consents and approvals as have already been given or obtained, those required under or in relation to DOH Approval and those required by the Bankruptcy Court.

5.4    Brokers' Fees.    Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions.

5.5    Buyer's Consents and Approvals.    Schedule 5.5 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Buyer to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing) (collectively, "Buyer's Consents and Approvals"), other than (a) DOH Approval, (b) entry of the Sale Order, and (c) Supreme Court Approval.

5.6    Acknowledgement Regarding Condition of the Business.    Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that Sellers are not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by Sellers to Buyer in ARTICLE IV (as modified by the Schedules), and Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets and the Business are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7    Financial Capability.    Buyer has or on the Closing Date will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  On the Closing Date, Buyer (or its designee) will be capable of satisfying the conditions contained in Sections 365(b)(1)(c) and 365(f) of the Bankruptcy Code regarding the Assigned Contracts.

5.8    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Buyer or the Contemplated Transactions, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), Buyer disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Sellers by any director, officer, member, manager, employee, agent, consultant, or other Representative of Buyer or any of its Affiliates).

ARTICLE VI
BANKRUPTCY COURT MATTERS

6.1    Approval of the Termination Fee and Expense Reimbursement.

(a)    Subject to the approval of the Bankruptcy Court, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, the Bidding Procedures Order shall provide that if Buyer's bid embodied in

this Agreement is exceeded by a Competing Bid, or either Seller or both Sellers enter into an Alternate Transaction, then Sellers shall, or shall cause the purchaser in an Alternate Transaction, as applicable, to pay to Buyer the Termination Fee and the Expense Reimbursement, upon the consummation of the Alternate Transaction from the proceeds of such Alternate Transaction paid at the closing thereof. Sellers acknowledge and agree that (a) the approval of the Termination Fee and the Expense Reimbursement is an integral part of the Contemplated Transactions, (b) Buyer would not have entered into this Agreement absent a Termination Fee and Expense Reimbursement, (c) the entry of Buyer into this Agreement is necessary for preservation of the estate of Sellers and is beneficial to Sellers, (d) the Termination Fee and Expense Reimbursement are reasonable in relation to Buyer's efforts and to the magnitude of the Contemplated Transactions, and (e) time is of the essence with respect to entry of the Bidding Procedures Order.

(b)    If this Agreement is terminated pursuant to Section 12.1(a)(iii) (provided that the failure of the Sale Order to be entered within 60 days of the Petition Date was due in whole or in part to any action or inaction by Sellers), Section 12.1(b)(i) (provided that the failure to close by the Outside Closing Date was due in whole or in part to any action or inaction by Sellers), Section 12.1(b)(iii), Section 12.1(b)(iv), or Section 12.1(b)(vii) (provided that the Title Defects at issue were willfully placed of record or consented to be placed of record by Sellers after the date hereof), then Sellers shall pay to Buyer the Expense Reimbursement within 5 Business Days after such termination.

(c)    The provisions of this Agreement regarding the payment of the Termination Fee and Expense Reimbursement shall be subject to the approval of the Bankruptcy Court as part of the Bidding Procedures Order.

6.2    <u>Competing Transaction</u>.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (each, a "<u>Competing Bid</u>").

(b)    Notwithstanding the execution of this Agreement, Sellers are permitted to cause their Representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Representatives) in connection with any sale or other disposition of all or any part of the Acquired Assets, alone or in connection with the sale or other disposition of any other asset of Sellers. In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers. Prior to Sellers furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Acquired Assets, Sellers must enter into a customary confidentiality agreement with such Person on terms no less favorable to the Sellers than those contained in Section 8.3.