(c)    If a Competing Bid is selected in conjunction with an auction (the "Auction") but such bidder does not consummate the purchase of the Acquired Assets and Buyer is the second highest bidder, Buyer shall have the option to close the transactions contemplated by this Agreement in accordance with the terms of this Agreement; provided that in such event, Buyer informs Sellers in writing of its decision whether to proceed with the Contemplated Transactions within 10 Business Days of receipt of written notice from the Sellers that the selected bidder submitting the Competing Bid failed to consummate the purchase of the Acquired Assets.

(d)    If the Termination Fee and Expense Reimbursement payable under Section 6.1 are not be approved by the Bankruptcy Court in the Bidding Procedures Order, then Buyer shall have the right, but not the obligation, to terminate this Agreement within 10 Business Days following entry of the Bidding Procedures Order by delivery of written notice to Sellers. If Buyer does not deliver such notice within such 10 Business Day period, then Buyer will be deemed to have waived its right to terminate this Agreement under this Section 6.2(d).

6.3    <u>Bankruptcy Court Filings</u>. Within 10 days of the Petition Date, Sellers shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, which shall include a request for the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Termination Fee and Expense Reimbursement. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, each Party shall use their respective commercially reasonable efforts to defend against such appeal, unless Buyer otherwise elects to terminate this Agreement pursuant to ARTICLE XII. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Bidding Procedures Order, Sellers shall promptly notify Buyer of such appeal or stay request and provide to Buyer a copy of the relevant notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders. Sellers shall not submit any material document (including any motion papers) to the Bankruptcy Court related to the Contemplated Transactions without first providing Buyer with a reasonable opportunity to comment thereon.

6.4    <u>Notice of Sale</u>. Notice of the sale of the Acquired Assets contemplated in this Agreement shall be in a form and manner reasonably acceptable to Buyer and be served in accordance with Applicable Law (including, to the extent applicable, Bankruptcy Rules 2002 and 6004 and any local rules or orders of the Bankruptcy Court) on all Persons required to receive notice by this Agreement, the Bankruptcy Court and Applicable Law.

6.5    <u>Treatment of Monetary Obligations</u>. The Termination Fee and Expense Reimbursement payable to Buyer under this Agreement shall be entitled to administrative

expense priority in Sellers' Bankruptcy Case pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code.

## ARTICLE VII
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

7.1     General. Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE IX) and to ensure that Buyer is relieved of all Excluded Liabilities including Successor Liabilities.

7.2     Regulatory Approvals.

(a)     Buyer shall, at its own cost and expense, promptly following the entry of the Bidding Procedures Order by the Bankruptcy Court, formally submit the CON Application to DOH. Buyer shall diligently prosecute the CON Application and shall timely submit all information and documents requested in connection therewith by DOH. Buyer shall provide Sellers with notice as promptly as practicable of its receipt of DOH's approval, contingent approval or a rejection of the CON Application, along with a copy of any documentation related thereto. Buyer shall not knowingly take any action prior to the Closing intended to disqualify Buyer (or its designee) as the new operator of the Nursing Home.

(b)     As necessary, Sellers and Buyer will promptly confer with the appropriate federal, state and local regulators to obtain their support for the approval of the Contemplated Transactions, including DOH and the Office of the New York State Attorney General Charities Bureau.

(c)     If necessary, each of Buyer and Sellers shall use their reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any Applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Schedule 4.12 or Schedule 5.5, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Authority in respect of such filings or the Contemplated Transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Authority under such Laws with respect to any such filing or any such transaction.

7.3    Operation of Business. Sellers will operate the Business in the Ordinary Course of Business in accordance with any budget prepared in connection with Sellers' debtor-in-possession financing (the "DIP Budget"), which DIP Budget shall have been approved by Buyer in its discretion. Sellers will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business (except for transactions specified in this Agreement) and LBMNH will use its best efforts to preserve its goodwill, to keep intact its business organization and relationships with Governmental Authorities, suppliers, customers and other third parties, and to keep available the services of its present officers and Employees. Sellers will maintain their tax-exempt status. Without limiting the generality of the foregoing, neither Seller will, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

(a)    enter into or amend any Material Contract, including any CBA;

(b)    terminate any Material Contract other than upon the expiration of its term or for the counterparty's breach of such Material Contract or as may be necessary to maintain appropriate levels of patient care and quality;

(c)    fail to perform when due all material obligations under any Material Contracts except to the extent such performance is excused under the Bankruptcy Code or by the Bankruptcy Court;

(d)    hire any clinical employee except to maintain necessary levels of patient care and quality;

(e)    hire any non-clinical employee except in the Ordinary Course of Business;

(f)    add or close any line of clinical services unless approved in advance in writing by Buyer, which approval shall not be unreasonably withheld, or file a certificate of need application or plan of closure for such purpose;

(g)    change the compensation of any Employee except as may be required by CBAs or other contracts;

(h)    change any welfare plans or Seller Plans except (with prior notice to Buyer) to the extent required by law;

(i)    fail to give prompt notice to Buyer of the commencement of or any Material Development of which either Seller becomes aware;

(j)    fail to give prompt notice to Buyer of any Material Adverse Change;

(k)    sell, transfer, or convey any Acquired Asset (other than obsolete or worn out immaterial equipment disposed of in the Ordinary Course of Business and replaced if necessary with adequate replacement equipment);

(l)    adopt or propose any change to its governing documents or admit any new corporate member;

39680675v17

(m)     merge or consolidate with any entity or acquire any assets from any entity (other than purchases of supplies in the Ordinary Course of Business);

