GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A. Shah
Adam T. Berkowitz
*Proposed Counsel for Debtors*
*And Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:

LONG BEACH MEDICAL CENTER, et al.[1]                     Chapter 11
                                                         Case No. 14-_____ (___)

                               Debtors.                  (Joint Administration Pending)
-----------------------------------------------------------x

**AFFIDAVIT OF DOUGLAS MELZER PURSUANT TO**
**LOCAL BANKRUPTCY RULE 1007-4 AND**
**IN SUPPORT OF FIRST DAY MOTIONS**

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NASSAU           )

     1.     I am the President and Chief Executive Officer of Long Beach Medical Center

("**LBMC**") and Long Beach Memorial Nursing Home, Inc. *dba* The Komanoff Center for

Geriatric and Rehabilitative Medicine ("**Komanoff**" each a "**Debtor**" and collectively sometimes

referred to as the "**Debtors**").  (LBMC and Komanoff are also sometimes also collectively

referred to as the "**Medical Center**")  I am familiar with the business and financial affairs of

both LBMC and Komanoff.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include:  Long Beach Medical Center (5084) and Long Beach Memorial Nursing Home, Inc. dba The Komanoff Center for Geriatric and Rehabilitative Medicine (3422).

2694768v.8

2.     I submit this affidavit (this "**Affidavit**") pursuant to Rule 1007-4 of the Local Bankruptcy Rules for the Eastern District of New York (the "**Local Bankruptcy Rules**") in support of (i) the Debtors' petitions for relief filed on the date hereof (the "**Petition Date**") under Chapter 11, Title 11 of the United States Code (the "**Bankruptcy Code**") in these cases (the "**Chapter 11 Cases**") and (ii) the relief sought by the Debtors in their motions and applications simultaneously filed with the Court (the "**First Day Motions and Applications**").

3.     Unless otherwise stated, the facts set forth in the Affidavit are based upon my personal knowledge as an officer of the Debtors, upon information supplied to me by other current and former members of the Debtors' management and employees of the Debtors, upon my review of relevant documentation and financial information, advice and counsel of the Debtors' professionals, and my opinions based upon my knowledge and information concerning the Debtors' operations and financial affairs.  If called as a witness, I would testify to the facts set forth in this Affidavit.  Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis.  I am authorized to submit this Affidavit by the Debtors.

## INTRODUCTION

4.     On February 19, 2014 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their assets and continue to manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee, examiner or committee of creditors has yet been appointed in these cases and to the best of my knowledge, information and belief there have been no informal committees formed prior to the filing of these Chapter 11 cases.

5.     On February 18, 2014, an asset purchase agreement (the "**APA**") was executed between South Nassau Communities Hospital ("**SNCH**") and the Debtors, providing for the sale of all of the Debtors' real property and substantially all of its operating assets (the "**Acquired**

Assets") and the assumption of certain liabilities (the "**Assumed Liabilities**") by SNCH. Among the overriding concerns of the parties when entering into the APA was to ensure that the Medical Center's not-for-profit missions would continue to be met by SNCH and that an appropriate level of healthcare under a viable delivery model be restored to the storm ravaged communities of Long Beach in a manner that is supported by the New York State Department of Health ("**DOH**"), the community and all affected parties (the "**Sale Transaction**"). Simultaneously herewith, the Debtors have filed a Motion to, *inter alia*, establish bid procedures and approve the Sale Transaction to SNCH or any other party or entity making a higher and better bid therefore (the "**Sale Motion**").

6.    During these Chapter 11 Cases, the Debtors intend to: (i) consummate the Sale Transaction with SNCH or to any other party making a higher or better offer for the assets and properties, pursuant to section 363 of the Bankruptcy Code; (ii) implement an orderly transition of their properties and operations to SNCH or any other successful bidder; and (iii) ultimately confirm a liquidating plan that addresses the claims of creditors.

**PART I**

**THE DEBTORS' HISTORY AND BUSINESS**

7.    Since 1922 Long Beach Medical Center has provided medical services to the residents of Long Beach and its surrounding communities.  Prior to superstorm Sandy, as the primary health care provider for the island of Long Beach and the surrounding communities, the Medical Center operated as a comprehensive health care organization which included a 162-bed acute care hospital; a 200-bed skilled nursing facility specializing in geriatrics and rehabilitation medicine; a certified home health care agency and numerous outpatient clinical programs. Together, these services allowed the Medical Center to offer a continuum of care – with the

3

ability to meet all of a patient's health care needs seamlessly, including acute hospitalization, outpatient services, sub-acute care, rehabilitative care or services from home.

8.      The Medical Center had been financially troubled for a number of years before superstorm Sandy devastated the Medical Center's facility along with much of the surrounding communities.   In an attempt to reverse its financial misfortune, in the years leading up to superstorm Sandy, the Medical Center undertook a number of new initiatives including the hiring of highly skilled physicians and the introduction of new technological advances as well as actions to reduce expenses.   For example, LBMC's radiology and emergency departments made significant investments in technology, which included a new 16 slice CT scanner, new ultrasound equipment, and a Picture Archiving Computer System (PACS) to compliment LBMC's expanding electronic medical record system in the Emergency Department.   LBMC was also in the process of implementing a total hospital clinical information system that, similar to PACS, would have permitted physicians and ultimately patients to access medical records online.

9.      In addition, LBMC has a long history of developing services tailored to the needs of the community. Often this process involved the voluntary discontinuance of underutilized services (e.g., maternity, pediatrics), together with either a response to requests by agencies to provide needed services (e.g., inpatient psychiatry, inpatient detoxification) or to identified community needs (e.g., diabetes education, outpatient medical and behavioral health clinics). Recently, given community needs, LBMC expanded its medically managed drug and alcohol detoxification unit and established a patient centered health care delivery model that provides comprehensive and continuous medical care.   LBMC also opened a modern, comfortable Dialysis Center to provide residents of the community with dialysis treatments close to home in

4

pleasant surroundings with the personal care for which Long Beach Medical Center had become known. The Dialysis Center provided the added benefit of allowing residents of Komanoff who require dialysis to obtain their treatment without having to go outdoors and travel by ambulance to more distant facilities.

10.     These initiatives, among others, together with the ever changing array of services provided to the community, were beginning to yield positive results with patient satisfaction scores at all time highs. However, in October, 2012, superstorm Sandy devastated the communities of Long Beach and left the Debtors largely incapacitated.

11.     LBMC sustained significant damage during superstorm Sandy. Many infrastructure operating systems, the computer systems, boiler plant, laundry, kitchen, electrical distribution systems, and emergency generators, were among the damaged systems and equipment that are essential for operations. Almost immediately after the storm, The U.S. Department of Health and Human Services Office of Assistant Secretary for Preparedness and Response (ASPR) activated the National Disaster Medical System and ASPR personnel established a Disaster Medical Assistance Team (DMAT) base of operations in Long Beach. This DMAT allowed the community to receive emergency care without having to leave the immediate area. Following the demobilization of the DMAT a mobile satellite emergency department (MSED) (provided by Hackensack University Center), consisting of two tents and two trailer trucks, was staffed by LBMC physicians and nurses who were providing temporary care while LBMC worked to repair damage and bring basic infrastructure support systems back online. Upon an order by the NYS Commissioner of Health, the MSED was demobilized and was then replaced by a van provided by Refuah Health Center that provided basic primary care services. With the reopening of LBMC's Family Care Center, the hospital began operating its

5

primary medical clinics in temporary quarters in a renovated building on the LBMC campus, which permitted the demobilization of the Refuah van. LBMC's outpatient mental health clinic also reopened in a temporary location in Baldwin. LBMC had been working to arrange for suitable space for its other behavioral health outpatient clinics and specialty clinics, but were never able to reopen them. In essence, a skeleton of health care services were operational post Sandy. The acute care hospital, however, remained shuttered.

12.    On January 28, 2013, 120 nursing home residents who had been evacuated to other facilities in anticipation of the superstorm were able to return to Komanoff. In connection with the reopening of the Nursing Home, 200 employees returned to work. Komanoff offers short-term restorative care, long-term care and inpatient hospice care.

13.    On January 13, 2014, LBMC received notification from CMS that because the provision of inpatient services had not resumed since the initial storm related closure in November 2012, LBMC's provider agreement with Medicare was to be terminated as of February 1, 2014. As a result, LBMC was no longer able to participate in the Medicare program, which severely limited its ability to receive payment for services in connection with the Family Care Clinics as well of the Behavioral Health Clinic. LBMC is now engaged in discussions with the NYS Department of Health and the NYS Office of Mental Health for SNCH to take over the operation of these clinics.

A. **Overview of the Debtors**

### 1. LBMC

14.    Prior to Sandy, a significant portion of the Debtors' core business focused around LBMC. LBMC is a not-for-profit 162-bed, community-based hospital offering primary, acute, emergency and long-term health care to the residents of Long Beach. LBMC is located at 455 East Bay Drive, Long Beach, New York 11561. Founded in 1922, LBMC was a teaching facility

2694768v.8

for the New York College of Osteopathic Medicine, with residency programs in Physical Medicine and Rehabilitation and Family Medicine. It also hosted several centers of excellence including Arthritis and Osteoporosis; Diabetes; Wound Care & Hyperbaric; Behavioral Health and Addiction Treatment.