(n)     change any of its accounting methods;

(o)     except as permitted by the terms of any Material Contract pertaining to any Debt, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others other than as disclosed to Buyer and excluding any accounts payable arising in the Ordinary Course of Business of a Seller;

(p)     enter into any operating lease;

(q)     terminate, fail to renew or materially reduce the amount of any insurance coverage provided by the existing insurance policies of Sellers;

(r)     terminate or fail to exercise any right of renewal under any Real Property Lease or any Assigned Contract except as such expires by its terms or by termination by the counterparty;

(s)     terminate or waive any right of substantial value, including any rights with respect to the Real Property Leases except as such expires by its terms or by termination by the counterparty;

(t)     fail to promptly disclose to Buyer the grant of any severance, retention or termination pay to any director, officer or other Employee of either Seller;

(u)     fail to give any notices or other information required to be given to the Employees of either Seller, any labor union representing any collective bargaining unit of Employees of either Seller, and any applicable government authority under the National Labor Relations Act, the Code, COBRA, WARN Acts, and other Applicable Law in connection with the Contemplated Transactions;

(v)     remove from either Seller's premises or modify (other than in the ordinary course of business) any books or records of such Seller;

(w)     fail to keep in full force and effect its Licenses;

(x)     utilize, invade or otherwise divest themselves of the Restricted Assets or any rights thereto unless Attorney General or Supreme Court of the State of New York rejects the transfer to Buyer or the donor expressly chooses to transfer Restricted Assets to party other than Buyer; or

(y)     agree or commit to do any of the foregoing.

7.4     Access. Sellers will permit Representatives of Buyer (including its accountants) to have access at all reasonable times, and in a manner so as not to interfere with the normal business operations of Sellers, to the premises, properties, personnel, books, records (including

39680675v17

Tax records and unredacted copies of the minutes of the Board of Directors and quality management committee, if any, of either Seller, provided that those portions of any records or discussions pertaining to the entry into or consummation of the Contemplated Transactions may be withheld and/or redacted), contracts, and documents of or pertaining to Sellers. On the Closing Date, Sellers will electronically transfer onto Buyer's (or its designee's) computer system all employee information, patient records, accounts receivable information and other data requested by Buyer to effectively operate the Nursing Home from and after the Closing Date. Prior to the Closing Date, Sellers will cooperate with Buyer and allow Buyer (or its designee) to access Sellers' computer systems so as to enable the information, records and data described in this Section to be immediately transferred on the Closing Date.

7.5    Notice of Developments.

(a)    Each Seller shall promptly notify Buyer of:

(i)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions;

(ii)    any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions; or

(iii)    its obtaining Knowledge of (A) a breach or violation of any representation or warranty made by it contained in this Agreement that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation of warranty that is not so qualified becoming untrue or inaccurate in any material respect and (B) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any other Closing Document.

(b)    Sellers shall promptly notify Buyer of any event or occurrence not in the Ordinary Course of Business and any written notice of any termination, default or event that, with notice or lapse of time or both, would become a default, received by Sellers subsequent to the Execution Date, under any Real Property Lease, any Affiliate Agreement, or any other Material Contract.

(c)    No notification under this Section 7.5 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.6    Employment and Physician Contracting Matters. From and after the Execution Date, Buyer shall have the right to contact the Employees of Sellers, the Physicians who are parties to the Physician Contracts with either Seller and any labor union with which either Seller has a CBA to discuss the terms on which, subject to the occurrence of the Closing, (i) Buyer may offer employment-at-will to such Employees at the time of the Closing, (ii) Buyer may offer to enter into contracts with the Physicians at the time of the Closing and (iii) Buyer may offer to

39680675v17

enter into a CBA with such labor unions. Nothing in this Agreement shall obligate Buyer to offer (x) employment to any Employee of either Seller, (y) to enter into any contract with a Physician or (z) to enter into any CBA with any labor union.

7.7     Schedules.   All schedules identified in this Agreement shall be delivered by Sellers to Buyer no later than the 30th day after the Petition Date. Any schedule identified in this Agreement that is not received by Buyer by such date shall be deemed to state, "None." None of the schedules delivered by Sellers or deemed to state "None" will become part of this Agreement unless and until approved in writing by Buyer. Buyer will use commercially reasonable efforts to review such schedules and notify Sellers promptly whether any of the schedules are unacceptable.

ARTICLE VIII
POST-CLOSING COVENANTS.

The Parties agree as follows with respect to the period following the Closing:

8.1     General.   After the Closing, each of the Parties will take such further action as is necessary on its part to carry out the purposes of this Agreement (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expenses). Without limiting the foregoing, each of the Parties will cooperate in providing access to all books, records, ledgers, files, documents, correspondence, lists and other documents and information related to the matters covered by this Agreement as any other Party may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expense).