15.    In the 12 months prior to superstorm Sandy, LBMC discharged approximately 3,800 patients, administered 1,600 surgeries, and treated 12,500 patients in the emergency room. For the same time period, two years prior to the storm, LBMC discharged approximately 4,100 patients, administered 1,750 surgeries, and treated 13,000 patients in the emergency room.

16.    Prior to the storm LBMC employed approximately 700 people of which 203 belonged to the local chapter of the Service Employees International Union ("**1199**") and 11 belonged to the International Union of Operating Engineers, Local 30 ("**Local 30**"). Given the closures resultant from the storm, LBMC currently employs approximately 85 people of which 22 belong to 1199 and 9 belong to Local 30. Currently, LBMC's monthly payroll is approximately $800 thousand inclusive of wage related benefits.

17.    As of December 31, 2013 LBMC's total unrestricted assets were $21 million and its liabilities were $48 million. LBMC's revenues for the 12 months ending September, 2012 totaled approximately $55 million and expenses aggregated approximately $59 million. For the 12 months prior to that, LBMC had approximately $66 million in total revenue and expenses aggregated approximately $68 million.

## 2. Long Beach Memorial Nursing Home d/b/a
### The Komanoff Center for Geriatric and Rehabilitative Medicine

18.    Established in 1974, Komanoff is a 200-bed, hospital-based skilled nursing facility affiliated with Long Beach Medical Center. It provides services for residents requiring long term nursing home care and short term post-acute (sub-acute) care. Although most of the

7

residents are over 65 years of age, it also serves younger residents. Residents largely come from communities within the southern portion of Nassau County. Currently there are 127 residents of Komanoff, of which 118 are long term nursing residents and 9 require only short term care.

19.    Prior to the storm Komanoff employed approximately 400 people of which 189 belonged to 1199 and 1 belonged to Local 30. Komanoff's post Sandy operations have reduced its staffing needs and it currently employs approximately 200 people of which 85 belong to 1199 and 1 belong to Local 30. Currently, Komanoff's monthly payroll is approximately $850 thousand inclusive of wage related benefits.

20.    As of December 31, 2013, Komanoff's total unrestricted assets were approximately $8.4 million and its liabilities were approximately $16.3 million. For the 12 months ending December 31, 2013, Komanoff had approximately $11.2 million in total revenue and expenses aggregated approximately $13.1 million. In 2011, Komanoff's revenues totaled approximately $20.7 million and expenses aggregated approximately $21.4 million. As a result of CMS's cancellation of LBMC's provider agreement, as of February 1, 2014, Komanoff will no longer be considered a hospital based skilled nursing facility. The practical ramification being that Komanoff's reimbursement rates will decline, and Komanoff will receive approximately $15,000 to $16,000 less each month from Medicare.

## B. Charitable Services.

21.    In furtherance of their charitable mission, the Debtors provided critical healthcare services to large uninsured and indigent populations. While unable to return to pre-storm levels, the Debtors attempted to continue providing such care post-Sandy to the greatest extent possible.

22.    The Debtors provided free care on a sliding scale basis to patients unable to pay for medical services. The Debtors do not pursue amounts due for charity care through collection. Accordingly, any such amounts due to the Debtors are not reported as revenue. However, the

Debtors are entitled to distributions from the New York State Charity Care pools for the provision of such charitable care. In 2011 and 2012, the Debtors provided over $1.7 million in charitable care.

## C. Corporate Governance

23.    There are separate but interlocking boards for LBMC and Komanoff, in that the Executive Committee of the Board of Trustees of LBMC serves as the Board of Directors of Komanoff. LBMC is governed by a volunteer board who collectively possess business experience and demonstrate commitment to the communities served by LBMC. The Officers of the Board of Trustees include: Bernard Kennedy (Chairman), Douglas L. Melzer (President/CEO), James Portnof (Vice-Chairman), Michael Tribush (Treasurer/VP), Martin Kaminsky (Secretary/VP), and Ronald Conklin and Theodore Hommel (VPs). There are eleven general board members, of which three are members of the medical staff.

24.    Komanoff is governed by a Board of Directors with full authority and responsibility for the conduct of the nursing home and the quality of patient care that is rendered. The volunteer board is comprised of individuals who possess business, management or professional experience; demonstrate commitment and dedication to the nursing home; and hold stature within important segments of the communities served by the nursing home. The Board of Directors includes: Bernard Kennedy (Chairman), Douglas L. Melzer (President/CEO), James Portnof (Vice-Chairman), Michael Tribush (Treasurer/VP), and Martin Kaminsky (Secretary/VP).

## D. Events Leading to Filings

25.    As is true with many community hospitals, the Medical Centers have been beset by the financial pressures caused by cuts in Medicare and Medicaid funding, declining indigent pool payments, and changing demographics in the communities served by the Debtors. For a

number of years the Debtors experienced a progressive decline in patient volume and discharges and reduction in acuity of the case mix.  Operating revenues have steadily decreased, leading to significant losses in the years preceding these filings.  Cash book balances were frequently negative, and past due vendor payables increased.

26.    Given the Medical Center's historical losses, DOH urged the Debtors to partner or otherwise affiliate with a more financially viable healthcare system.  In the years preceding the filings, the Debtors had, at various times, engaged in active discussions with several regional healthcare providers, including Mount Sinai Hospital, Winthrop University Hospital, South Nassau Communities Hospital and North Shore University Hospital.  None of those bore fruit as an affiliation was not consistent with the geographical footprint or strategic plan of any of those systems.

27.    On a parallel track, as previously noted, the Debtors undertook a number of initiatives in an attempt to address the Debtors' operating and liquidity concerns.  While some of these initiatives were beginning to show positive results, the Debtors efforts were brought to an abrupt halt in October of 2012 when superstorm Sandy decimated the Medical Center.  The storm further exacerbated an already precarious financial situation and left the Debtors in a situation from which they have not been able to recover.

28.    In the months following the storm, the Debtors undertook tremendous efforts to reopen both LBMC and Komanoff.  On January 28, 2013, those efforts led to the reopening of Komanoff, allowing 120 nursing home residents to return home and reinstituting more than 200 employees to their jobs.  While rebuilding and repair efforts persist, the acute care portion of the hospital remains closed with extensive damage to its boilers, mechanical and electrical distribution systems, fire alarm systems, communications, food services and laundry services.

2694768v.8

LBMC continued to operate a family care center clinic (FCC) at one of its adjacent properties and a mental health clinic in a rented facility in Baldwin, NY, for some time. Other clinics including the Methadone Maintenance Clinic and the Family Alcohol Counseling and Treatment Services remain closed. LBMC is now in discussions with the NYS Department of Health and the NYS Office of Mental Health to have SNCH assume responsibility of the FCC and mental health clinic.

29.    During the year ended December 31, 2012, the Medical Center had a negative working capital of approximately $7.6 million and experienced an operating loss of approximately $4.8 million with a net asset deficiency of approximately $18.2 million.

### E. Proposed Repurposing and Marketing Process:

30.    Senior Management took the initial days and weeks after superstorm Sandy to focus on essential emergency measures. The Federal Emergency Management Agency ("**FEMA**") established a command center in Long Beach and the hospital's CEO was charged with coordinating health services. Although Long Beach was under a mandatory evacuation order, an estimated 10,000 residents never left the island. Thus, LBMC requested of the U.S. Department of Health and Human Services ("**HHS**") that a Disaster Medical Assistance Team ("**DMAT**") be dispatched and temporary emergency facilities were erected. As DMAT could only be available for a short term, HHS coordinated to make available a mobile satellite emergency department which was erected in the parking lot of the hospital. The unit was demobilized a short time later when DOH determined that regulations did not permit the operation of a free standing emergency department without a fully functioning hospital.[2] In lieu, a basic primary care mobile van staffed by a physician or a nurse practitioner was positioned in its place.

---

[2] Currently, proposed amendments to such regulations would allow a freestanding Emergency Department.

31.    In December, 2012 with the approval of DOH, LBMC engaged a consulting firm to analyze the hospital's pre-storm services and existing community needs in order to make recommendations to restructure services in a more financially feasible model. In March 2013 the consultant's plan was presented to DOH but the plan was rejected. An amended proposal was rejected the following month.

32.    In February, 2013 LBMC separately engaged FEMA and construction consultants to facilitate completion of the temporary repairs necessary to reopen two of the five wings of the Hospital housing vital services including the emergency department. LBMC also enlisted many of its elected representatives over the course of ensuing months to assist the hospital in obtaining financial support including designation as a Vital Access Provider, Community Development Block Grants or Social Services Block Grants but none of these requests materialized. LBMC also urged officials to advocate for the reopening of services at LBMC. DOH concluded that the facility could not be reopened in any capacity without the joinder of a strong provider.