8.2     Access to Records.   After the Closing Date, each Seller shall retain for a period consistent with such Seller's record-retention policies and practices and Applicable Law its books and records related to the Business that do not constitute part of the Acquired Assets

8.3     Non-Disclosure.

(a)     From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Sellers, and not use to the detriment of Sellers, any Seller Confidential Information relating to or obtained from Sellers or their Representatives. For purposes of this Section 8.3(a), "Seller Confidential Information" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii) becomes available to Buyer on a non-confidential basis from a

50

source other than Sellers or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Sellers, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further,* that upon the Closing, the restrictions contained in this Section 8.3(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, the Assumed Liabilities or the Business. Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Transactions and who are directed to keep it confidential. Buyer shall instruct its Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Sellers with prompt notice prior to making any disclosure so that Sellers may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Sellers waive compliance with the provisions of this Section 8.3(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)     From and after the date hereof, Sellers shall, and shall direct their Representatives to, maintain in confidence and not disclose to any third party (other than their Representatives) without the prior written consent of Buyer, and not to use to the detriment of Buyer, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by Governmental Authorities, (iii) compliance activities prior to or after the Closing related to periods occurring prior the Closing Date, (iv) any legal proceeding, (v) enforcing any rights or other claims of Sellers under this Agreement, or (vi) performing any obligations of Sellers under this Agreement. For purposes of this Section 8.3(b), "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters. Sellers may disclose any of the Business Confidential Information to their Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who are directed to keep it confidential. Sellers shall instruct their Representatives having access to the Business Confidential Information of such obligation of confidentiality. If Sellers or anyone to whom they have transmitted Business Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Business Confidential Information, Sellers shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Buyer

51

waives compliance with the provisions of this Section 8.3(a), Sellers and their Representatives shall furnish only that portion of the Business Confidential Information that they are advised by counsel is required by Applicable Law to be disclosed.

(c)      It is understood by the Parties that the information, documents and instruments delivered to Sellers by Buyer or its Representatives in connection with the negotiation of this Agreement (the "Buyer Confidential Information") are of a confidential and proprietary nature.  Sellers agree that both prior and subsequent to Closing they will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend claims as provided herein.  Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Sellers, or any of their Representatives, (ii) becomes available to Sellers on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Sellers to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Sellers from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Sellers through written documents or evidence maintained by them to have been independently developed by them without the use of Buyer Confidential Information.  Sellers further agree that upon Buyer's written request, they will destroy or, or at Sellers' option return to Buyer, all such documents and instruments and all copies thereof in their possession.  If Sellers or anyone to whom they have transmitted Buyer Confidential Information is required by Applicable Law to disclose any of such Buyer Confidential Information, Sellers shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 8.3(c), Sellers and their Representatives shall furnish only that portion of the Buyer Confidential Information that they are advised by counsel is required by Applicable Law to be disclosed.

(d)      The obligations contained in this Section 8.3 shall survive the Closing.

8.4      Further Assurances.  Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under Applicable Laws and regulations to effectuate the consummation of the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Sellers at Closing) and to facilitate Buyer's operation of the Business after the Closing Date.

8.5      Cost Reports.  LBMNH shall prepare and file with appropriate Medicare and Medicaid agencies its final Cost Reports covering its operation of the Nursing Home through the Closing Date as soon as reasonably practicable after the Closing Date, but in no event later than the date on which such final cost report is required to be filed by Applicable Law under the terms of the Medicare and Medicaid programs, and will provide the appropriate Medicare and Medicaid agencies with any information needed to support claims for reimbursement made by

52

LBMNH either in such final Cost Report or in any Cost Reports filed for prior cost reporting periods, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to Buyer after it becomes the operator of the Nursing Home is not reduced or offset in any manner as a result of LBMNH's failure to timely file, or filing an inaccurate or incomplete, final Cost Report or supporting documentation with respect to any past reimbursement claims, including those included in the final Cost Report. Simultaneously with such filing, LBMNH shall provide Buyer with a copy of the final Cost Reports and such supporting documentation reasonably requested by Buyer in writing.

8.6     <u>Cooperation Regarding Restricted Assets</u>.  Sellers shall use their best efforts and take all reasonable actions required to facilitate the transfer of the Restricted Assets to Buyer (or its designee), including filing an application with the New York State Supreme Court for an order approving the modification of any restrictions relating to the Restricted Assets that Buyer may determine to be necessary to permit the Restricted Assets to be transferred to, and maintained, administered and used by, Buyer (or its designee) to support the Buyer's (or its designee's) mission(s), operations, programs, services and/or facilities consistent with the applicable restrictions on the Restricted Assets.  Nothing herein shall require such transfer of the Restricted Assets to Buyer (or its designee) if, despite Sellers' best efforts, the transfer is not approved by the New York State Supreme Court or the Attorney General or the donor decides to transfer the Restricted Assets to party other than Buyer (or its designee).  Sellers' inability to transfer the Restricted Assets to Buyer (or its designee) as provided in this Section 8.6 shall not constitute grounds for Buyer to terminate this Agreement.

8.7     <u>Accounts Receivable</u>.

(a)     Sellers shall be entitled to bill for and receive all Pre-Closing Accounts Receivable and Buyer (or its designee) shall be entitled to bill for and receive all Post-Closing Accounts Receivable, to the extent permitted by Applicable Law.

(b)     Within 5 Business Days before the Closing, Sellers shall provide to Buyer a schedule listing all outstanding accounts receivable as of that date.  Within 5 Business Days following the Closing, Sellers shall provide Buyer with an updated schedule listing all Pre-Closing Accounts Receivable.

(c)     Buyer agrees that it will pay over or cause to be paid over to the Sellers, insofar as practicable within 5 Business Days of receipt, and until so paid shall hold in trust for the Sellers, all sums received by it or any of its Affiliates in respect of or on account of the Pre-Closing Accounts Receivable.

(d)     Sellers agree that they will pay over or cause to be paid over to the Buyer (or its designee), insofar as practicable within 5 Business Days of receipt, and until so paid shall hold in trust for the Buyer (or its designee), all sums received by either of them in respect of or on account of any Post-Closing Accounts Receivable.