33.    Simultaneously, the Debtors renewed efforts to find a financially viable healthcare system to partner with. In March, 2013, while rebuilding efforts continued, the Debtors issued a request for proposal ("**RFP**") to five hospital providers that might have sights on the South Shore Long Island market as part of their strategic plans. Thus RFP's for an affiliation were sent to NYU Medical Center ("**NYU**"), North Shore Long Island Jewish Hospital ("**NS-LIJ**"), New York Presbyterian Healthcare System ("**NYPH**"), the Catholic Health System of Long Island ("**CHS**") and South Nassau Communities Hospital ("**SNCH**"). The RFP's issued in conjunction with management's ongoing discussions with DOH regarding alternative healthcare models at the LBMC site, the potential use of grant dollars to restructure the Medical

Center's balance sheet and the use of FEMA and Community Development Block grants to repair and upgrade the physical plant.

34.     No responses were received from NYU, NYPH or NS-LIJ. CHS expressed initial interest in an affiliation arrangement and several meetings among executive management followed, but CHS ultimately determined not to proceed for geographical reasons.

35.     The only serious interest came from SNCH which neighbors the Long Beach facility. SNCH also brought financial strength to the equation and was best positioned to assure the continuity of healthcare in the Long Beach area. In August, 2013, the parties entered into a memorandum of understanding (the "**MOU**") to explore proposed transactions which contemplated the sale of substantially all of the Medical Centers' real property and operating assets to SNCH, changes to the healthcare delivery model at the Long Beach site, the restructuring or satisfaction and discharge of LBMC and Komanoff indebtedness, and the provision of financing to fund continued operations and maintenance of the assets until any transaction could be completed. The MOU was submitted to DOH for its review and ultimately received the Department's strong support.

36.     Recognizing that the damage sustained to the Medical Centers' facilities and the changes to the demographics of the Long Beach area did not permit the continuation of a full service, 162 bed acute care hospital, the parties embarked on an analysis of how services could be restructured in a financially sound manner consistent with community needs. As an initial matter, SNCH sought, and subsequently obtained, certificate of need approval to establish an urgent care center at the LBMC campus and applied for, and subsequently received, a community block grant to fund its development and operation. The project is currently in the developmental stage.

37.     On a larger scale, the parties entered into negotiations for SNCH to acquire substantially all of the real property and operating assets of both the LBMC campus and Komanoff. Those negotiations resulted in the execution of the APA which provides, as is set forth more fully in the Sale Motion, that SNCH will pay appraised value for the real property and operating assets. It is anticipated that SNCH will continue to operate the Komanoff nursing home. The parties will continue to pursue FEMA funding to repair and restore the LBMC campus facilities. What proposed uses the LBMC campus will be put to by SNCH still remains in the developmental stages and depends in some measure on the ability to obtain, and the amount of any FEMA funding, to restore and rebuild the physical plant.

## F. CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

### (a)     New York State Housing Financing Agency.

38.     During 1973, Komanoff entered into an agreement with the State of New York and the New York State Housing Finance Agency in order to finance the construction of a new facility. A total of $6,155,000 was borrowed via the issuance of $5,105,000 of 1974 Series A Bonds and $1,050,000 of 1977 Series A Bonds. Principal and interest payments are made monthly. The average interest rate was 5.9% per annum on the 1974 Series and 7.0% on the 1977 Series. The bonds were scheduled to be redeemed forty years from the date of issuance.

39.     During 1998, Komanoff entered into an agreement with the New York State Housing Finance Agency to refinance its 1974 Series A and 1977 Series A Bonds. The mortgage agreement, with a remaining balance of approximately $3,762,527, was refinanced with an average interest rate of 4.9% per annum. The 1998 Series A Project Revenue Bonds are scheduled to be redeemed 16 years from the date of refinancing. The mortgage loan payable is collateralized by substantially all assets and future revenues of Komanoff.

40.    Under the terms of the mortgage and the subsequent refinancing, Komanoff is required to make monthly deposits equal to 1/12 of its current annual principal amortization and interest expense into the mortgage repayment escrow fund, which is restricted for the payment of bond interest and principal.

41.    Monthly deposits are also required, under this agreement, into the operating escrow fund. This fund consists of a reserve for equipment replacement and structural repairs and a reserve for contingencies.  Komanoff may draw monies out of these reserves with the approval of DOH.

42.    As of the Petition Date, the balance due on the 1998 Series A Project Revenue Bonds is $172,527, and the balance of the mortgage repayment and operating escrow sum is $41,118 and $345,307, respectively.

(b)    **Dormitory Authority of the State of New York ("DASNY")**.

43.    Pursuant to a Reimbursement Agreement dated as of November 1, 2007, DASNY made a non-interest-bearing loan to LBMC in the initial principal amount of $2,000,000 (the "**DASNY Loan**") for the purpose of funding the restructuring of its operations to improve operating performance, consistent with the recommendations of the Commission of Health Care Facilities in the 21st Century. As security for the DASNY Loan, DASNY was given a mortgage in certain of the Medical Center's real property constituting the parking lots adjacent to the facilities. Commencing January 2010, the Medical Center was to begin repaying the balance in sixty monthly installments of $33,333. In 2011, the Medical Center only made nine payments. In April 2012, the repayment terms were revised and the Medical Center began to make monthly payments of $10,000, with interest being charged at 1%, scheduled through December 31, 2013. Those payments were schedule to increase to $31,500 in January of 2014, and were to remain at

15

that amount until the balance is repaid. The last payment made in respect of the DASNY Loan was in September of 2012, approximately one month prior to Sandy. As of the Petition Date, the outstanding balance of the DASNY Loan is approximately $1.252 million.

(c)     <strong>First Central Savings Bank ("First Central").</strong>

44.    LBMC holds several properties which it used as off-site storage, employee housing and physician office space. LBMC purchased these properties over a number of years as part of a strategic expansion plan. The properties include: 757 Lincoln Blvd., 758 Lincoln Blvd., 759 Lincoln Blvd., 760 Lincoln Blvd., 762 Lincoln Blvd., 711 Lincoln Blvd., 415 State St., 425 State St., 479 State St., 765 Franklyn Blvd., and 761 Franklyn Blvd (the "**Offsite Premises**").

45.    In order to refinance and consolidate the various loan obligations with respect to the aforementioned properties, LBMC borrowed from First Central $1.8 million, evidenced by a permanent loan note (the "**Mortgage Loan**") and obtained a line of credit in the amount of $1 million (the "**First Central Line**"), evidenced by a commercial line of credit note (the "**Line Note**") and security agreement ("**Line Security Agreement**"), each dated as of March 7, 2008. In connection therewith, LBMC executed and delivered to First Central a blanket mortgage on the Offsite Premises (the "**First Central Mortgage**"). Subsequently, LBMC requested a complete draw of the First Central Line. As a condition to authorizing the full draw, First Central required LBMC to consolidate the Mortgage Loan and the First Central Line into a consolidated note (the "**First Central Consolidated Note**"). On or about August 1, 2008, LBMC drew down on the First Central Line. The principal balance upon consolidation, after taking into account payments previously made, was $2,704,606.26. As of the Petition Date, obligations under the First Central Consolidated Note are approximately $2,641,000.00.

(d)    **Pension Plan/Pension Benefit Guaranty Corporation ("PBGC").**

46.    The Medical Center sponsored two noncontributory defined benefit pension plans (the "**Pension Plans**") covering substantially all employees.    The Pension Plans provided benefits based primarily on years of service and career average pay.

47.    The Medical Center applied to PBGC for distress terminations of the Pension Plans effective July 31, 2009.    By letters dated September 14, 2010 and July 29, 2011, PBGC approved the distress application for LBMC and Komanoff, respectively.    As a result of the termination of the Pension Plans, through the executed trusteeship agreement with the PBGC, benefit accruals under the Pension Plans ceased as of July 31, 2009, the PBGC became the Pension Plans' trustee, and the PBGC has become responsible for paying the Pension Plans' benefits, up to insured limits.    The termination of the Pension Plans and previously unpaid pension contributions and premiums resulted in liabilities for the Medical Center arising under the provisions of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), and the Internal Revenue Code ("**IRC**"), for pension termination underfunding, past contributions due to the Pension Plans, unpaid special termination and pension insurance premiums due to PBGC with respect to the Pension Plans, and unpaid excise taxes plus interest and penalties.

48.    As of the Petition Date, PBGC asserts that LBMC and Komanoff collectively owe in excess of $40 million for termination underfunding, unpaid premiums, and excise taxes. LBMC and Komanoff are jointly and severally liable for the Pension Plan liabilities.    Of the aforementioned liabilities, PBGC has federal liens against the properties of the Medical Center in the aggregate amount of approximately $9 million, of which approximately $7.2 million relates to LBMC and $1.8 million relates to Komanoff.