(e)     If either Party receives any reimbursement payments for services that straddle both pre-Closing and post-Closing time periods (each a "<u>Straddle Payment</u>"), then such Straddle Payments shall be appropriately allocated, with the Party receiving a

Straddle Payment holding in trust for the other Party the other Party's allocable amount and paying over such amount as soon as practicable, but in no event more than 5 Business Days after receipt.

(f)    Each Party making a payment to the other pursuant to Section 8.7(c), Section 8.7(d) or Section 8.7(e) shall provide therewith information available to it identifying the source of the amounts so paid over so to permit the other Party to apply correctly such amounts to the other Party's accounts.  In addition, upon reasonable request, each Party shall allow the other Party (at the other Party's cost) to audit, access and copy any of its records relating thereto.

(g)    The provisions of Section 8.7 shall survive the Closing.

8.8    Set-off Right.  If Buyer, its designee or any of their respective Representatives incurs any loss, Liability, Environmental Claim, claim, damage, expense (including costs of investigation and defense and reasonable attorneys' fees and expenses) or diminution of value, whether or not involving a claim asserted by a third-party (collectively, "Damages"), arising from or in connection with: (a) any breach of any representation or warranty made by Sellers in (i) this Agreement, (ii) any transfer instrument or (iii) any certificate, document, writing or instrument delivered by Sellers pursuant to this Agreement; (b) any breach of any covenant or obligation of Sellers in this Agreement or in any other certificate, document, writing or instrument delivered by Sellers pursuant to this Agreement; (c) any Liability arising out of the ownership or operation of the Business or the Acquired Assets prior to the Effective Time other than the Assumed Liabilities; (d) any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or alleged to have been made, by any Person with Sellers (or any Person acting on their behalf) in connection with any of the Contemplated Transactions; (e) any services provided by Sellers prior to the Effective Time; (f) any liability under the WARN Act or any similar state or local Law that may result from an Employment Loss caused by any action of Sellers prior to the Closing or by Buyer's decision not to hire Employees; (g) any Seller Plan; (h) any Healthcare Program Liabilities; or (i) any other Excluded Liabilities or Excluded Assets, then Buyer (or its designee) shall have the right to set-off against any amounts otherwise payable by Buyer (or its designee) to Sellers after the Closing (including the Excluded Assets described in Section 2.2(b), Section 2.2(c) and Section 2.2(e)) the full amount of such Damages.

8.9    FEMA Advanced Funds.  Any FEMA Advanced Funds received by Buyer on or after the Closing will be used by Buyer for the purpose for which such funds were disbursed by FEMA.

ARTICLE IX
EMPLOYEES

9.1    Buyer Not Assuming Sellers' CBAs or Benefit Plans.  Buyer is not assuming any of Sellers' CBAs or Employee Benefit Plans.  Seller represents that prior to Closing it will take all necessary steps to terminate any and all of its Employee Benefits Plans, effective as of the Closing Date.

54

9.2    <u>Offers of Employment Made to Sellers' Employees</u>.    Buyer shall offer employment on a probationary basis to certain Employees of Sellers who (a) at the time of Closing were employed by Sellers; (b) in Buyer's sole discretion, meet Buyer's job qualifications as of the Closing and complete Buyer's application process, which includes background checks and pre-employment drug testing; and (c) agree to resign from employment with Sellers ("<u>Eligible Employees</u>").    Buyer shall be the sole judge of those Employees it may decide to employ and the qualifications of Seller's Employees.    Employment shall be offered to such Eligible Employees on such new terms and conditions of employment as may be established by Buyer in its sole discretion, and not on the terms of Sellers' CBAs with any of the unions representing Sellers' Employees.    Offers made to Eligible Employees shall be for employment commencing immediately following the Closing and any offers made prior to the Closing shall be subject to the Closing. Buyer may impose a reasonable time period within which Eligible Employees must respond to an offer of employment.

9.3    <u>No Successor Liability</u>.    Except as to specific liabilities which Buyer expressly assumed in writing, if any, Buyer shall have no liability, as successor or otherwise, for any breach by Sellers of any of their CBAs, nor for any arrears by Sellers in payments to Employees for wages or otherwise, nor for contributions due to any Employee Benefit Plan or Multiemployer Plan pursuant to any such CBA or any trust agreement, nor for any liability or claim arising out of or relating to the termination of Sellers' obligations under any CBA or any trust agreement, including termination of Sellers' obligations to contribute to any Multiemployer Plan.    Sellers shall remain liable for all of their pre-petition and post-petition arrears to any such Employee Benefit Plans and Multiemployer Plans and for any Withdrawal Liability associated with their ceasing to contribute to any Multiemployer Plan.

ARTICLE X
CONDITIONS TO OBLIGATION TO CLOSE

10.1    <u>Conditions to Buyer's Obligation</u>.    Buyer's obligation to consummate the Contemplated Transactions is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date.

(b)    Sellers shall have performed and complied with all of their covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Sellers shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)     No breach or default on the part of either Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)     No Material Adverse Change shall have occurred with respect to either Seller;

(e)     The financial performance of LBMNH shall not have materially worsened since the Execution Date;

(f)     No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(g)     No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(h)     Sellers and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.12, Section 5.5 and Section 7.2, as applicable, all of which shall be in form and substance reasonably satisfactory to Buyer;

(i)     No Debarment or Suspension shall have occurred and no proceeding shall be pending or threatened seeking a Debarment or Suspension;

(j)     Sellers shall have received all other Sellers' Consents and Approvals;

(k)     No Governmental Authority, including CMS, DASNY, PBGC or the Internal Revenue Service, shall have objected to the sale of the Acquired Assets pursuant to the Sale Order or, if any Governmental Authority shall have objected to the sale of the Acquired Assets pursuant to the Sale Order, such objection shall have been overruled or consensually resolved;