17

(e)    **Mechanics Liens**

49.    As noted above, in the wake of superstorm Sandy the Medical Center undertook substantial efforts to restore the physical plant to a condition suitable for the reinstatement of health care services. Accordingly, the Medical Center contracted with various entities to make necessary, and in many instances emergency, repairs to their facilities with the understanding that the majority of the funding for such work would be coming from FEMA. The FEMA reimbursement process is not an expedient one, and without any significant operating revenue, the Medical Center quickly amassed sizeable payables associated with this work. Many of the contractors performing repair work at the Medical Center filed mechanic's liens against the property of LBMC and/or Komanoff as applicable.

50.    The FEMA process involves an in-depth review of all invoices submitted for reimbursement. Once approved by FEMA, funds are obligated for reimbursement based on specific projects and vendors. FEMA will only reimburse up to 90% of the actual costs associated with any given project. By agreement between FEMA and the New York State Office of Emergency Management ("**OEM**"), FEMA authorizes OEM to remit funds to the Medical Center. Upon receipt, these funds become restricted assets only available to specific payees, and are subsequently paid to the vendors for which the funds were obligated.

51.    To date the Medical Center has received approximately $17.6 million from FEMA, which has been used to satisfy a substantial portion of the mechanics' liens. As of the Petition Date, there remains approximately $3.7 million in mechanics' liens against the property of LBMC and approximately $500,000 in mechanics' liens against the property of Komanoff, each after taking into account duplicative filings by general and subcontractors. Based on FEMA's reimbursement scheme, the Debtors anticipate that approximately 90% of the remaining

mechanics' liens will be satisfied by FEMA reimbursements. The Debtors anticipate that the remaining 10% of outstanding mechanics liens, or approximately $2,000,000, may be satisfied by Community Block Grants.

### (f)  New York State Department of Labor

52.    The Debtors are each not-for-profit corporations under Section 501(c)(3) of the federal Internal Revenue Code, and, as such, are able to elect one of two payment methods for discharging its obligations to the New York State Department of Labor (the "**DOL**"), referred to as either the "reimbursement" or "tax contribution" options. Those employers that elect the tax contribution basis remit funds to the DOL periodically as a tax. This tax is based on the employer's applicable tax rate and the annual compensation paid to its employees. Employers that elect the reimbursement option do not make periodic payments and instead are only obligated to repay the DOL for unemployment benefits actually paid out to former employees. The Debtors elected to satisfy their unemployment obligations on a reimbursement basis. Accordingly, after superstorm Sandy the Debtors' obligation to DOL rose precipitously at the same time their revenue stream collapsed, giving rise to a claim for non-payment.

53.    Accordingly, the DOL asserts that it is owed $3,012,334.14 and $358,763.50 on account of unemployment benefits DOL paid to the LBMC and Komanoff's respective terminated employees. In order to secure LBMC's obligation to pay such amounts, DOL filed state tax liens against it. DOL also issued a warrant for the amounts due from Komanoff. The aggregate amount due DOL as of the Petition Date is approximately $3.37 million.

### (g)  South Nassau Communities Hospital Prepetition Credit Agreement

54.    As the Medical Center's liquidity continued to deteriorate in the weeks before the Chapter 11 filing, there became an increased need for immediate additional funding. As the

2694768v.8

Debtors were unable to secure such financing from traditional sources, they turned to SNCH to provide the necessary liquidity and working capital to maintain operations pending completion of the Sale Transaction, as well as to fund expenses in connection with the preparation and filing of these Chapter 11 cases. After extensive arms length negotiations, SNCH agreed to provide such funding and, pursuant to that certain Loan and Security Agreement, dated as of December 30, 2013 (as amended, modified or otherwise supplemented from time to time, (the "**Pre-Petition Credit Agreement**"), among SNCH and the Debtors signatory thereto, SNCH made available to the Debtors up to $1.5 million in financing secured by liens in substantially all of the Debtors' assets subject to previously existing liens.

55.     Under the Pre-Petition Credit Agreement, the SNCH is owed, as of the Petition Date, approximately $1,500,000 in principal obligations, plus interest, fees, costs and expenses and all the "Obligations" under and as defined in the Pre-Petition Credit Agreement (the "**Pre-Petition Obligations**"). The Pre-Petition Obligations are secured by liens on and security interests in substantially all of the Debtors' real and personal property assets, subject to all previously existing liens and security interests in any such property

## LOCAL BANKRUPTCY RULE 1007-4 SCHEDULES

56.     Attached hereto as <u>Exhibit A</u> and incorporated herein by reference are various schedules setting forth additional information required pursuant to Local Bankruptcy Rule 1007-4. Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meaning ascribed to them in preceding paragraphs of this Affidavit.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

57.     Simultaneously with the filing of their Chapter 11 petitions, the Debtors filed their First Day Motions and Applications in order to minimize the adverse impact of the commencement of the Debtors' bankruptcy cases on their business and the sale process.  I believe the approval of the First Day Motions and Applications is critical to the success of the Chapter 11 Cases.  I have reviewed the factual background in support of each First Day Motion and Application and certify the facts contained therein are true and correct to the best of my information, knowledge and belief.  A brief overview and summary of the more significant First Day Motions and Applications is set forth herein.[3]

**A.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Secured  Superpriority Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, AND 364 And (B) To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetion Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363 AND 364; And(III) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(B) AND 4001(C)[4]**

58.     As noted above, in order to maximize the value of their existing asset base the Debtors intend to sell substantially all of their assets to SNCH, which will continue the Debtors' efforts to restore an appropriate level of health care to Long Beach and its surrounding communities.  Absent the DIP Financing the Debtors will not have sufficient sources of working capital to continue operations or otherwise fund the administrative expenses of these Chapter 11 cases, putting both the sale process and the future of health care in Long Beach and its surrounding communities in jeopardy.

---

[3] In the interest of brevity, summaries of all First Day Motions and Applications have not been included.
[4] Capitalized terms used in this Section II(A) are used with the meanings ascribed to such terms in the Financing Motion.

59.    The DIP Financing will be used to permit the Debtors to pay their medical and nursing staff and other employees in order to provide critical patient care, maintain already strained business relationships with vendors and suppliers, purchase new inventory, and otherwise finance their operations.    Without the DIP Financing, serious and irreparable harm could result, not only to the Debtors' remaining operations and their continued eligibility for FEMA funds, but to the community and the more than 100 patient residents of Komanoff, all of whom are relying on the process for the restoration of medical services.

60.    Given the Debtors' financial condition, current financing arrangements, and capital structure, the Debtors do not have any unencumbered funds and are otherwise unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.    As detailed more fully in the motion, financing on a postpetition unsecured or solely on a superpriority basis is not available.    SNCH is willing to provide the DIP Financing pursuant to section 364(c)(1) of the Bankruptcy Code, provided that the Lender has priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code other than as described below, and such indebtedness and obligations are secured by the interests in and the liens (including, with respect to the assets of Komanoff, priming liens) upon the Debtors' property pursuant to sections 364(c) and 364 (d) of the Bankruptcy Code.    The Debtors are unable to obtain from another lender the necessary postpetition financing that they need on terms more favorable in the aggregate than those provided in the DIP Loan Agreement.

61.    The Debtors are unable to obtain from another lender the necessary post-petition financing that they need on terms more favorable in the aggregate than those provided in the DIP Credit Agreement. Thus, SNCH presented the only viable proposal for postpetition financing.

22

62.     Under the proposed DIP Loan Agreement, the Lender will make cash advances and other extensions of credit in a maximum principal amount not to exceed $4.5 million on a multiple draw term loan basis under and subject to the terms and conditions of DIP Loan Documents.

63.     The proceeds of the DIP Credit Agreement and the proceeds of the Debtors' services, which constitutes Cash Collateral, will be used by the Debtors: (i) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (ii) the costs and expenses associated with these Chapter 11 Cases, including the fees, costs, expenses and disbursements of professionals retained by the Debtors and any statutory committee appointed in these Chapter 11 Cases, and other bankruptcy related costs as allowed by the Court, including amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, all in accordance with the terms of the Debtors' proposed Budget.

64.     Under the proposed Interim Order, the initial loans and advances will be limited to $1.8 million during the Interim Period.  Upon approval at a Final Hearing to consider the motion, and entry of the Final Order, any remaining availability under the DIP Credit Agreement will become available for the Debtors' use subject to the DIP Documents and an agreed budget.

65.     To secure the payment and performance of the DIP Loan Obligations, the Debtors will grant a continuing security interest in, and a right to set off against, and liens pursuant to sections 364(c)(2), and 364(c)(3), and priming liens, solely with respect to the real and personal property assets of the Komanoff pursuant to section 364(d) of the Bankruptcy Code on, any and all right, title and interest of Debtors in and to all of the following Collateral: (i) all Accounts; (ii) all cash and currency; (iii) all Chattel Paper; (iv) all Deposit Accounts; (v) all Documents; (vi) all

Equipment; (vii) all Fixtures; (viii) all General Intangibles; (ix) all Instruments; (x) all Inventory; (xi) all Investment Property; (xii) all Letter-of-Credit Rights; (xiii) all Goods; (xiv) all oil, gas, or other minerals before extraction; (xv) all pledged equity; (xvi) all other Property and assets owned by Borrowers (including real property); (xvii) all DIP collateral (as defined in the DIP Orders) and (xviii) all Accessions and all Proceeds of any and all of the foregoing; excluding any insurance proceeds and restricted funds maintained in a segregated account which may only be used for a specific purpose by FEMA or any other Governmental Authority, subject to the Carve Out (except as otherwise defined in the DIP Loan Documents, each as defined under the Uniform Commercial Code).