(l)     The Bankruptcy Court shall have entered the Bidding Procedures Order no later than 20 days from the Petition Date;

(m)     The Bankruptcy Court shall have entered the Sale Order, which shall have become a Final Order;

(n)     All actions to be taken by Sellers in connection with consummation of the Contemplated Transactions and all certificates, opinions, instruments, and other documents required to effect the Contemplated Transactions shall be reasonably satisfactory in form and substance to Buyer;

39680675v17

(o)    Buyer shall have received reasonably acceptable assurances, in Buyer's sole discretion, from counsel and/or appropriate regulatory agencies that Buyer shall have no successor liability resulting from the Contemplated Transaction;

(p)    FEMA shall have confirmed, in a writing acceptable to Buyer in its sole discretion, that Buyer (or its designee) will succeed to the proceeds of all funds otherwise payable by FEMA to Sellers (either directly from FEMA or indirectly, including from a Governmental Authority other than FEMA), and that FEMA will provide to Buyer (or its designee) such funding as determined by Buyer (or its designee) to be necessary to implement and complete Buyer's (or its designee's) alternative use project for developing replacement health care services in the Long Beach community;

(q)    Buyer shall have received all of the Closing Documents described in Section 3.4(a);

(r)    All Governmental Authorities conducting investigations with respect to LBMNH, including investigations by The Attorney General of the State of New York, Medicaid Fraud Control Unit, shall have agreed to cap any potential liability of LBMNH at an amount acceptable to Buyer in its sole discretion;

(s)    Buyer shall have received written assurances from the Medicare and Medicaid programs limiting Buyer's (or its designee's) potential Liability for obligations owed by LBMNH to an amount acceptable to Buyer in its sole discretion;

(t)    Buyer shall have received current Phase I environmental site assessments with respect to the Real Property, any additional reports, and if recommended by an environmental engineering or consulting firm, Phase II environmental site assessments or any other investigations, prepared by an environmental engineering or consulting firm selected by Buyer, and the scope, findings and conclusions of all such assessments, reports and investigations shall be acceptable to Buyer; provided, however, that Buyer shall have taken commercially reasonable efforts to conduct such Phase I environmental site assessment promptly following the Execution Date and, if warranted, such Phase II environmental site assessment promptly following any recommendation to do so by an environmental engineering or consulting firm;

(u)    the Title Company shall have irrevocably committed to issue a title policy to Buyer with respect to the Owned Real Property at standard rates in accordance with its standard form of title policy, clear of all Liens, subject to the Permitted Exceptions;

(v)    Buyer shall have received the entire proceeds of a HEAL Grant in an amount of $21,962,357, as described in an award letter from DOH and DASNY to Buyer, dated December 17, 2013;

(w)    The Bankruptcy Court shall have approved and authorized Sellers' assignment of the Assigned Contracts to, and the assumption thereof by, Buyer; and

(x)    All of the schedules delivered to Buyer (or deemed to state "None") pursuant to Section 7.7, shall have been acceptable to Buyer in its sole discretion.

57

Buyer may waive in its sole and absolute discretion any condition specified in this Section 10.1 if it executes a writing so stating at or prior to the Closing. Sellers will remain jointly and severally liable for damages proximately caused by either Seller's breach of this Agreement which prevents the consummation of the Contemplated Transactions.

10.2   Conditions to Sellers' Obligations.   Sellers' obligations to consummate the Contemplated Transactions are subject to satisfaction of the following conditions:

(a)   The representations and warranties set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date;

(b)   Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Buyer shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)   No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(d)   No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(e)   Sellers and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.12, Section 5.5 and Section 7.2, as applicable;

(f)   The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order;

(g)   Sellers shall have received all of the Closing Documents described in Section 3.4(b); and

(h)   Buyer shall have paid, or shall pay simultaneously with the Closing, or shall have made arrangements to pay, any and all Cure Amounts with respect to the Assigned Contracts.

58

Sellers may waive any condition specified in this Section 10.2 if they execute a writing so stating at or prior to the Closing (and for such purpose LBMNH hereby irrevocably appoints LBMC as its agent to grant all waivers and consents hereunder on behalf of both Sellers).

ARTICLE XI
DISPUTE RESOLUTION

11.1    Dispute Resolution.  The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute that arises under this Agreement.

ARTICLE XII
TERMINATION

12.1    Termination of Agreement.  In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)    Termination Due to Events in Bankruptcy Case.  Unless otherwise agreed to in writing by Buyer, this Agreement shall terminate immediately if: (i) the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) the Bidding Procedures Order is not entered by the Bankruptcy Court within 20 days of the Petition Date (or such later date as Buyer may have designated in writing to Sellers); (iii) the Sale Order is not entered by the Bankruptcy Court within 60 days of the Petition Date (or such later date as Buyer may have designated in writing to Sellers); (iv) substantially all of the assets of either Seller are sold to a Person other than Buyer (or a designee of Buyer) occurs; (v) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the material assets of Sellers; or (vi) Sellers consent to any modification of this Agreement without the prior written agreement of Buyer.