66.    As additional security for SNCH, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall have the status of an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out and shall otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code.  The DIP Superpriority Claims shall not extend to Avoidance Actions under chapter 5 of the Bankruptcy Code or the proceeds of Avoidance Actions.

67.    In the ordinary course of business, the proceeds of substantially all of the Debtors receivables, including the those receivables generated prior to the petition date, constitute the cash collateral of certain of the Komanoff Prepetition Secured Creditors, including, without limitation, the PBGC and SNCH.   These funds had been used by the Debtors to fund ongoing operations.   By DIP Motion, the Debtors propose to use the proceeds of the Cash Collateral of the Komanoff Prepetition Secured Creditors in accordance with the Budget, and to provide Adequate Protection Liens (as defined below) to those Komanoff Prepetition Secured Creditors with liens in Cash Collateral.

68.    Cash Collateral shall include: (a) all cash proceeds of Prepetition Collateral in which any of the Komanoff Prepetition Secured Creditors have an interest, whether such interest existed as of the Petition Date or arises thereafter, and (b) proceeds of the Prepetition Obligations.

69.    As adequate protection to the Komanoff Prepetition Secured Creditors against any Diminution of Value, the Debtors propose to grant the Komanoff Prepetition Secured Creditors Adequate Protection Liens in the form of automatically perfected, replacement liens on the Komanoff Collateral to the same extent and priority of their respective Prepetition Liens.

70.    Only to the extent Adequate Protection Liens fail to protect the Komanoff Prepetition Secured Creditors against any Diminution in Value, the Komanoff Prepetition Secured Creditors shall be entitled, pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, to an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases subordinate in payment and priority only to the DIP Loans, the DIP Superpriority Claims and the Carve Out.

71.    Notwithstanding the granting of the DIP Liens, the Adequate Protection Lien, the DIP Superpriority Claims, and the Komanoff Prepetition Secured Creditor Superpriority Claim, the Carve Out shall have priority in payment over the claims of SNCH and all other secured creditors, such that all proceeds received by such parties shall be subject to the prior payment of the Carve Out.

**B.  Motion For Order Pursuant to 11 U.S.C. 105(A) and 363 Authorizing Continued Use of the Debtors' (I) Cash Management System;(II) Bank Accounts; and (III) Business Forms; and (IV) Granting a Limited Waiver of Section 345 Investment and Deposit Requirements**

72.    The Debtors filed a Motion pursuant to 11 U.S.C. §§105(A) and 363 seeking entry of an Order: (a) authorizing the continued use of the Debtors' existing Cash Management Systems; (b) honoring certain prepetition obligations relating to the use of the Cash Management Systems; (c) authorizing the continued use and maintenance of the existing Bank Accounts; (d) authorizing the continued use of existing Business Forms; (e) granting a limited 60 day waiver of the requirements of section 345 of the Bankruptcy Code, and (f) granting a final hearing on the Motion (the "**Cash Management Motion**").

73.    A list of the Debtors' bank accounts (collectively, the "**Bank Accounts**") is annexed as Exhibit B to the Cash Management Motion.  Bank Accounts are maintained at TD Bank, Bank of America NA and Capital One Bank.  The Debtors also maintain escrow accounts with First Central Savings Bank and Wilmington Trust in connection with the First Central Loans and the HFA Loans, respectively.

74.    As fully detailed in the Cash Management Motion, prior to the commencement of these cases, LBMC and Komanoff each maintained an individual cash management system (the "**Cash Management Systems**"), collectively consisting of 22 bank accounts (the "**Bank Accounts**") through which the Debtors collect deposits and made disbursements in ordinary

course of their respective operations. The Debtors' bank accounts include, among others, those maintained as disbursement accounts, payroll accounts and receipt accounts. The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from and between their respective bank accounts by various methods including, checks, automated clearing house transactions, electronic funds transfers and direct deposits. The Cash Management Systems are essential to the ordinary course operations of the Debtors' businesses and ensure the Debtors' ability to efficiently monitor and control all of their cash receipts and disbursements.

75.     The Cash Management Systems utilized by the Debtors are similar to those commonly employed by other healthcare organizations. Because the Cash Management Systems constitute the Debtors' usual, ordinary and essential business practices, the Debtors seek the Court's authorization to continue such practices during these Chapter 11 cases.

76.     Closing the existing bank accounts and opening new accounts at the outset of these cases would unnecessarily undermine the Debtors' continued operations and would not only be costly and disruptive, but could threaten the viability of the Debtors' Chapter 11 cases. Indeed, maintenance of the existing Cash Management Systems is not only essential, but in the best interests of all the creditors and parties of interest. It will permit uninterrupted flow of essential operating funds, minimize operating costs and provide the same efficiencies that existed before the Petition Date. It will permit the Debtors to trace receipts and disbursements and efficiently manage liquidity. The Debtors thus seek a waiver of the requirement under the U.S. Trustee Guidelines that the prepetition bank accounts be closed and new postpetition bank accounts be opened.

77.     Additionally, asking payors to remit payments to new or different accounts may result in a significant slowdown in the Debtors' collections just at the time when prompt

27

collection is most critical.    In addition, the Debtors' Cash Management System is especially delicate in light of its reliance upon receivables proceeds from both Medicare and Medicaid. A disruption in the Debtors' ability to collect receivables from the Medicare and Medicaid programs could take several weeks to correct and deny the Debtors much needed cash.

78.    To the best of the Debtors' knowledge, the Bank Accounts are in financially stable institutions that are insured by the FDIC (up to an applicable limit per Debtor per institution).    In addition, the majority of the Bank Accounts are held at "Authorized Depositories" under the Guidelines.    The only Bank Accounts not maintained with one of the Authorized Depositories is the escrow account held at Wilmington Trust in connection with the HFA loans. The Debtors anticipate the HFA loans being satisfied shortly, with any excess funds in the escrow account being returned to Debtors and, thereafter, deposited into an account held at an Authorized Depository.    For these reasons, the Debtors believe that the funds held in deposit are safe, and that any risks associated with such accounts are so *de minimis* that it would be a waste of estate resources to incur the cost required to close such accounts and establish entirely new ones.    The Debtors thus submit that their prepetition cash management practices generally conform with the intent of section 345(b) to protect and maximize the value of their estates and request a waiver to the extent they do not.

79.    As of the Petition Date, the Debtors have instructed the Banks to stop payment on all outstanding checks issued to vendors or other trade creditors on account of prepetition debts or liabilities, with the exception of (i) those checks to employees for wages or employee benefits, as described fully in the Motion For Order (I) Authorizing Payment of Prepetition Wages, Employee Benefits and Expense Reimbursement and (II) Authorizing and Directing Banks To Honor Checks With Respect Thereto (the "**Wage Authorization Motion**").

80.     As noted in the Wage Authorization Motion, filed contemporaneously herewith, the Debtors request that the Court authorize the Debtors' Banks to continue to honor payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued. Such relief is necessary and appropriate and, to the extent granted, shall be subject to, the relief requested by the Debtors in the Wage Authorization Motion. The Debtors intend to provide notice of entry of the order granting this Motion to the Debtor's Banks within one (1) business day of the entry of such an order.

81.     Furthermore, the Debtors also request permission to use their existing business forms and stationary without alteration or change. The Debtors do not print their own business forms and stationary. Thus, substantial time and expense would be required if the Debtors were required to print new business forms and stationary merely to indicate "debtor in possession." Post petition, the Debtors intend to execute new signature cards with respect to its Bank Accounts to indicate "debtor in possession." The Debtors will also stamp all checks "DIP" post petition.

## C. Motion Pursuant to Sections 105(a), 363(b), 507(a)(4) and (a)(5) and 541(a) of the Bankruptcy Code for an Order (I) Authorizing Payment of Prepetition Wages, Employee Benefits and Expense Reimbursement, (II) Authorizing and Directing Banks to Honor Checks with Respect Thereto (Wage Authorization Motion)

82.     The Debtors' efforts in these Chapter 11 cases require the continued and uninterrupted service of their employees in order to support continuing operations and to maintain consistent, high-quality standards necessary for proper patient care. To avoid the significant risks of resignations and of further discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtors be granted the authorization to pay outstanding prepetition wages, benefits and expenses.

2694768v.8

83.     The Debtors have a total of approximately 285 employees, both union and non-union (the "**Employees**").    Historically, the Debtors' Employees are paid bi-weekly in the Debtors' ordinary course of business in two tranches.    Payroll is issued on a weekly basis with approximately 50% of the employees being paid during each weekly pay period.