(b)    Termination by Buyer.  Prior to the Closing Date, Buyer may terminate this Agreement immediately upon written notice to Sellers of the occurrence of any of the following, at which time all obligations of Buyer hereunder shall be of no further force and effect:

(i)    the Closing has not occurred by the Outside Closing Date;

(ii)    if any of the conditions to the obligations of Buyer that are set forth in Section 10.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)    if there shall be a material breach by Sellers of any material representation or warranty, or any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within 15

59

Business Days after the giving of written notice by Buyer to Sellers of such breach;

        (iv)    if there is a Material Adverse Effect;

        (v)    if Sellers (x) fail to obtain either interim or final orders from the Bankruptcy Court authorizing and approving post-petition debtor-in-possession financing, or (y) breach and are in default of any agreement relating to such debtor-in-possession financing, causing a termination of funding to Sellers;

        (vi)    as provided in Section 6.2(d);

        (vii)    as provided in Section 13.1; or

        (viii)    the Bankruptcy Court approves a Competing Bid.

    (c)    <u>Termination by Sellers</u>. Prior to the Closing Date, Sellers may terminate this Agreement upon written notice to Buyer of the occurrence of any of the following, unless Sellers are in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Sellers hereunder shall be of no further force and effect, except for those obligations specified in this Agreement to survive termination:

        (i)    if any of the conditions to the obligations of Sellers to close that are set forth in Section 10.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers; or

        (ii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within 15 Business Days after the giving of written notice by Sellers to Buyer of such breach.

    (d)    <u>Termination by Buyer or Sellers</u>. Either Buyer or Sellers may terminate this Agreement upon the occurrence of any of the following:

        (i)    by mutual written consent of Sellers and Buyer prior to the Closing Date;

        (ii)    if either Seller or both Sellers consummate an Alternate Transaction, subject to Buyer's right to payment of the Termination Fee and Expense Reimbursement in accordance with the provisions of this Agreement and the Bidding Procedures Order; or

        (iii)    upon 20 Business Days' written notice to the other Party if, after 90 days after the entry of the Sale Order, DOH has disapproved or indicated that it will disapprove the CON Application; *provided, however*, that DOH does not,

prior to the expiration of such 20 Business Days' notice, approve the CON Application or indicate that it will approve the CON Application.

If this Agreement is terminated in accordance with Section 12.1(d)(ii), then from and after such termination neither Party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that Buyer shall receive payment of the Termination Fee and Expense Reimbursement.

(e)    Extension of Time Periods.  The time periods for termination of this Agreement set forth in this Section 12.1 may be extended upon the written agreement of the Parties without the further approval of the Bankruptcy Court.

12.2    Procedure For Termination.  If this Agreement is terminated by Buyer or Sellers, or both, pursuant to Section 12.1, written notice thereof shall promptly be given to the other Party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 12.1), the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 12.3, without further action by the Parties.

12.3    Effect of Termination.  If any Party terminates this Agreement pursuant to Section 12.1, except as otherwise provided herein (*e.g.*, the obligation of Sellers to pay or cause to be paid to Buyer the Termination Fee and Expense Reimbursement), all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement); *provided* that if such termination is the result of a breach or default hereunder by the non-terminating Party, then the non-breaching Party shall be entitled to seek any and all remedies available to the terminating Party at law or in equity.

ARTICLE XIII
TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS

13.1    Title Insurance.  Buyer (i) has ordered from First American Title Insurance Company (the "Title Company") a current title report with respect to the Owned Real Property, and Buyer shall request the Title Company to perform continuation searches of title prior to the Closing (collectively, the "Title Report"), and (ii) promptly following the Execution Date will order a current ALTA survey of the Owned Real Property (the "Survey").  Within 10 Business Days after receipt of (a) the Title Report and Survey or (b) after receipt of the Title Report and Survey, any continuation or update thereof, but in any event prior to Closing, Buyer shall notify Sellers, in writing (a "Buyer's Objection Notice"), of any exception, lien, mortgage, security interest, claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation or other encumbrance affecting the Owned Real Property (collectively, "Exceptions") disclosed by same that is not a Permitted Exception and to which Buyer objects; *provided, however,* that notwithstanding anything herein to the contrary, (x) any and all monetary liens, including all mortgages and security interests securing any obligations of Sellers (or any predecessor-in-interest to Sellers), all judgments

61

against Sellers (or any predecessor-in-interest to Sellers), all mechanics' liens recorded against the Owned Real Property (or any portion thereof), all monetary liens or penalties arising out of violations on the Owned Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions), and (y) any and all tenancies, shall be deemed to be and shall constitute Title Defects for all purposes and Buyer shall be deemed to have objected to same and shall not be obligated to deliver a Buyer's Objection Notice with respect thereto in order for same to constitute a Title Defect.  Except as otherwise provided herein, Sellers may elect (but shall not be obligated) to attempt to cure or remove any such title objections (collectively and individually, a "Title Defect") set forth in the Title Report, the Survey, a Buyer's Objection Notice or otherwise.  The Parties acknowledge that Sellers may rely on the Sale Order to discharge certain Title Defects and hereby agree that the Title Company's issuance of a title insurance policy, in reliance on the Sale Order, without taking exception for those Title Defects shall be sufficient to constitute Sellers' cure and removal of such Title Defects.  If Sellers are obligated or elects to attempt to cure or remove any Title Defect and are unable to do so on or before the Closing Date, then Sellers shall be entitled to adjourn the Closing in order to cure or remove such Title Defect for a period of not more than 30 days in the aggregate.  If Sellers elect not to cure or remove, or after electing to cannot cure or remove, any Title Defect that Sellers are not otherwise obligated to cure or remove pursuant to the terms of this Agreement or shall, for any reason, be unable to cure or remove any Title Defect that Sellers are not otherwise obligated to cure or remove pursuant to the terms of this Agreement within the time periods set forth in the preceding sentence, then Sellers shall notify Buyer in writing and Buyer shall have the right to either (i) terminate this Agreement or (ii) accept such title as Sellers shall be able to convey without abatement in the Purchase Price and without any liability on the part of Sellers.  Notwithstanding anything herein to the contrary, Sellers shall, at or prior to Closing, cure or remove the following Exceptions:  (A) any and all monetary liens, including all mortgages and security interests securing any obligations of Sellers (or any predecessor-in-interest to Sellers), all judgments against Sellers (or any predecessor-in-interest to Sellers), all mechanics' liens recorded against the Owned Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions); (B) any and all tenancies, other than any tenancies where Buyer or its designee is the tenant; and (C) without limitation of the Exceptions described in preceding clauses (A) and (B), any and all of Title Defects objected (or deemed objected) to by Buyer that Sellers willfully placed of record or consented to be placed of record.