84.     The Debtors' most recent payroll period, covering approximately 50% of the Employees ("**Tranche 1**"), runs from February 2, 2014 through February 15, 2014 and was paid on February 18, 2014.    Payroll for the remaining Employees ("**Tranche 2**") covering the pay period from February 9, 2014 to February 22, 2014 is scheduled to be paid on February 26, 2014. Approximately four days of Tranche 1 and approximately [2/3] of Tranche 2 wages and benefits earned by Employees during their respective pay periods constitute prepetition wages and payroll related benefits (collectively, the "**Prepetition Wages**").    Thus, the Wage Motion seeks authority to any open pay prepetition wages for Tranche 2 period from February 9, 2014 through Petition Date approximately $253,000 in the aggregate.

85.     In addition, in the ordinary course of their businesses, the Debtors contribute to several benefit funds that provide benefits to the Debtors' union employees in addition to providing direct benefits to non-union employees (collectively, the "**Employee Benefits**").    The Employee Benefits to non-union employees, include but are not limited to, health insurance, COBRA coverage vacation pay, sick pay, holiday pay, workers' compensation, disability, 401(k) and related programs.    The estimated aggregate cost to the Debtors of funding the unpaid Employee Benefits to both union and nonunion employees through Petition Date is approximately $4 million.

86.     Given the timing of the filing, no employee, including executives and others in management positions will receive more than $12,425 on account of prepetition wages.

87.    The Debtors further request that this Court authorize the Banks to process, honor and pay all prepetition checks issued by, and fund transfer made from, the Debtors with respect to employee wages and Employee Benefits that were not processed, honored or paid as of Petition Date, subject to the provisions of any post-petition financing order, and provided, however, the Banks will not honor checks: (a) for services rendered 180 days prior to the Petition Date, or (b) if payment of same would cause the employee to exceed the maximum $12,425 maximum priority allowance under Bankruptcy Code section 507(a)(4).

88.    The Debtors also seek to reimburse employees for expenses incurred by such employees in the ordinary course of business. Such accrued expenses are negligible and do not aggregate more than several hundred dollars for all of the Employees, collectively.

89.    The obligations for which the Debtors seek authorization to honor were earned by individuals employed by the Debtors, and are services rendered within one hundred and eighty (180) days before commencement of the Debtors' case. The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

90.    The Debtors submit that the Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein. Without the requested relief, the Debtors' stability would likely be seriously undermined at the outset of these Chapter 11 Cases. Any delay in paying prepetition wages, benefits, and deductions or expenses would seriously harm the Debtors' relationship with its Employees and could irreparably impair employee morale at the very time the deduction, confidence and cooperation of the Employees is most critical. Nor can the Debtors afford to jeopardize patient safety by the destabilization of the employee workforce.

**D. Motion Pursuant to Sections 102(1), 105(a), and 105(d) of the Bankruptcy Code and Rules 1015(c), 2002(m), 9006, 9007, 9014 and 9036 of the Federal Rules of Bankruptcy Procedure for an Order Establishing Case Management Procedures**

91.    In order to streamline the administration of the Debtors' estates and increase overall efficiencies, the Debtors are seeking to establish certain procedures (the "**Case Management Procedures**") which will govern and alleviate certain noticing and related administrative burdens and costs for the Court, the Debtors' estates and all parties in interest. The Debtors anticipate that these cases will be complex, involving many secured and unsecured claims — some of which may be disputed and potentially litigated. It is expected that many of these potential claimants and parties-in-interest will file requests for notice of filings pursuant to Bankruptcy Rule 2002(i). The Debtors also expect the filing of numerous motions and applications in these cases. The proposed Case Management Procedures will permit the orderly and efficient presentation of such claims and filings to the Court.

92.    The Case Management Procedures (a) establish requirements for filing and serving notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents and other papers filed in these Chapter 11 Cases, (b) delineate standards for service of notices of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for scheduling hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court. Given the size and scope of these Chapter 11 Cases, the Debtors believe that the Case Management Procedures will facilitate the efficient administration of these Chapter 11 Cases and permit less burdensome and costly service of Court Papers while still ensuring that appropriate notice is provided. Thus, pursuant to Bankruptcy Rule 2002, the Debtors are seeking approval for the Case Management Procedures and request that the procedures be implemented.

2694768v.8

**E. Motion Pursuant to 11 U.S.C. §§ 105 and 366 of the Bankruptcy Code Prohibiting Utilities from Altering, Refusing or Discontinuing Service to, or Discriminating Against the Debtors, Determining Utilities are Adequately Protected and Establishing Procedures for Determining Requests for Adequate Assurance of Payment ("Utility Motion")**

93.     In connection with the operation of their businesses and management of their properties, the Debtors obtain water, heat, natural gas, oil, electricity, trash removal, telephone and other similar services (collectively, "**Utility Services**") at the Debtors' facilities, including those listed on Exhibit B to the Utility Motion (the "**Utility Service List**"). Uninterrupted utility services are essential to the Debtors' ongoing operations, and to their Chapter 11 efforts. Should any utility company (the "**Utility Providers**") refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, which could pose life threatening hazards and consequences for the Debtors' patient population. It is therefore absolutely critical that utility services continue uninterrupted.

94.     In the past twelve (12) months, the Debtors paid an average of approximately $48,000 per month on account of Utility Services. The Debtors intend to pay all postpetition obligations owed to their utility companies in a timely manner. To that end, the Debtors have developed a postpetition budget that contemplates full payment of their utility obligations. In addition, the Debtors propose to deposit, as adequate assurance, $24,000 into a newly created, segregated escrow account (the "**Utility Reserve**") for the benefit of utilities providing services to the Medical Centers within 20 days of the Petition Date. The Utility Reserve equals 15 days of the Debtors' estimated aggregate postpetition utility expenses for the Medical Centers, based upon average usage for the last 12 months.

95.     The Debtors submit that the Utility Reserve, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the

"**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers.   Nonetheless, if any Utility Provider believes additional assurance is required, the Debtors propose that such Utility Provider be required to adhere to the adequate assurance procedures (the "**Adequate Assurance Procedures**") detailed in the motion.   The Adequate Assurance Procedures will permit the Debtors to evaluate requests for additional adequate assurance on a case-by-case basis and allow the Debtors to work with the Utility Providers to consensually resolve any adequate assurance issues.

96.     As further detailed in the motion, the relief requested pursuant to the motion is necessary, fair to the Utility Providers, and in the best interests of the Debtors' estates and creditors.

**F. Application Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Garfunkel Wild, P.C. as Counsel for the Debtors**

97.     The Debtors have been informed that the members and associates of Garfunkel Wild, P.C. ("GW") who will be engaged in these Chapter 11 Cases and who will appear before this Court are admitted to practice before this Court.   The Debtors have selected GW as their general bankruptcy counsel because GW and its attorneys have extensive experience and knowledge in the fields of debtors' and creditors' rights, debt restructuring and corporate reorganizations, healthcare, tax law, real estate matters, employee benefits and commercial litigation, among other areas.

98.     GW has represented the Debtors on numerous legal matters in the past, and brings to this case a unique perspective and knowledge base.   Among other things, GW has for approximately thirty (30) years represented LBMC and Komanoff as general counsel providing a broad array of legal services including healthcare, financing, litigation and real estate related

34

work. As a consequence, GW is intimately familiar with the Debtors' business and financial affairs, and given the length of its representation, GW is uniquely positioned to serve the Debtors in these cases.

99. In July, 2013, as the Debtors' financial circumstances continued to deteriorate, GW was asked by the Debtors to provide advice with respect to its exigent financial issues, including among other things, (i) assisting in the development of a restructuring plan or asset disposition that addressed existing indebtedness (ii) assisting in the negotiation, documentation and closing of any potential transaction to partner with another healthcare system for the preservation and expansion of healthcare delivery in the Debtors' community; (iii) interfacing with the NYS Department of Health, CMS and any other regulatory agencies in the implementation of any restructuring or merger plan; (iv) providing any related transactional or litigation counsel or advice that may be required; and (v) providing representation and counsel in developing and implementing strategies to deal with creditor constituencies. As part of the retention, the Debtors also requested that GW provide guidance relative to the defense of pending litigations commenced by various contractors and vendors in connection with the Debtors' efforts to remedy the damage and restore their premises, following the destruction caused by Superstorm Sandy (the "**Construction Litigation**"). GW's assistance was also requested in connection with the preparation of a proper response to administrative demands and subpoenas issued by the Medicaid Fraud Control Unit ("**MFCU**") with respect to a pending regulatory investigations relating to Komanoff (the "**Komanoff Investigation**").

100. In the months leading up to the Chapter 11 filing, GW has been actively involved in this representation. In addition to the significant work required to prepare the filing, including, inter alia, the preparation of the petitions, schedules, statements of affairs, ancillary

documents and first day motions, the negotiation and documentation of loan facilities and drafting of a motion to approve DIP financing, GW has devoted a substantial amount of time over the last several months negotiating the terms of an asset purchase agreement with South Nassau Communities Hospital ("**SNCH**") for the sale of substantially all of the Debtors' real property assets relating to the Hospital and the real property and operating assets of the Nursing Home and preparing to file a motion to approve bid procedures and that sale (the "**Preparation Services**"). Throughout this time, GW has also continued to assist and represent the Debtors in the resolution of the Construction Litigations and the Komanoff Investigation.