13.2    Permitted Exceptions.  "Permitted Exceptions" means:

(a)    all matters set forth on Schedule 13.2(a) attached hereto and made a part hereof;

(b)    building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

(c)    any state of facts that a current, accurate survey or visual inspection of the Owned Real Property would disclose, provided same do not render title uninsurable at standard rates and do not materially and adversely affect the use or development of the Owned Real Property in any manner permitted by current Applicable Law, including current zoning laws;

39680675v17

(d)     all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Owned Real Property, provided the same are for the benefit of the Owned Real Property and do not materially and adversely affect the use or development of the Owned Real Property in any manner permitted by current Applicable Law, including current zoning laws;

(e)     any variations between the tax diagram or the tax map and the record description;

(f)     rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Owned Real Property existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Buyer) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Owned Real Property;

(g)     real property taxes, water rates and charges, sewer taxes and rents, and similar items with respect to the Owned Real Property, not yet due and payable and subject to apportionment as provided herein; and

(h)     assessments or installments thereof arising after the date of Closing, whether or not a lien as of Closing, which are due and payable on or after Closing.

13.3    <u>Apportionments</u>.

(a)     <u>Items Subject to Apportionment</u>. Subject to the terms of this Section 13.3, the following items, without duplication, are to be apportioned between Seller and Buyer with respect to the Owned Real Property 12:00:01 a.m. on the calendar day immediately following the Closing Date, and at the Closing the net amount thereof shall, as applicable, either be (x) paid by Buyer to Sellers by wire transfer of immediately available federal funds to a bank account designated by Sellers or (y) credited by Sellers against the Purchase Price:

(i)     real property taxes and assessments;

(ii)    water rates and charges;

(iii)   sewer taxes and rents;

(iv)    electricity, steam, gas and all other utilities, including, without limitation, taxes thereon;

(v)     deposits on account with any utility company servicing the Property, to the extent transferred to Buyer;

(vi)    deposits on account with any municipality having jurisdiction over the Property, to the extent transferred to Buyer;

39680675v17

(vii)    rents and charges under the Real Property Leases in effect on the Closing Date, if, as and when collected;

(viii)    charges under the Assigned Contracts that are in effect on the Closing Date; and

(ix)    all other items that reasonably require apportionment in accordance with local custom and practice to effectuate the transactions contemplated hereby.

Seller and Buyer shall adjust any apportionments made under this Section 13.3 after the Closing to account for errors or incorrect estimates made as of the Closing Date (it being agreed that the Parties' aforesaid agreement to make such adjustments shall survive the Closing for a period of 12 months).

(b)    Governmental Charges. Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed. If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Property are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation. After the real property taxes, water rates and charges, sewer taxes and rents or similar items, as the case may be, are finally fixed for the fiscal year in which the Closing occurs, Sellers and Buyer shall make a recalculation of the apportionment thereof based on the amounts finally fixed for the fiscal year in which the Closing occurs, and Sellers or Buyer, as the case may be, shall make an appropriate payment to the other Party based on such recalculation. Sellers or their representatives shall have the right (x) at any time before the Closing, to institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to any tax period ending at or prior to the end of the tax year in which the Closing occurs and (y) to continue, after the Closing, any such proceedings commenced by Sellers prior to the Closing; *provided, however*, that (A) Sellers (or their representatives) shall notify Buyer of, and keep Buyer reasonably informed with respect to, any such proceedings and no such proceeding shall be finally settled by Sellers without the prior consent of Buyer, which consent shall not be unreasonably withheld, and (B) upon notice to Sellers, Buyer shall have the right to assume control of and prosecute any such proceeding relating to the tax year in which the Closing occurs, provided that no such proceeding shall be finally settled by Buyer without the prior consent of Sellers, which consent shall not be unreasonably withheld. If Buyer, at any time following the Closing shall institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to the tax period ending at the end of the tax year in which the Closing occurs, such proceeding shall not be finally settled by Buyer without the prior consent of Sellers, which consent shall not be unreasonably withheld. If any refund of any real property tax, water rates and charges, sewer taxes and rents or similar items is issued after the Closing Date for any period ending prior to or including the Closing Date, such refund shall be applied as follows: first, to the cost incurred in obtaining such refund; and, second, the balance of

such refund, if any, shall be apportioned between Sellers, for the period prior to the Closing Date, and Buyer, for the period from and after the Closing Date.