101.    Given the level of GW's involvement to date, the firm is uniquely and well qualified and able to continue to represent the Debtors for the matters in respect of which the firm is to be engaged in this case in a most efficient and timely manner. If the Debtors are required to retain attorneys other than GW in connection with these Chapter 11 Cases, the Debtors and their estates would be prejudiced by the time and expense necessary for such attorneys to become familiar with the Debtors' business operations. In addition, the Debtors have directed GW to work cooperatively with the other professionals retained in this case to avoid duplication and inefficiency.

## G. Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) Appointing GCG, Inc. as Claims and Noticing Agent for the Debtors

102.    The Debtors are seeking the appointment of GCG, Inc. to act as the official claims and noticing agent for these Chapter 11 cases, and assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' Chapter 11 cases. The Debtors anticipate that there will be in excess of 2000 entities to be noticed in these cases. In view of the number of anticipated claimants and

complexity of these cases, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors, their estates and all creditors.

103.    By appointing GCG, Inc. as the Claims and Noticing Agent in these Chapter 11 cases, the distribution of notices and the processing of claims will be expedited, and the Clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

104.    GCG, Inc. has acted as the claims and noticing agent in numerous cases of comparable size in this District, many of which are currently pending before the Court.  GCG, Inc. has significant expertise in these matters and is well qualified to act as the claims and noticing agent in these cases.  Prior to the Petition Date the Debtors provided GCG, Inc. a retainer in the amount of $20,000.  No other payments have been made by the Debtors to GCG, Inc. in the year preceding the filing of their Chapter 11 cases.

[Remainder of Page Intentionally Left Blank; Signature Page to Follow]

## CONCLUSION

The Debtors' objective in these bankruptcy cases is to carry out the sale of substantially all of their assets while minimizing loss to their estates and safeguarding the welfare of their patients. I believe that, if this Court approves the First Day Motions, which are designed to allow the Debtors to safely operate while completing the contemplated sale process in a manner consistent with the terms and objectives of the Bankruptcy Code, the prospect for achieving these objectives will be substantially enhanced, thus maximizing the benefit for the estates' creditors.

Douglas Melzer, President and CEO

Sworn to me this 18th day
of February, 2014

Notary Public

FANY COHEN
Notary Public, State of New York
No. 31CO52946904
Qualified in Nassau County
Commission Expires June 28, 2015

# EXHIBIT B

# SCHEDULES TO 1007-4 AFFIDAVIT

## Consolidated List of 30 Largest Creditors

Contemporaneously with the filing of their petitions, the Debtors filed a motion requesting, among other things, authority to file a consolidated list of the 30 largest unsecured creditors (the "Top 30 List") in lieu of separate lists of each Debtor's 20 largest unsecured creditors. Attached hereto is the Top 30 List which is based on the Debtors' books and records as of approximately January 31, 2014. The Top 30 List was prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtors' Chapter 11 Cases. The Top 30 List does not include: (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101; or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

The information contained herein, including any claim amounts, shall not constitute an admission of liability by, nor is it binding, upon the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| (1)<br>Name of creditor and complete mailing address including zip code | (2)<br>Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Amount of claim [if secured, also state value of security' | (5)<br>Indicate if claim is contingent, unliquidate, disputed, or subject to setoff |
|---|---|---|---|---|
| Empire Healthchoice HMO, Inc. | P.O. Box 11744<br>Newark, NJ 07101-4744<br>Attn: Tom Buckman<br>Email:tom.buckman<br>@empireblue.com<br>Tel: 212-476-3246 | Benefit | 2,958,240.19 | |
| DMS Disaster Recovery Consultants | 3651 Fau Blvd., Ste 400<br>Boca Raton, FL 33431<br>Attn: David Schapiro<br>Email:David.Shapiro<br>@DMSrecovery.com<br>Tel. 919-696-6003 | Trade Debt | 1,169,278.00 | |
| LIPA | 15 Park Drive<br>Melville, NY 11746<br>Attn: Brian Hassan<br>Email:<br>Brain.Hassan@lipangrid.com | Trade Debt | 820,290.00 | |
| ChemRx | P.O. Box 1060<br>Long Beach, NY 11561<br>Attn: Susan Mitch<br>Tel. 516 992-3642<br>Fax. 516-889-8732 | Trade Debt | 818,385.30 | |

| (1)<br>Name of creditor and complete mailing address including zip code | (2)<br>Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Amount of claim [if secured, also state value of security' | (5)<br>Indicate if claim is contingent, unliquidated disputed, or subject to setoff |
|---|---|---|---|---|
| Empire Healthchoice Assurance, Inc. | P.O. Box 11744<br>Newark, NJ 07101-4744<br>Attn: Tom Buckman<br>Email:tom.buckman<br>@empireblue.com<br>Tel. 212-476-3246 | Benefit | 751,105.11 | |
| HIP | P.O. Box 9329 GPO<br>New York, NY 10087-9329<br>Attn: Ruben Ortiz<br>Email:<br>rortiz@emblemhealth.com<br>Tel. 646-447-6991 | Benefit | 543,371.65 | |
| ServPro | 1 Bishop Street<br>Norwalk, CT 06851<br>Tel. 516-445-6605 | Trade Debt | 353,981.25 | |
| EMS Restoration | 200 Blydenburgh Road<br>Islandia, NY 11749<br>Attn: Lucy A. Illuminato<br>Email:<br>emsrestoration@optonline.net<br>Tel. 631-952-5700 | Trade Debt | 293,943.00 | |
| National Grid | 15 Park Drive<br>Melville, NY 11746<br>Attn: Brian Hassan<br>Email:<br>Brian.Hassan@lipangrid.com | Trade Debt | 271,888.00 | |
| NES | P.O. Box 277001<br>Atlanta, GA 30384-7001<br>Attn: Kim Jones<br>(800) 394-6376 | Trade Debt | 265,377.75 | |
| Physicians Reciprocal Insurers | 1800 Northern Blvd<br>Roslyn, NY 11576-5897<br>Attn: Jeanne H. Braun, Sr. VP<br>Tel. 516-365-6690 | Trade Debt | 261,025.00 | |

| (1)<br>Name of creditor and complete mailing address including zip code | (2)<br>Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Amount of claim [if secured, also state value of security' | (5)<br>Indicate if claim is contingent, unliquidated disputed, or subject to setoff |
|---|---|---|---|---|
| Modern Medical Systems Co. | 170 Finn Court<br>Farmingdale, NY 11735<br>Attn: Vincent Lombardo<br>Email:<br>vlombardo@modmedsys.com<br>Tel. 800-736-8257 ext. 215 | Trade Debt | 204,314.09 | |
| Allen Healthcare | Lockbox Dep Acct 4832042876<br>P.O. Box 417780<br>Boston, MA 02241-7780<br>Attn: Lyudmila Kolisnyk<br>Email:<br>Lyudmila@allenhealth.com<br>Tel. 718-657-2966<br>Fax. 718-506-9908 | Trade Debt | 195,857.00 | |
| Better Home Health | 310 Merrick Road<br>Rockville Center, NY 11570<br>Tel. 516-763-3260<br>Fax. 516-763-4296 | Trade Debt | 182,105.62 | |
| Royal Disposable Import & Domestic | 57-00 49th Place<br>Maspeth, NY 11378<br>Tel. 718-381-5555<br>Fax. 718-381-6550 | Trade Debt | 180,965.00 | |
| Sunquest Hospital Systems | P.O. Box 75214<br>Charlotte, NC 28275-0214<br>Attn: Maggie Nham<br>Email:Maggie.Nham<br>@sunquestinfo.com<br>Tel. 520-570-2209<br>Fax. 520-570-2990 | Trade Debt | 180,118.60 | |
| Loeb & Troper | 655 Third Avenue<br>12th Floor<br>New York, NY 10017<br>Attn: Harold Gelernter<br>Email:HGelernter<br>@loebandtroper.com<br>Tel. 212-867-4000 | Trade Debt | 180,000.00 | contingent |