(c)     _Water Meters_. If there shall be any meters measuring water consumption at the Owned Real Property, Sellers shall attempt to obtain meter readings to a date that is no more than 30 days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time, shall be apportioned on the basis of such readings, or if such readings are not obtained, the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d)     _Payment of Certain Items._ The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Sellers are obligated to pay and discharge with respect to the Owned Real Property, with interest and penalties thereon to the date which is 3 Business Days following the Closing Date, may, at the option of Sellers, be allowed to Buyer out of the Purchase Price, provided that official bills therefor with interest and penalties thereon are furnished to Buyer by Sellers at the Closing.  Buyer, if request is made at least 2 Business Days prior to the Closing, shall provide Sellers at the Closing with separate wire transfers of immediately available federal funds, in an aggregate amount not exceeding the balance of the Purchase Price due to Sellers at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date.  Without limiting the foregoing, Sellers are solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Owned Real Property that are delinquent as of the Closing Date, subject to apportionment as herein provided.

(e)     _Utilities_.  With respect to the utilities described in _Section 13.3(a)(iv)_, where possible, Sellers shall secure cutoff readings for all utilities as of the apportionment time.  To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the Parties as of the apportionment time on the basis of the most recent actual (not estimated) bill for such service, and, after Closing, upon determination of the final meter readings shall be readjusted based on same as of the apportionment time.  Buyer shall be responsible for causing such utilities and services to be changed to its name (or the name of any affiliate, manager or tenant of Buyer) as of the Closing Date, and shall be liable for and shall pay all utility bills for services rendered after the apportionment time.  With respect to deposits of Sellers on account with any utility company servicing the Owned Real Property, to the extent same are unconditionally transferred to Buyer at Closing, Sellers shall receive an adjustment equal to the full amount of such deposits transferred to Buyer.  To the extent that any such deposits are not unconditionally transferred to Buyer, Sellers shall have the right to a return of such deposits and Buyer shall be responsible for posting any deposits required from and after the Closing.

(f)     _Assessments_.  If, on the Closing Date, the Owned Real Property, or any part thereof, is affected by any real property tax assessments, then Sellers shall pay such

39680675v17

assessments; *provided, however*, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Buyer shall pay such installments due after the Closing Date.

(g)    Survival. The provisions of this Section 13.3 shall survive the Closing.

ARTICLE XIV
MISCELLANEOUS

14.1    Survival.    All representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall survive the Closing and the consummation of the Contemplated Transactions.    The right to set-off described in Section 8.8 or any other remedy based upon such representations, warranties, covenants and obligations shall not be affected by any investigation (including any environmental investigation or assessment) conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant or obligation. The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect such right to set-off or other remedy based upon such representations, warranties, covenants and obligations.

14.2    Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to advise the other Party prior to making the disclosure).

14.3    No Third-Party Beneficiaries.    This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.4    Entire Agreement.    This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

14.5    Succession and Assignment.    This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates, including any not-for-profit corporation of which Buyer is a member and which succeeds to the interest of Buyer in either Seller and (b) designate one or more of its Affiliates to perform its obligations

66

hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

14.6    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

14.7    Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.8    Notices. All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Sellers:          Long Beach Medical Center
                        455 E Bay Drive
                        Long Beach, NY 11561
                        Attn:  President & CEO

Copy to:                Garfunkel Wild, P.C.
                        111 Great Neck Road, Suite 600
                        Great Neck, NY 11021
                        Attn:  Burton S. Weston, Esq.

If to Buyer:            South Nassau Communities Hospital
                        One Healthy Way
                        Oceanside, NY 11572
                        Attn:  President & CEO

Copy to:                Proskauer Rose LLP
                        Eleven Times Square
                        New York, NY 10036
                        Attn:  Richard J. Zall, Esq.


                        and

                        Togut, Segal & Segal LLP
                        One Penn Plaza
                        New York, New York 10119
                        Attn:  Frank Oswald, Esq.

39680675v17

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

14.9    Governing Law; Waiver of Jury Trial. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

14.10    Submission to Jurisdiction; Consent to Service of Process. Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 14.8 hereof; *provided, however*, that, if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of New York sitting in Brooklyn, New York or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in Nassau County and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 14.8.

14.11    Amendments. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and each Seller. Sellers may consent to any such amendment at any time prior to the Closing with the prior authorization of each Seller's Board of Directors.

14.12    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

14.13    Expenses. Except with respect to the Termination Fee and Expense Reimbursement, each of the Parties will bear its own costs and expenses (including legal fees

39680675v17

and expenses) incurred in connection with this Agreement and the Contemplated Transactions, except that Buyer on the one hand and Sellers on the other hand shall each bear fifty percent (50%) of all Transfer Taxes payable with respect to the conveyance of the Owned Real Property and the assignment of the Real Property Leases, if any.

14.14  Construction.  The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

14.15  Incorporation of Exhibits and Schedules.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

14.16  No Waiver.  The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

[SIGNATURES ARE ON NEXT PAGE]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Sellers:                                    LONG BEACH MEDICAL CENTER


By: _____
Name:  Douglas Melzer
Title:   President & CEO


LONG BEACH MEMORIAL NURSING HOME, INC., a/k/a THE KOMANOFF CENTER FOR GERIATRIC AND REHABILITATIVE MEDICINE


By: _____
Name:   Douglas Melzer
Title:    President & CEO


Buyer:                                      SOUTH NASSAU COMMUNITIES HOSPITAL


By: _____
Name:
Title:

70

39680675v17

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Sellers:                                    LONG BEACH MEDICAL CENTER


By:_____
Name:
Title:


LONG BEACH MEMORIAL NURSING
HOME, INC., a/k/a THE KOMANOFF
CENTER FOR GERIATRIC AND
REHABILITATIVE MEDICINE



By:_____
Name:
Title:


Buyer:                                      SOUTH NASSAU COMMUNITIES
                                            HOSPITAL


By:_____
Name:      Richard J. Murphy
Title:     President and CEO


70

39680675v17