| (1) Name of creditor and complete mailing address including zip code | (2) Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Amount of claim [if secured, also state value of security' | (5) Indicate if claim is contingent, unliquidated disputed, or subject to setoff |
|---|---|---|---|---|
| ADMS | 385 Seneca Avenue Ridgewood, NY 11385 Tel. 718-483-7414 | Trade Debt | 164,529.12 | |
| State Insurance Fund | P.O. Box 5262 Binghamton, NY 13902-5262 Attn: Bart Simon Email: bart.simon@RMPG.com Tel. 516-535-4930 | Trade Debt | 157,185.50 | |
| Hess Small Business Services | 1040 East 149th Street Bronx, NY 10455-5014 Tel. 888-494-4377 | Trade Debt | 150,492.11 | |
| LBH249 LLC | 2555 Ocean Avenue Brooklyn, NY 11229 Attn: Alan Pilevsky Tel. 718 616-2000 | Trade Debt | 149,127.00 | |
| NTT Data, Inc. | P.O. Box 4201 Boston, MA 02211 Attn: Jim Laboyne Email: james.laboyne@nttdata.com Tel. 631-824-5205 | Trade Debt | 148,914.00 | |
| New York Blood Center | P.O. Box 9674 Uniondale, NY 11553-9814 Accts Receivable Dept Email: accts recnybc@nybloodcenter.org Tel. 516-478-5223 Fax. 516-478-5213 | Trade Debt | 148,223.70 | |
| Iron Mountain Records Management | P.O. Box 27128 New York, NY 10087-7128 Tel. 800-934-3453 | Trade Debt | 142,135.09 | |
| Quest Diagnostics | 7402 Collection Center Dr Chicago, IL 60693 Tel. 866-865-2806 Fax. 201-462-6760 | Trade Debt | 136,337.12 | |

| (1) *Name of creditor and complete mailing address including zip code* | (2) *Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3) *Nature of claim (trade debt, bank loan, government contract, etc.)* | (4) *Amount of claim [if secured, also state value of security'* | (5) *Indicate if claim is contingent, unliquidated disputed, or subject to setoff* |
|---|---|---|---|---|
| Toshiba America Medical Systems | P.O. Box 91605 Chicago, IL 60693 Tel. 800-421-1968 | Trade Debt | 130,435.20 | |
| Risk Management Planning Group | P.O. Box 528 Mineola, NY 11510 Attn: Bart Simon Email: bart.simon@RMPG.com Tel. 516-535-4920 | Trade Debt | 111,930.01 | |
| Gem Healthcare Agency | 49 West Merrick Road Suite 201 Freeport, NY 11520 Email:info @gemhealthcareagency.com Tel. 516-255-5400 | Trade Debt | 108,251.00 | |
| HANYS | P.O. Box 5535 GPO New York, NY 10087-5535 Attn: Daniel Del Pozzo Email: ddelpozz@hanys.org Tel. 518-431-7787 | Trade Debt | 101,011.73 | |
| Relay Health | P.O. Box 403421 Atlanta, GA 30384-3421 Email: arissues@mckesson.com Tel. 800-632-1155 | Trade Debt | 97,240.29 | |

**Holders of Five Largest Secured Claims against the Debtors**

In accordance with Local Rule 1007-4(a) (vi), the following chart lists the five largest secured claims against the Debtors.

The information contained herein, including any claim amounts, shall not constitute an admission of liability or of a proper security interest or lien by, nor is it binding, upon the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor | Address | Amount of Claim[1] | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|
| PBGC | 1200 K Street, N.W. Washington, DC 20005 | 9,000,000.00 | Tax Lien | |
| Northstar Recovery | 35 Corporate Drive Ste. 1155 Trumbull, CT 06611 | 3,746,537.00 | Mechanic's Lien | |
| NYS Department of Labor | U.I. Employer Services – Nassau District Office 301 W. Old Country Road Hicksville, NY 11801 | 3,012,334.14 | Lien | |
| First Central Savings | 70 Glen Street Glen Cove, NY 11542 | 2,641,000.00 | Mortgage | |
| South Nassau Communities Hospital | One Healthy Way Oceanside, NY 11572 | 1,500,000.00 | Pre-Petition Credit Agreement | |

---

[1] The scheduled amounts reflects only the purported secured portion of such creditor's claims and do not reflect any unsecured claims they may have.

## Summary of Debtors' Assets and Liabilities

In accordance with Local Rule 1007-4 (a)(vii), the Debtors' estimated assets and liabilities, as of December 31, 2013, on a consolidated basis, are as follows:

Total Assets    $21 million

Total Liabilities  $48 million

The financial data set forth herein shall not constitute an admission of liability by the Debtors. The Debtors further reserve all rights to assert that any claim or debt listed herein as liquidated or fixed is in fact a disputed claim or debt.  The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt.

## Shares of Stock, Debentures, or Other Securities

In accordance with Local Rule 1007-4 (a) (viii), the The Debtors are a a not-for-profit corporation. Accordingly, there are no shares of stock of the Debtors that are publicy held. Furthermore, there are no debentures or other securities of the Debtors that are publicy held.

## Debtors' Property in Possession of Third Parties

Pursuant to Local Rule 1007-4(a)(ix), to the best of the Debtors' knowledge, none of the Debtors has any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity, other than, if any:

(i) bank accounts, including, without limitation, those escrow accounts with Wilmington Trust for HFA, and the proceeds of certain insurance policy being held by First Financial, that may be subject to claims of setoff by the Debtors' lenders, or their agents (collectively, the "Lenders");

(ii) various security deposits held by certain lessors, utility companies, regulatory agencies and others; and

(iii) property transferred by the Debtors to third parties for purposes of storage, repair, and/or delivery, in their ordinary course of business.

(iv) FEMA funds which were seized by the Department of Labor prior to distribution to Debtors.

The foregoing information contained shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt. The Debtors further reserve the right to supplement this schedule if additional property is identified as being held by a third party.

## Debtors' Premises

Pursuant to Local Rule 1007-4(a)(x), the following chart lists the premises owned, leased, or held under other arrangement from which the Debtor operates its businesses:

| Debtor/Lessee | Property Address | Type of Interest |
|---|---|---|
| Long Beach Medical Center | 455 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 375 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 455 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 760 Lincoln Blvd.<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 762 Lincoln Blvd.<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 479 State Street<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 425 State Street<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 415 State Street<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 758 Lincoln Blvd.<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 400 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 375 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 765 Franklin Street<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 761 Franklin Street<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 757 Lincoln Street<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 711 Lincoln Street<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 440 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | Vacant Land | Owned |
| Long Beach Medical Center | 416 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 420 E. Bay Drive<br>Long Beach, NY 11561 | Owned |

| Debtor/Lessee | Property Address | Type of Interest |
|---|---|---|
| Long Beach Medical Center | 426 E. Bay Drive<br>Long Beach, NY 11561 | Owned |
| Long Beach Medical Center | 206 West Park Avenue<br>Long Beach, NY 11561 | Leased |
| Long Beach Medical Center | 950 Church Street<br>Baldwin, NY 11510 | Leased |
| Long Beach Medical Center | 249 East Park Avenue<br>Long Beach, NY 11561 | Leased |

## Location of Debtors' Substantial Assets and Books and Records

Pursuant to Local Rule 1007-4(a)(xi), the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside of the territorial limits of the United States is as follows:

*Location of Debtors' Substantial Assets*

455 E Bay Drive
Long Beach, NY 11561

*Location of Debtors' Books and Records*

455 E Bay Drive
Long Beach, NY 11561

*Nature, Location and Value of Assets Held Outside of the United States*

None.

**Summary of Actions or Proceedings Pending Against the Debtors Where a Judgment or Seizure May Be Imminent**

In accordance with Local Rule 1007-4(a) (xii), there are no known actions or Proceedings Pending Against the Debtors Where a Judgment or Seizure May be Imminent.

### Senior Management of the Debtors

Pursuant to Local Rule 1007-4(a) (xiii), the following chart lists the names of the Debtors' existing senior management.

| Name | Tenure in Position | Position | Responsibilities |
|------|--------------------|----------|------------------|
| Douglas L. Melzer | 03/07/77 | President/CEO | Responsible for directing, coordinating and supervising the business affairs and properties of LBMC along with the administration of LBMC in all its activities and departments. |
| Stanley Weber | 01/19/05 | Chief Financial Officer | Directs the Debtors' financial planning and accounting practices. |
| Cheryl Chapman | 01/16/75 | VP Hospital Operations | Responsible for leading, planning and directing all operational functions of the Hospital. |
| Dennis H. Conway | 07/20/92 | Administrator -- Long Term Care | Administrator of Nursing Home, Home Care and Behavior Health Services |

## Payroll

Pursuant to Local Rule 1007-4(a) (xiv)-(xv), the following provides the estimated amount of payroll to the Debtors' employees (not including officers and directors) and the estimated amount to be paid to officers, stockholders and financial and business consultants for the thirty (30) day period following the filing of the Chapter 11 Petition.

| | |
|---|---|
| **Payments to Employees (Not Including Officers and Directors)** | $900,000.00 |
| **Payments to Officers and Directors** | $88,000.00 |
| **Payments to Financial and Business Consultants** | $200,000.00 |

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petition**

Pursuant to Local Rule 1007-4(a)(xvi), the following provides, for the 30-day period
following the filing of the Debtors' Chapter 11 Petition, the estimated cash receipts and
disbursements, estimated cash gain or loss, and estimated obligations and receivables expected to
accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $1,145,667.00 |
| **Cash Disbursements** | $2,190,046.00 |
| **Net Cash Gain/Loss** | ($969,379.00) |
| **Obligations expected to accrue but unpaid** | $462,000.00 |
| **Receivables expected to accrue but unpaid** | $1,100,000.00 |

2765640v.1